

RECEIVED

JAN 0 3 2018

CLERK
U.S. DISTRICT COURT
LINCOLN

PETITIONER

BY SPECIAL APPEARANCE ONLY

AMBASADOR Michael Parsons OF THE SOVERIGN TSILHQOT'IN NATION-

COUNTRY OF THE CHILCOTIN, A LIVE MAN UNDER DURESS, WITHOUT PREJUDICE,

CURRENTLY HELD AGAINST MY WILL AT THE SALINE COUNTY JAIL, WILBER NEBRASKA

TO,

8TH CIRCUIT COURT OF APPEALS

c/o CLERK OF THE COURT

100 CENTENNIAL MALL, SUITE 587 FEDERAL BUILDING

LINCOLN, NEBRASKA 68508

NOTICE

DEMAND AS A MATTER OF RIGHT, ORDER TO SET ASIDE ORDER #37 OF JUDGE

GERRARD AND ORDER A STAY OF ORDER BY JUDGE ZWART TO FORCABLY

INJECT ME WITH AN UNKNOWN AND UNSAFE TB TEST OR X-RAY IN VIOLATION OF

INTERNATIONAL LAW, THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS-

(VCDR) ON 18 APRIL 1961. ENTERED INTO FORCE ON 24 APRIL 1964. UNITED NATIONS,

TREATY SERIES, VOL. 500, P. 95, THE UNITED STATES CONSTITUTION AMENDMENTS

#1, FREEDOM OF RELIGION, #9 RIGHTS RETAINED BY THE PEOPLE, THE McKYES DECISION

BY THE U.S. SUPREME COURT AND 28 U.S.C. SECTION 1330, ALL OF WHICH WERE NOT

ADDRESSED BY THE COURT IN PETITIONERS' NOTICE OF DECEMBER 25, 2017, AND

DISMISS OR TRANSFER THIS MATTER TO THE ARTICLE III SECTION 2 CONSTITUTIONAL

COMMON LAW COURT OF ORIGINAL JURISDICTION IN ALL CASES AFFECTING AMBASADORS.

FACTS

ON DECEMBER 29, 2017, FRIDAY NIGHT AT 18:00 HOURS PM. A FAXED COPY OF AN

ORDER DATED DECEMBER 27, 2017 AND SIGNED BY "BY THE COURT JOHN M. GERRARD

UNITED STATES DISTRICT JUDGE" WAS RECEIVED AT THE SALINE COUNTY JAIL AND

DELIVERED TO ME AT 6:30 PM, THEREIN, THE COURT, "A DISTRICT COURT MAY

RECONSIDER A MAGISTRATE JUDGE'S RULING... WHEN IT HAS BEEN SHOWN THAT THE

①

RULING IS CLEARLY ERRONEOUS OR CONTRARY TO LAW." PERTAINING TO
THE MAGISTRATE JUDGE'S ORDER (FILING #33) GRANTING THE GOVERNMENTS
MOTION TO COMPEL (FILING 13)... "UPON REVIEW OF THE RECORD, THE COURT
FINDS NO ERROR, AND WILL OVERRULE THE OBJECTION."

HOWEVER, THE COURT FAILED TO ADDRESS PETITIONERS EXHIBIT 113 ON
12/20/2017 WHICH IS CONFIRMATION BY THE U.S. DEPARTMENT OF STATE
OF MY AMBASSADORS' A.1 DIPLOMATIC VISA. CONFIRMATION NO. AA006NW076
FOR THE TSILHQOT'IN NATION· COUNTRY OF THE CHILCOTIN, EXHIBIT 112 ON
12/20/2017 IS A LETTER FROM HEREDITARY GRAND CHIEF STANLEY STUMP SR OF
THE TSILHQOT'IN NATION- COUNTRY OF THE CHILCOTIN IDENTIFYING, "PETITIONER
AS THEIR AMBASSADOR, ASSOCIATE CHIEF JUSTICE, TSILHQOT'IN TRIBAL MEMBER,
MEMBER OF THEIR GOVERNING BODY, THE CHILCOTIN NATIONAL CONGRESS AND THAT
I AM NOT A U.S. CITIZEN. THE APPOINTMENT OF PETITIONER AS AMBASSADOR BY HEREDITARY
GRAND CHIEF STANLEY STUMP SR ON JANUARY 01, 2016 WAS NOTIFIED TO FORMER
SECRETARY OF STATE JOHN KERRY AND THE AFORMENTIONED A.1 VISA WAS COMPLETED
ON JANUARY 19,2017, AND EXIDIT 111 ON 12/20/2017 IS AN ENLARGMENT OF MY
STATUS CARD ISSUED ON JULY 01, 2016 AND LISTING PETITIONER AS AMBASSADOR,
JUSTICE, DIPLOMATE. THIS IS THE EVIDENCE IN THE RECORD THAT IS UNDISPUTED
AND SUPPORTS MY DIPLOMATIC STATUS, (SEE EXHIBITS 111, 112 AND 113 ATTACHED)

CONTRARY TO THIS COURTS SUGGESTION THAT RECOGNITION OF DIPLOMATIC IMMUNITY
IS ONLY OBTAINED BY "RECOGNITION BY THE STATE DEPARTMENT," (FOOTNOTE PAGE 4)
THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS APRIL 18,   1961 STATES AND
AS A SIGNATOR TO, THE UNITED STATES OF AMERICA IS BOUND TO THAT AGREEMENT;
ARTICLE 39, (1) EVERY PERSON ENTITLED TO PRIVILEGES AND IMMUNITIES
SHALL ENJOY THEM, FROM THE MOMENT WHEN HIS APPOINTMENT IS NOTIFIED
TO THE MINISTRY OF FOREIGN AFFAIRS OR SUCH OTHER MINISTRY AS MAY BE
AGREED, THEREFORE, PETITIONER HAS HAD DIPLOMATIC IMMUNITY SINCE NOTIFICATION
TO THE U.S. DEPARTMENT OF STATE IN JANUARY 2016, A.1 VISA CONFIRMATION 19 JAN 2017

2

FURTHERMORE, UNITED STATES CODE 28 SECTION 1330 STATES,

"AMBASSADORS ARE IMMUNE FROM PROSECUTION IN ANY U.S. COURT,

ARTICLE 29 OF THE (VCDR) STATES; THE PERSON OF A DIPLOMATIC AGENT SHALL BE INVIOLABLE. HE SHALL NOT BE LIABLE TO ANY FORM OF ARREST OR DETENTION. THE RECEIVING STATE SHALL TREAT HIM WITH DUE RESPECT AND SHALL TAKE ALL APPROPRIATE STEPS TO PREVENT ANY ATTACK ON HIS PERSON, FREEDOM OR DIGNITY.

ARTICLE 31 OF THE VCDR STATES; (1). A DIPLOMATIC AGENT SHALL ENJOY IMMUNITY FROM THE CRIMINAL ; CIVIL OR ADMINISTRATIVE JURISDICTION.

(2). A DIPLOMATIC AGENT IS NOT OBLIGED TO GIVE EVIDENCE AS A WITNESS.

(3). NO MEASURE OF EXECUTION MAY BE TAKEN IN RESPECT OF A DIPLOMATIC AGENT.

ARTICLE 22 OF THE VCDR STATES; : (1). THE PREMISES OF THE MISSION SHALL BE INVIOLABLE. THE AGENT OF THE RECEIVING STATE MAY NOT ENTER THEM, EXCEPT WITH THE CONSENT OF THE HEAD OF THE MISSION. (2). THE RECEIVING STATE IS UNDER A SPECIAL DUTY TO TAKE ALL APPROPRIATE STEPS TO PROTECT THE PREMISES OF THE MISSION AGAINST INTRUSION OR DAMAGE AND TO PREVENT ANY DISTURBANCE OF THE PEACE OF THE MISSION OR IMPAIRMENT OF ITS DIGNITY.

(3). THE PREMISES OF THE MISSION, THEIR FURNISHINGS AND OTHER PROPERTY THEREON AND THE MEANS OF TRANSPORT OF THE MISSION SHALL BE IMMUNE FROM SEARCH, REQUISITION, ATTACHMENT OR EXECUTION.

AS A SIGNATOR TO THE MONTEVIDEO CONVENTION ON RIGHTS AND DUTIES OF STATES, DECEMBER 26, 1933, THE UNITED STATES OF AMERICA IS BOUND TO THE AGREEMENT THAT; ARTICLE 3; THE POLITICAL EXISTENCE OF THE STATE IS INDEPENDENT OF RECOGNITION BY OTHER STATES. EVEN BEFORE RECOGNITION, THE STATE HAS THE RIGHT TO DEFEND ITS INTEGRITY AND INDEPENDENCE, TO PROVIDE FOR ITS CONSERVATION AND PROSPERITY, AND CONSEQUENTLY TO ORGANIZE ITSELF AS IT SEES FIT, TO LEGISLATE UPON ITS INTERESTS, ADMINISTER ITS SERVICES, AND TO DEFINE THE JURISDICTION AND COMPETENCE OF ITS COURTS,

THE EXISTENCE OF THESE RIGHTS HAS NO OTHER LIMITATION THAN THE EXERCISE OF THE RIGHTS OF OTHER STATES ACCORDING TO INTERNATIONAL LAW.

ARTICLE 4; STATES ARE JURIDICALLY EQUAL, ENJOY THE SAME RIGHTS, AND HAVE EQUAL CAPACITY IN THEIR EXERCISE. THE RIGHTS OF EACH ONE DO NOT DEPEND UPON THE POWER WHICH IT POSSESSES TO ASSURE ITS EXERCISE, BUT UPON THE SIMPLE FACT OF ITS EXISTENCE AS A PERSON UNDER INTERNATIONAL LAW.

ARTICLE 5; THE FUNDAMENTAL RIGHTS OF STATES ARE NOT SUSCEPTIBLE OF BEING AFFECTED IN ANY MANNER WHATSOEVER.

ARTICLE 6; THE RECOGNITION OF A STATE MERELY SIGNIFIES THAT THE STATE WHICH RECOGNIZES IT ACCEPTS THE PERSONALITY OF THE OTHER WITH ALL THE RIGHTS AND DUTIES DETERMINED BY INTERNATIONAL LAW. RECOGNITION IS UNCONDITIONAL AND IRREVOCABLE.

ARTICLE 7; THE RECOGNITION OF A STATE MAY BE EXPRESS OR TACIT. THE LATTER RESULTS FROM ANY ACT WHICH IMPLIES THE INTENTION OF RECOGNIZING THE NEW STATE.

ARTICLE 8; NO STATE HAS THE RIGHT TO INTERVENE IN THE INTERNAL OR EXTERNAL AFFAIRS OF ANOTHER.

THE DELEGATION OF THE UNITED STATES OF AMERICA, IN SIGNING THIS AGREEMENT FURTHER EXPRESSED "THE UNITED STATES GOVERNMENT IS AS MUCH OPPOSED AS ANY OTHER GOVERNMENT TO INTERFERENCE TO FREEDOM, THE SOVEREIGNTY, OR OTHER INTERNAL AFFAIRS OR PROCESSES OF THE GOVERNMENTS OF OTHER NATIONS." CLEARLY, THESE EGALITARIAN PRINCIPALS, THAT ALL PEOPLE ARE EQUAL AND SHOULD HAVE THE SAME RIGHTS AND OPPORTUNITIES ENSHRINED IN THESE ARTICLES, THIS DELEGATION'S EXPRESSION AS EVIDENT IN THE CONSTITUTION FOR THE UNITED STATES OF AMERICA ARE WHAT ONE WOULD EXPECT TO BE DEMONSTRATED BY THE AGENTS OF THE UNITED STATES OF AMERICA. THE FBI CLEARLY DOES NOT. WILL THIS COURT?

THE UNIFORM ENFORCEMENT OF FOREIGN JUDGMENTS ACT OF 1947 IS A UNIFORM

LAW GIVING THE HOLDER OF A FOREIGN JUDGMENT THE RIGHT TO LEVY AND EXECUTE AS IF IT WERE A DOMESTIC JUDGMENT. ON DECEMBER 2, 2015 I WAS EXONERATED OF ALL 2009 CONVICTIONS FROM TEAHOUSE BY THE UNIVERSAL SUPREME COURT OF THE TSILHQOT'IN. THEREFORE, THE UNDERLYING CHARGE OF BEING IN POSSESSION OF A WEAPON AFTER HAVING BEEN CONVICTED OF A STATUTE CARRYING A SENTENCE OF A YEAR AND A DAY IS VOID ON ITS FACE, (SEE ATTACHED REASONS FOR JUDGMENT)

THE TSILHQOT'N NATION V. BRITISH COLUMBIA, 2014 SCC 44 RECOGNITION OF THE AUTONOMY OF THE TSILHQOT'IN NATION AND ITS PEOPLE BY THE SUPREME COURT OF CANADA IS UNDISPUTABLE PROOF OF THEIR EXISTANCE AND RECOGNITION OF THE TSILHQOT'N NATION FOR PURPOSES OF THE MONTEVIDEO CONVENTION ON RIGHTS AND DUTIES OF STATES, ARTICLE 3, "THEIR RIGHT TO ORGANIZE ITSELF AS IT SEES FIT, TO LEGISLATE UPON ITS INTERESTS, ADMINISTER ITS SERVICES, AND DEFINE THE JURISDICTION AND COMPETENCE OF ITS COURTS,

THE UNITED STATES MAGISTRATE JUDGE s/ CHERYL R. ZWART, DETENTION ORDER DECLARE, x AS A BASIS OF DENIAL OF RELEASE, "HAS SUBSTANTIAL CONTACTS WITH A FOREIGN COUNTRY AND COULD FLEE THE UNITED STATES BEFORE TRIAL," IS TACIT RECOGNITION OF THE TSILHQOT'IN NATION-COUNTRY OF THE CHILCOTIN, AND AS SUCH THE UNITED STATES COURTS MUST UPHOLD THE VCDR OF 1961 AND THE MCRD IS THE LAW OF THE LAND AND ORDER MY IMMEDIATE RELEASE.

WHEREFORE, THE CONSTITUTION FOR THE UNITED STATES OF AMERICA REPUBLIC STATES, "IN ALL CASES AFFECTING AMBASSADORS, THE SUPREME COURT SHALL HAVE ORIGINAL JURISDICTION ... ALL TREATIES MADE, OR WHICH SHALL BE MADE UNDER THE AUTHORITY OF THE UNITED STATES SHALL BE THE SUPREME LAW OF THE LAND, AND THE JUDGES IN EVERY STATE SHALL BE BOUND THEREBY AND JUDICIAL OFFICERS, ... OF THE SEVERAL STATES, SHALL BE BOUND BY OATH OR AFFIRMATION, TO SUPPORT THE CONSTITUTION." THEREFORE, THE PREJUDICIAL AND ARBITRARY ACTS OF THIS COURT DENYING MY GOD GIVEN RIGHTS AND THOSE GUARANTEED BY THE ORGANIC CONSTITUTION FOR THE REPUBLIC ARE VOID, FAILURE OF THIS COURT TO RESEND ITS ORDERS IS DEEMED WAR CRIMES,

CRIMES AGAINST HUMANITY AND CULTURAL GENOCIDE AND WILL BE REPORTED TO AND PROSECUTED BY THE INTERNATIONAL COURTS OF JUSTICE.

FURTHERMORE, THIS COURT HAS FAILED TO IDENTIFY THE UNDERLYING BASES FOR THE U.S.M.S. DEMANDING A T.B TEST WAS FOR TRANSPORTATION PURPOSE. OBVIOUSLY, TRANSPORTATION IS NO LONGER AN ISSUE. FURTHERMORE, THIS COURT HAS FAILED TO RECOGNIZE THAT THERE ARE OTHER WAYS TO TEST FOR T.B. THAT DO NOT REQUIRE EXPOSURE TO HAZARDOUS CHEMICALS OR RADITION THAT CAN CAUSE CANCER. AS SOMEONE HIGHLY LEARNED IN THE WAYS OF NATURAL MEDICINE I KNOW OF 2 ALTERNATIVE METHODS FOR NON-INVASIVE TESTING OF T.B. THAT DO NOT VIOLATE MY RELIGION. (1) A URINE TEST (2) A BREATHALIZER TEST, AND FURTHERMORE, THE U.S.M.S. IS A CORPORATION LISTED ON DUN+BRADSTREET WITH A CORPORATE ID, OR DUNS NUMBER OF 165329280. THEREFORE, THEY ARE NO MORE FEDERAL THAN FEDERAL EXPRESS AND WITHOUT A CONTRACT WITH ME WHEREBY I HAVE AGREED TO SOME PERFORMANCE ABSENT FRAUD, THREAT OR COERSION, THEY HAVE NO STANDING AND THEIR CLAIM IS FRIVOLOUS AND AS SUCH THE DISTRICT COURTS ORDERS ARE NULL, AND ULTRA VIRES.

AS THE UNDISPUTED AMBASSADOR OF THE TSILHEOT'IN NATION - COUNTRY OF THE CHILCOTIN AS DISCLOSED AND UNCHALLANGED BY PLAINTIFF, THIS COURT LACKS JURISDICTION AND PLAINTIFF LACKS STANDING. THAT WAS MY STATEMENT 12/18/2017 ALONG WITH THE FACTS' THAT I WAS GIVEN NO ADVANCE NOTICE OF THE MATTER BEFORE JUDGE ZWART'S FORUM PRIOR TO BEING FORCED INTO HER FORUM, TRIAL OR HEARING BY SURPRISE IS ILLEGAL IN EVERY LEGITIMATE COURT AND AS THIS IS THE CASE ALONG WITH MY NOTICES TO THE DISTRICT COURT JUDGE JOHN GERRARD WHO STATES ON PAGE 4 OF HIS ORDER "THE DEFENDANTS MOVED TO RECUSE THE MAGISTRATE JUDGE, CLAIMING THE MAGISTRATE JUDGE WAS BIASED... AFTER REVIEWING THE RECORD, THE COURT FINDS THE DEFENDANTS' MOTION TO RECUSE WERE NOT CLEARLY ERRONEOUS OR CONTRARY TO LAW." THE BASIS FOR THE MOTION TO RECUSE WAS THE FACT JUDGE ZWART HAD PRE PARED EVIDENCE AND CASE LAW AND PROVIDED IT TO PLAINTIFF 2 DAYS BEFRE THE HEARING. TO WHICH

PLAINTIFFS ATTORNEY JAN SHARP REPLIED, "THANK YOU JUDGE, I WILL REVIEW THIS BEFORE HEARING WEDNESDAY." CLEARLY THIS IS PROOF SHE IS WORKING TO SUPPORT THE U.S. MARSHAL AND U.S. ATTORNEY, GIVING HIM CITATION PREPERATION IN SUPPORT OF HIS POSITION IS PREJUDICAL AND AS SUCH, SHE SHOULD BE REMOVED FROM THIS MATTER AND REPLACED WITH SOMEONE WHO IS IMPARTIAL, AND ALL OF HER ORDERS SET ASIDE AS THEY ARE ALL TAINTED. ANYTHING LESS INSULTS THE INTEGRITY OF WHAT IS SAID TO BE A CONSTITUTIONAL COURT OF, FOR AND BY THE PEOPLE. THE APPEARANCE OF COLLUSION IS SO GREAT IN THIS MATTER THAT NOT TO RENDER THIS MATTER VOID FROM ITS INCEPTION WOULD CAUSE ANY REASONABLE MIND TO VIEW THIS FRAUD UPON THE COURT BY THE COURT VERIFICATION THIS IS NOTHING BUT A KANGAROO COURT AND A RIGGED GAME TO DEPRIVE ME OF MY LIBERTY. THEREFORE, I DEMAND AS A MATTER OF RIGHT, THIS MATTER BE DISMISSED OR TRANSFERED TO THE ARTICLE III SECTION 2 CONSTITUTIONAL COMMON LAW COURT OF ORIGINAL JURISDICTION IN ALL CASES AFFECTING AMBASSADORS.

### CERTIFICATE OF SERVICE

PETITIONER AMBASSADOR Michael Parsons OF THE SOVEREIGN TSILHQOT'IN NATION - COUNTRY OF THE CHILCOTIN, HEREBY CERTIFY THAT THE FORGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND THAT THE FORGOING HAS BEEN GIVEN TO THE CORRECTIONAL OFFICER FOR PLACEMENT INTO THE INSTITUTIONAL MAIL SYSTEM THIS JANUARY 01, 2018 AT THE SALINE COUNTY JAIL IN WILBER NEBRASKA AND ADDRESSED TO THE 8TH CIRCUIT COURT OF THE UNITED STATES, 100 CENTENNIAL MALL, FEDERAL BUILDING, LINCOLN NEBRASKA 68508, PER FEDERAL RULES IS DEEMED FILED TODAY, JANUARY 01, 2018. UNDER DURESS WITHOUT PREJUDICE

AMBASSADOR Michael Parsons
TSILHQOT'IN NATION - COUNTRY OF THE CHILCOTIN

c/o SALINE COUNTY JAIL P.O. BOX 911 WILBER NEBRASKA 68465

⑦

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ⸰⸰⸰⸰ ⸰⸰⸰⸰⸰⸰⸰⸰ ⸰⸰⸰⸰⸰ |
| Plaintiff, | 4:17-CR-3038 |
| vs. | |
| MICHAEL WAYNE PARSONS,[1] | ORDER |
| Defendant. | |

This matter is before the Court on the defendant's objection (filing 36) to the Magistrate Judge's order (filing 33) granting the government's motion to compel (filing 13), as well as the defendant's objection to the Magistrate Judge's order (filing 34) denying the defendant's motion to recuse. A district court may reconsider a magistrate judge's ruling on nondispositive pretrial matters only where it has been shown that the ruling is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); *Ferguson v. United States*, 484 F.3d 1068, 1076 (8th Cir. 2007). Upon review of the record, the Court finds no error, and will overrule the objection.

First, the government moved to compel the defendant to submit to tuberculosis testing. The defendant objected to the testing, claiming that the test impermissibly violates his right to free exercise of religion under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1(b).[2] *See*

---

[1] The defendant suggests that the spelling of his name in all capital letters invokes an "unknown entity," not him. He is wrong: in federal court, capitalization is a matter of style, not substance. *See Jaeger v. Dubuque Cty.*, 880 F. Supp. 640, 643-44 (N.D. Iowa 1995).

[2] RFRA has been held unconstitutional as applied to state and municipal governments. *See City of Boerne v. Flores*, 521 U.S. 507, 516 (1997). The Court assumes, without deciding,

filing 36. The Magistrate Judge determined, and the Court agrees, that the testing does not violate RFRA.

Generally speaking, RFRA prohibits the government from substantially burdening a person's exercise of religion, but that protection is not absolute. Indeed, infringements of a person's sincerely held religious beliefs will pass constitutional muster if: (1) the action furthers a compelling government interest; and (2) is the least restrictive means of furthering that governmental interest. 42 U.S.C. § 2000bb-1(b). The first prong of the analysis is satisfied here. The state has a strong interest in preserving the health and welfare of inmates, detainees, and prison staff. *See DeGidio v. Pung*, 920 F.2d 525, 528 (8th Cir. 1990); *Lareau v. Manson*, 651 F.2d 96, 109 (2d Cir. 1981). In fact, prison officials have an affirmative obligation to protect inmates from exposure to infectious diseases. Jolly v. Coughlin, 76 F.3d 468, 477 (2d Cir. 1996).

The second prong is also met. Indeed, in the Magistrate Judge's order granting the government's motion to compel, the defendant was given the opportunity to decide whether the TB testing would be done by subcutaneous injection or by chest x-ray. Filing 33 at 2. And although there is some disagreement among various courts as to precisely what tuberculosis tests comply with the least restrictive analysis, *compare Jolly*, 76 F.3d at 439 (finding the administration of the PPD test was not the least restrictive means) *with Karolis v. New Jersey Dep't of Corr.*, 935 F. Supp. 523, 528 (D.N.J. 1996) (determining that the Mantoux test is a least restrictive test),

that RFRA's protections extend to the application of a federal policy to a federal prisoner, despite his custody in the Saline County Jail. *See* filing 13 at 2-3. In any event, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, would afford the defendant essentially the same protection in state or local custody. *See Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 987 (8th Cir. 2004).

2

courts addressing the issue have consistently held that submission to chest x-rays and sputum samples satisfies the least-restrictive-means injury. *See Jolly*, 76 F.3d at 439 (holding the PPD test did not satisfy the least restrictive means analysis because the inmate could submit to periodic chest x-rays and sputum samples); *Jihad v. Wright*, 929 F. Supp. 325, 331 (N.D. Ind. 1996) (suggesting as a least restrictive measure that the officials could have required the defendant to submit to periodic chest x-rays or sputum samples). So, the defendant's submission to a chest x-ray for the purpose of testing for tuberculosis is the least restrictive means furthering the government's compelling interest in detecting, and preventing, the spread of infectious diseases.

The defendant also takes issue with the Marshals Service policy for TB testing, contending that the policy is only meant to apply to prisoners who are actively symptomatic. He is wrong about that—while the policy prescribes measures to be taken when a prisoner is suspected of having tuberculosis, it plainly provides for routine testing at intake. *See* filing 36 at 8. In any event, the defendant cites to no authority suggesting that the Marshals Service may not pursue testing in the absence of such a policy, or that the Marshals Service policy has the force of law enforceable by judicial decree. *Cf. Fanoele v. United States*, 975 F. Supp. 1394, 1400 (D. Kan. 1997).[3]

---

[3] The defendant also questions the Court's jurisdiction over him, purporting to be a foreign ambassador, and asserting diplomatic immunity pursuant to the Vienna Convention on Diplomatic Relations, Art. 31, Dec. 13, 1972, 23 U.S.T. 3227. But diplomatic status cannot be unilaterally established; rather, it depends on recognition by the Department of State. *See United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984), *aff'd*, 794 F.2d 806 (2d Cir. 1986); *Mazengo v. Mzengi*, 542 F. Supp. 2d 96, 99-100 (D.D.C. 2008); *see generally The Schooner Exch. v. McFaddon*, 11 U.S. 116, 138 (1812). The defendant has given the Court

3

Additionally, the defendant moved to recuse the Magistrate Judge, claiming the Magistrate Judge was biased. The Magistrate Judge denied the defendant's motion. After reviewing the record, the Court finds that the Magistrate Judge's orders regarding the government's motion to compel as well as the defendant's motion to recuse were not clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a); *see* 28 U.S.C. § 636(b)(1)(A). Accordingly, the defendant's objection (filing 36) is overruled in its entirety.

IT IS ORDERED:

1.   The defendant's objection (filing 36) is overruled.

2.   A copy of this order shall be provided to the United States Marshal.

Dated this 29th day of December, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge

---

no evidence, or any reason to believe, that his supposed diplomatic status has been recognized by the State Department.

4




April 24, 2017

All Authorities of the United States of America

. RE: Ambassador and Associate Chief Justice Michael Parsons

To Whomever It May Concern:

Ambassador and Associate Chief Justice Michael Parsons is a Tsilhqotin Tribal member and a member of the Chilcotin National Congress in the Country of Chilcotin (formerly British Columbia, Canada). Michael Parsons is not a US citizen.

Michael Parsons has diplomatic immunity based on the appointment to the position of Ambassador by Hereditary Grand Chief of the Tsilhqotin Nation, Country of Chilcotin, Stanley Stump, Sr. on January 01, 2016 and based on the Vienna Convention on Diplomatic Relations, Article 39, which states that upon appointment by the Country to the position of Ambassador, they are recognized and have diplomatic immunity.

Ambassador Michael Parsons has been exonerated of all prior convictions and charges from the United States, by the Universal Supreme Court of the Chilcotin which under the rules of reciprocity and the Constitution of the Chilcotin National Congress (www.universal supremecourt.org) must be upheld by the United States and abroad.

Therefore, based on all of the above, I, Hereditary Grand Chief Stanley Stump, Sr. request the immediate release of Ambassador Michael Parsons from detention, in accordance with the Vienna Covention on Diplomatic Relations.

Hereditary Grand Chief Stanley Stump, Sr.

Box 228, Highway 20, Alexis Creek, BC V0L 1A0        Phone/  : (250) 394-7042

DEFENDANT'S
EXHIBIT
112
NO. 4:17cr 3038



**U.S. DEPARTMENT of STATE**
CONSULAR ELECTRONIC APPLICATION CENTER

Print Confirmation

Online Nonimmigrant Visa Application (DS-160)

## Confirmation

A A 0 0 6 N W 0 7 6

| | | |
|---|---|---|
| Name Provided: | PARSONS, USCT CHIEF JUSTICE MICHAEL | Location Selected: |
| Date Of Birth: | 05 MAY 1961 | VAC |
| Place of Birth: | MEMPHIS, UNITED STATES OF AMERICA | U.S. Consulate General Vancouver |
| Gender: | Male | 1075 West Pender Street |
| Country/Region of Origin (Nationality) : | CHILQOTIN TSILHQOT'IN | Vancouver, BC V6E 2M6 |
| Passport Number: | 0000 | |
| Purpose of Travel: | AMBASSADOR OR PUBLIC MINISTER (A1) | Version 01.02.03 |
| Completed On: | 19 JAN 2017 | |
| Confirmation No: | AA006NW076 | |

A A 0 0 6 N W 0 7 6

Please provide to:
Justice Michael Parsons

Fax# 308-995-3101

402-452-3123
DIXIE MARIE
SENTER

EXHIBIT #6
pg 1
18/01/2017 9:04 PM

DEFENDANT'S
EXHIBIT
113
NO. 4:17cr3038
PENGAD-Bayonne, N.J.   12-30-17

*Country Of Chilcotin*
*Authorized By:* Chilcotin National Congress

Effective Date : JULY.01.2016



Tsilhqot'in
Identification

Name: Michael Wayne Parsons
Status: Tribal Member
Position: Ambassador/Justice/
Diplomat
International Travel Rights:
Jay Treaty/Internationally
Protected Person





DEFENDANT'S
EXHIBIT
111
NO. 4:17cr3038

From:                                              02/03/2017 07:29      #180 P.004/019

# Vienna Convention on Diplomatic Relations
## 1961

Done at Vienna on 18 April 1961. Entered into force on 24 April 1964.
United Nations, *Treaty Series*, vol. 500, p. 95.



Copyright © United Nations
2005

*Article 19*

1. If the post of head of the mission is vacant, or if the head of the mission is unable to perform his functions a chargé d'affaires ad interim shall act provisionally as head of the mission. The name of the chargé d'affaires ad interim shall be notified, either by the head of the mission or, in case he is unable to do so, by the Ministry for Foreign Affairs of the sending State to the Ministry for Foreign Affairs of the receiving State or such other ministry as may be agreed.

2. In cases where no member of the diplomatic staff of the mission is present in the receiving State, a member of the administrative and technical staff may, with the consent of the receiving State, be designated by the sending State to be in charge of the current administrative affairs of the mission.

*Article 20*

The mission and its head shall have the right to use the flag and emblem of the sending State on the premises of the mission, including the residence of the head of the mission, and on his means of transport.

*Article 21*

1. The receiving State shall either facilitate the acquisition on its territory, in accordance with its laws, by the sending State of premises necessary for its mission or assist the latter in obtaining accommodation in some other way.

2. It shall also, where necessary, assist missions in obtaining suitable accommodation for their members.

*Article 22*

1. The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission.

2. The receiving State is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent any disturbance of the peace of the mission or impairment of its dignity.

3. The premises of the mission, their furnishings and other property thereon and the means of transport of the mission shall be immune from search, requisition, attachment or execution.

*Article 23*

1. The sending State and the head of the mission shall be exempt from all national, regional or municipal dues and taxes in respect of the premises of the mission, whether owned or leased, other than such as represent payment for specific services rendered.

7

2. The exemption from taxation referred to in this article shall not apply to such dues and taxes payable under the law of the receiving State by persons contracting with the sending State or the head of the mission.

### Article 24

The archives and documents of the mission shall be inviolable at any time and wherever they may be.

### Article 25

The receiving State shall accord full facilities for the performance of the functions of the mission.

### Article 26

Subject to its laws and regulations concerning zones entry into which is prohibited or regulated for reasons of national security, the receiving State shall ensure to all members of the mission freedom of movement and travel in its territory.

### Article 27

1. The receiving State shall permit and protect free communication on the part of the mission for all official purposes. In communicating with the Government and the other missions and consulates of the sending State, wherever situated, the mission may employ all appropriate means, including diplomatic couriers and messages in code or cipher. However, the mission may install and use a wireless transmitter only with the consent of the receiving State.

2. The official correspondence of the mission shall be inviolable. Official correspondence means all correspondence relating to the mission and its functions.

3. The diplomatic bag shall not be opened or detained.

4. The packages constituting the diplomatic bag must bear visible external marks of their character and may contain only diplomatic documents or articles intended for official use.

5. The diplomatic courier, who shall be provided with an official document indicating his status and the number of packages constituting the diplomatic bag, shall be protected by the receiving State in the performance of his functions. He shall enjoy person inviolability and shall not be liable to any form of arrest or detention.

6. The sending State or the mission may designate diplomatic couriers ad hoc. In such cases the provisions of paragraph 5 of this article shall also apply, except that the immunities therein mentioned shall cease to apply when such a courier has delivered to the consignee the diplomatic bag in his charge.

7. A diplomatic bag may be entrusted to the captain of a commercial aircraft scheduled to land at an authorized port of entry. He shall be provided with an official document indicating the number of

8

packages constituting the bag but he shall not be considered to be a diplomatic courier. The mission may send one of its members to take possession of the diplomatic bag directly and freely from the captain of the aircraft.

### Article 28

The fees and charges levied by the mission in the course of its official duties shall be exempt from all dues and taxes.

### Article 29

The person of a diplomatic agent shall be inviolable. He shall not be liable to any form of arrest or detention. The receiving State shall treat him with due respect and shall take all appropriate steps to prevent any attack on his person, freedom or dignity.

### Article 30

1. The private residence of a diplomatic agent shall enjoy the same inviolability and protection as the premises of the mission.

2. His papers, correspondence and, except as provided in paragraph 3 of article 31, his property, shall likewise enjoy inviolability.

### Article 31

1. A diplomatic agent shall enjoy immunity from the criminal jurisdiction of the receiving State. He shall also enjoy immunity from its civil and administrative jurisdiction, except in the case of:

(a)     A real action relating to private immovable property situated in the territory of the receiving State, unless he holds it on behalf of the sending State for the purposes of the mission;

(b)     An action relating to succession in which the diplomatic agent is involved as executor, administrator, heir or legatee as a private person and not on behalf of the sending State;

(c)     An action relating to any professional or commercial activity exercised by the diplomatic agent in the receiving State outside his official functions.

2. A diplomatic agent is not obliged to give evidence as a witness.

3. No measures of execution may be taken in respect of a diplomatic agent except in the cases coming under subparagraphs (a), (b) and (c) of paragraph 1 of this article, and provided that the measures concerned can be taken without infringing the inviolability of his person or of his residence.

4. The immunity of a diplomatic agent from the jurisdiction of the receiving State does not exempt him from the jurisdiction of the sending State.

permanently resident in the receiving State, enjoy the privileges and immunities specified in articles 29 to 35, except that the immunity from civil and administrative jurisdiction of the receiving State specified in paragraph 1 of article 31 shall not extend to acts performed outside the course of their duties. They shall also enjoy the privileges specified in article 36, paragraph 1, in respect of articles imported at the time of first installation.

3. Members of the service staff of the mission who are not nationals of or permanently resident in the receiving State shall enjoy immunity in respect of acts performed in the course of their duties, exemption from dues and taxes on the emoluments they receive by reason of their employment and the exemption contained in article 33.

4. Private servants of members of the mission shall, if they are not nationals of or permanently resident in the receiving State, be exempt from dues and taxes on the emoluments they receive by reason of their employment. In other respects, they may enjoy privileges and immunities only to the extent admitted by the receiving State. However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.

### Article 38

1. Except insofar as additional privileges and immunities may be granted by the receiving State, a diplomatic agent who is a national of or permanently resident in that State shall enjoy only immunity from jurisdiction, and inviolability, in respect of official acts performed in the exercise of his functions.

2. Other members of the staff of the mission and private servants who are nationals of or permanently resident in the receiving State shall enjoy privileges and immunities only to the extent admitted by the receiving State. However, the receiving State must exercise its jurisdiction over those persons in such a manner as not to interfere unduly with the performance of the functions of the mission.

### Article 39

1. Every person entitled to privileges and immunities shall enjoy them from the moment he enters the territory of the receiving State on proceeding to take up his post or, if already in its territory, from the moment when his appointment is notified to the Ministry for Foreign Affairs or such other ministry as may be agreed.

2. When the functions of a person enjoying privileges and immunities have come to an end, such privileges and immunities shall normally cease at the moment when he leaves the country, or on expiry of a reasonable period in which to do so, but shall subsist until that time, even in case of armed conflict. However, with respect to acts performed by such a person in the exercise of his functions as a member of the mission, immunity shall continue to subsist.

3. In case of the death of a member of the mission, the members of his family shall continue to enjoy the privileges and immunities to which they are entitled until the expiry of a reasonable period in which to leave the country.

12

PETITIONER

BY SPECIAL APPEARANCE ONLY

AMBASSADOR Michael Parsons OF THE SOVEREIGN TSILHQOT'IN NATION-
COUNTRY OF THE CHILCOTIN, A LIVE MAN UNDER DURESS, WITHOUT PREJUDICE,
HELD AGAINST MY WILL AT THE SALINE COUNTY JAIL, WILBER NEBRASKA,
TO.

JUDGE GERRARD

C/o CLERK OF THE U.S. DISTRICT COURT

100 CENTENNIAL MALL, SUITE 587 FEDERAL BUILDING

LINCOLN, NEBRASKA 68508

NOTICE

DEMAND AS A MATTER OF RIGHT, ORDER OF STAY OF ORDER BY JUDGE ZWART
TO FORCABLY INJECT ME WITH AN UNKNOWN AND UNSAFE TB TEST OR X-RAY
IN VIOLATION OF INTERNATIONAL LAW, THE VIENNA CONVENTION ON DIPLOMATIC
RELATIONS, THE UNITED STATES CONSTITUTION AMENDMENT #1, FREEDOM OF
RELIGION, 42 U.S.C. §2000 bb THE RELIGIOUS FREEDOMS RESTORATION ACT, THE
MYERS DECISION BY THE U.S. SUPREME COURT AND 28 U.S.C. § 1330, AND DISMISS OR
TRANSFER THIS MATTER TO THE ARTICLE III SECTION 2 CONSTITUTIONAL COMMON
LAW COURT OF ORIGINAL JURISDICTION IN ALL CASES AFFECTING AMBASSADORS.

FACTS

ON SEPTEMBER 22, 2017 I WAS TAKEN AGAINST MY WILL BY FORCE INTO CUSTODY AND
HELD AT THE WEST TENNESSEE DETENTION CENTER BY ORDER OF THE UNITED STATES MARSHAL
SERVICE (USMS) BUT NEVER GIVEN A REASON. ON DECEMBER 06, 2017 I WAS TAKEN
TO LEAVENWORTH KANSAS AND HELD AT THE LEAVENWORTH DETENTION CENTER
AGAINST MY WILL. ON DECEMBER 13, 2017 I WAS TAKEN TO SALINE COUNTY
NEBRASKA AND HELD IN THEIR JAIL AGAINST MY WILL. THEN ON DECEMBER 18, 2017
I WAS TAKEN TO THE U.S. DISTRICT COURT FEDERAL BUILDING IN LINCOLN NEBRASKA,
THEREIN, USMS AGENTS LITERALY THREW ME INTO THEIR COURT. WITH NO ADVANCED NOTICE,
I WAS TOLD AN ALL CAPITOL LETTER MICHAEL WAYNE PARSONS, AN UNKNOWN ENTITY WAS

INDICTED ON 1 COUNT OF 18 U.S.C. SECTION 922 (g)(1). I GAVE NOTICE THAT I WAS THE AMBASSADOR OF THE TSILHQOT'IN NATION - COUNTRY OF THE CHILCOTIN AND NOT THE MICHAEL WAYNE PARSONS ENTITY LISTED IN THE INDICTMENT. THAT THE UNITED STATES OF AMERICA CORPORATION LISTED AS PLAINTIFF HAD NO COMPLAINT OR STANDING AGAINST ME. JUDGE ZWART REFUSED TO DISCLOSE THE FORM OF TRIBUNAL SHE WAS CONDUCTING AND I ADVISED HER I DID NOT CONSENT TO BEING THERE AND DID NOT UNDERSTAND ANYTHING SHE WAS DOING.

AT THAT POINT I DISCLOSED (MY CREDENTIALS) AND THE ASSISTANT U.S. ATTORNEY MR. SHARP, STIPULATED, AS WELL AS THE JUDGE, THAT I AM THE AMBASSADOR OF THE TSILHQOT'IN NATION. FURTHERMORE, I WAS THE BENIFICIARY OF THE TRUST AND THESE FACTS WERE NEVER REBUTTED. AS SUCH, THESE FACTS STAND AS TRUTH. I WAS THEN INFORMED I WOULD BE BROUGHT BACK ON DECEMBER 20, 2017 FOR A DETENTION HEARING. MY VERBAL REQUEST TO DISMISS FOR LACK OF JURISDICTION, MISTAKEN IDENTITY, UNNECESSARY DELAY AND LACK OF ADVANCE NOTICE WERE DENIED.

ON DECEMBER 20, 2017 I WAS ADVISED THE JUDGE WAS ALSO GOING TO HEAR ON A MOTION BY THE UNITED STATES OF AMERICA CORPORATION TO ORDER I BE FORCED TO SUBMIT TO A TB TEST. THIS HEARING WAS ALSO HELD WITH NO ADVANCED NOTICE TO ME. THEN THE USMS AGENT WHO ASSAULTED ME TWO DAYS EARLIER TESTIFIED TO HIS POLICY CLAIMING IT REQUIRED A TB TEST FOR EVERYONE AND CLAIMED THE POLICY HAD REFERENCED THE AUTHORITY TO DO THIS. I WAS ONLY GIVEN THE POLICY AFTER HE COMPLETED HIS TESTIMONY. MY OBJECTION WAS DENIED.

UPON REVIEW OF THE (POLICY HEREIN ATTACHED), YOU SHALL TAKE JUDICIAL NOTICE THAT IT IS SPECIFICALLY FOR "ACTIVE TB" WHEN PEOPLE ARE "SYMPTOMATIC," NOT FOR PEOPLE LIKE ME WHO DO NOT HAVE TB AND ARE NOT SYMPTOMATIC; THEIR POLICY ONLY SHOWS CONGRESS AUTHORIZED FUNDING FOR "HEALTH CARE," NOT FORCED TB TESTING. IT ALSO STATES, "THE USMS CAN NOT REQUIRE INTERGOVERNMENTAL AGREEMENT DETENTION FACILITIES TO PERFORM TB TEST ON PRISONERS" USMS POLICY 9.6 PRISONER AIRBORNE PATHOGEN CONTROL, E4(b).

THE UNDISPUTED FACT IS, I DO NOT HAVE TB. I HAVE NEVER HAD A TB TEST AS PART OF MY NATIVE AMERICAN RELIGION, WHEREBY MY BODY IS MY TEMPLE THROUGH WHICH I DO MY MINISTRY. PUTTING ANYTHING INTO MY BODY THAT I KNOW IS POTENTIALLY HARMFULL OR UNNECESSARY IS AGAINST MY RELIGION. THE MANUFACTURER OF THE TB TEST MATERIAL STATES THEIR PRODUCT IS, "NOT GUARANTEED TO BE SAFE OR EFFECTIVE." THE FACT IS, ONCE SOMETHING IS INJECTED INTO YOU, YOU CAN'T TAKE IT BACK. THERE ARE NO ACTS OF CONGRESS AUTHORIZING THIS TEST. IT VIOLATES INTERNATIONAL LAW, REFLECTED IN THE RELIGIOUS FREEDOMS RESTORATION ACT, TITLE 42 USC 2000bb AND THE U.S. SUPREME COURT MYERS DECISION. FURTHERMORE, 28 USC 1330 SPECIFIES, NO U.S. COURT HAS AUTHORITY OVER AN AMBASSADOR. THE CONSTITUTION FOR THE UNITED STATES OF AMERICA REPUBLIC STATES THAT, "IN ALL CASES AFFECTING AMBASSADORS, THE SUPREME COURT SHALL HAVE ORIGINAL JURISDICTION... ALL TREATIES MADE, OR WHICH SHALL BE MADE UNDER THE AUTHORITY OF THE UNITED STATES SHALL BE THE SUPREME LAW OF THE LAND, AND THE JUDGES IN EVERY STATE SHALL BE BOUND THEREBY." AND "JUDICIAL OFFICERS... OF THE SEVERAL STATES, SHALL BE BOUND BY OATH OR AFFIRMATION TO SUPPORT THE CONSTITUTION." AS SUCH, THIS MATTER SHALL BE TRANSFERED TO THE ARTICLE III SECTION 2 SUPREME COURT WHICH HAS ORIGINAL JURISDICTION FOR AMBASSADORS AND WHERE THE CONSTITUTION AND TREATIES ARE THE COMMON LAW AND THEREFORE, THE LAW OF THE LAND. AS SUCH, THIS COURT SHALL TAKE JUDICIAL NOTICE THAT THIS AND ALL COURTS OF THE UNITED STATES ARE BOUND TO THEIR TREATIES AND AS A SIGNATORY TO THE VIENNA CONVENTION ON DIPLOMATIC RELATIONS ARTICLE 29 STATES, "THE PERSON OF A DIPLOMATIC AGENT SHALL BE INVIOLABLE, HE SHALL NOT BE LIABLE TO ANY FORM OF ARREST OR DETENTION." ARTICLE 31, "A DIPLOMATIC AGENT SHALL ENJOY IMMUNITY FROM THE CRIMINAL JURISDICTION OF THE RECEIVING STATE. HE SHALL ALSO ENJOY IMMUNITY FROM ITS CIVIL AND ADMINISTRATIVE JURISDICTION (3) NO MEASURE OF EXECUTION MAY BE TAKEN IN RESPECT OF A DIPLOMATIC AGENT."

IN THE JUDGES(ORDER HEREIN ATTACHED) ALL OF THE CASES SHE SITED PERTAIN TO MATTERS RULED ON PRIOR TO THE RELIGIOUS FREEDOMS RESTORATION ACT, PERTAIN TO PRISON INMATES WHO HAVE ACTIVE ILLNESS I.E. SYMPTOMS AND NONE OF THOSE CASES INVOLVE PRETRIAL DETAINEES, LIKEWISE, NONE OF THOSE CASES PERTAIN TO AMBASSADORS OF ANOTHER COUNTRY, IT SHOULD ALSO BE NOTED THAT THE U.S. ATTORNEY SPECIFICALLY SITED THE SUPREME COURTS STANDARD FROM THE MYERS CASE THAT APPLY A 3 PRONG TEST AND THE FACT THE AUDIO RECORDING WILL PROVE THAT AS WELL AS THE FACT I HAD PREVIOUSLY ARTICULATED THOSE FACTS FROM MY STATEMENT ABOUT MY RELIGIOUS PRACTICE, THE JUDGES ORDER FAILED TO EVEN MENTION THOSE FACTS. AND IT SHOULD BE NOTED THAT IT APPEARS THE JUDGE IS ACTING AS A PROSECUTOR, THAT IS, SHE ACCORDING TO HER OWN E-MAIL TO THE US ATTORNEY, DISCLOSED HER RESEARCH ON THIS MATTER, DEMONSTRATING HER PREDETERMINED POSITION AND HIS REPLY WAS, "THANK YOU JUDGE, I WILL REVIEW THIS BEFORE OUR HEARING ON WEDNESDAY," CLEARLY THIS IS PROOF SHE IS WORKING TO SUPPORT THE U.S. ATTORNEY GIVING HIM CITATION PREPERATION IN SUPPORT OF HIS POSITION IS PREJUDICIAL AND AS SUCH SHE SHOULD BE REMOVED FROM THIS MATTER AND REPLACED WITH SOMEONE WHO IS, IMPARTIAL, A REVIEW OF BOTH DECEMBER 18, AND 20 HEARINGS DATES WILL CLEARLY DEMONSTRATE JUDGE ZWART IS NOT ACTING AS JUDGE BUT ADVOCATE FOR THE PROSECUTOR. (SEE ATTACHED E-MAIL)

GIVEN THOSE FACTS, INCLUDING PERJURY BY THE USMS AGENT WHO GAVE FALSE AND MISLEADING TESTIMONY IMPLYING A POLICY DESIGNED FOR ONLY ACTIVE TB PRISONERS WHO WERE SYMPTOMATIC AND NOT FOR PRETRIAL DETAINEES WHO DO NOT HAVE TB OR SYMPTOMS WAS FOR NO OTHER PURPOSE THAN TO DENY MY RIGHT TO RELIGIOUS LIBERTY, AND JUDGE ZWARTS ABUSE OF POWER AND ACTS OF OFFICIAL OPPRESSION WHEN SHE ORDERS SHE CLEARLY HAD PREDETERMINED IS CRIMINAL AND AS SUCH, THIS CASE AND ALL OF HER ORDERS SHOULD BE AND IT IS DEMANDED THEY BE DISMISSED WITH PREJUDICE AS JUSTICE DEMAND NO LESS, TO CORRECT THIS MANIFEST INJUSTICE,

CERTIFICATE OF SERVICE

PETITIONER, AMBASSADOR Michael Parsons OF THE SOVEREIGN TSILHQOT'IN NATION-
COUNTRY OF THE CHILCOTIN, HEREBY CERTIFY THAT THE FORGOING IS TRUE AND CORRECT
TO THE BEST OF MY KNOWLEDGE AND THAT THE FORGOING HAS BEEN GIVEN TO THE
CORRECTIONAL OFFICER FOR PLACEMENT INTO THE INSTITUTIONAL MAIL SYSTEM
ON THIS DECEMBER 25, 2017 AT THE SALINE COUNTY JAIL IN WILDER
NEBRASKA AND ADDRESSED TO THE HONORABLE JUDGE GERRARD, c/o CLERK
OF THE UNITED STATES DISTRICT COURT, 100 CENTENNIAL MALL, SUITE 587
FEDERAL BUILDING, LINCOLN, NEBRASKA 68508 PER FEDERAL RULES
IS DEEMED FILED TODAY DECEMBER 25, 2017,

UNDER DURESS, WITHOUT PREJUDICE

AMBASSADOR Michael Parsons
TSILHQOT'IN NATION- COUNTRY OF THE CHILCOTH,
c/o SALINE COUNTY JAIL
911 SOUTH MAIN
WILDER
SALINE, NEBRASKA 68465



# Ambassador Michael Parsons, ACJ (USCT)
# Tsilhqot'in Nation, Country of the Chilcotin
# Bio

I have a Mechanical Degree from Southwest College, I was a Special Missions Pilot and Officer in the United States Air Force Civil Air Patrol, a former Special Deputy with the Shelby County Tennessee Sheriff, a former Manager with Federal Express over Aircraft and Trucking operations in East Tennessee, an Adjunct Faculty Member at Southwest College, Licensed General Contractor, Licensed Building Inspector and a Radio Talk Show Host on The Voice of Truth with Mike Parsons.

The Voice of Truth is radio ministry dedicated to exposing corruption in government and restoring our Constitutionally recognized God given rights and teaching my fellow American how to be independent, self-sufficient and self-governing. As a man of faith, I was saved at 5, baptized at 8 and now as an Ordained Minister by the Native American Church of Nemenhah and recognized as a medicine man and traditional leader. My way is focused on practicing and promoting reliance on our Creator's ways of natural health care, living independent, self-governed and in harmony with all of God's creation.

I am a farmer and with my wife of 30 years, Mrs. Parsons and I raise organic hay, dairy goats, horses, rabbits, chickens and for 38 years I have raised wolves. I have worked to educate the public and dispel the false myths that wolves are dangerous to man and have provided wolves to autistic children and families seeking the world's best family companion animal.

Mrs. Parsons and I have raised our son in ministry and music and he has attained many successes in both including performances at Julliard Music Conservatory, a Music Minister and conductor for several churches and Orchestras. He has traveled the world playing music and now is the Director of Bands for the largest private Christian School in America.

In 2015 I was adopted into the Tsilhqot'in Nation as a full tribal member and appointed to the position of Associate Chief Justice for efforts with getting their children back from the Canadian government. Like the corporations posing as government here, Canada profits off the backs of the people including Native American children they kidnap for a $300,000 profit per child they use to balance their books.

On January 1, 2016, I was appointed Ambassador of the sovereign Tsilhqot'in Nation, Country of the Chilcotin, working to restore the native children kidnapped by the Canadian Child Ministries by creating a billion dollar timber deal that would provide jobs for all Chilcotin tribal members, as well as people from Tennessee involved in the production, harvesting and management of Tsilhqot'in timber resources. In the Summer of 2016, I was honored to serve notice of the new County of the Chilcotin upon the U.N., seeking peaceful relations with the people of the world.

Political Experience:

- 1994, Republican nominee for District 99 State Representative
- 2006, candidate for Tipton County Executive



RE: TB testing research
Sharp, Jan (USANE)
to:
Cheryl_Zwart@ned.uscourts.gov, John_Vanderslice@fd.org
12/18/2017 04:44 PM
Hide Details
From: "Sharp, Jan (USANE)" <Jan.Sharp@usdoj.gov>
To: "Cheryl_Zwart@ned.uscourts.gov" <Cheryl_Zwart@ned.uscourts.gov>,
"John_Vanderslice@fd.org" <John_Vanderslice@fd.org>

Thank you Judge.  I will review this before our hearing on Wednesday.

**From:** Cheryl_Zwart@ned.uscourts.gov [mailto:Cheryl_Zwart@ned.uscourts.gov]
**Sent:** Monday, December 18, 2017 4:36 PM
**To:** Sharp, Jan (USANE) <JSharp@usa.doj.gov>; John_Vanderslice@fd.org
**Subject:** TB testing research

*[handwritten annotation:]* THIS WOULD INDICATE THE JUDGE IS DOING HEARING PREPERATION FOR PLAINTIFFS ATTORNEY. AS WAS THE CASE ON 12/18 AND/12 ZWART IS NOT ACTING AS JUDGE BUT ADVOCATE FOR PROSECUTOR OBVIOUSLY THIS EMAIL WAS PUT INTO MY STACK BY MISTAKE.

Counsel:

I did not do a deep dive on this, but here is what I found:

Darby v. Schuetzle, No. 1:09-CV-004, 2009 WL 700631, at *5 (D.N.D. Mar. 13, 2009)

*[handwritten annotation:]* I AM NOT A PRISOHER IN A PRISPH. I AM A PRE-TRIAL DETAINEE

*[handwritten annotation:]* I AM NOT A PRISONER "Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system." Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 982 (8th Cir.2004). "Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting." Id. (citing Turner v. *[handwritten: PRE-DATES RFRA OF 1993]* Safley, 482 U.S. 78, 84 (1987)). "A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.' " Id. (quoting Turner v. Safley, 482 U.S. 78, 89)). When determining the reasonableness of the regulation at issue, courts consider the following four factors: (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) how the accommodation of the asserted constitutional right will affect guards, other inmates, and the allocation of prison resources; and (4) whether there are alternatives that fully accommodates the prisoner "at de minimis cost to valid penological interests." Turner v. Safley, 482 U.S. at 89–91).

Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990)

Prison policy authorizing treatment of nonconsenting mentally ill prisoner with antipsychotic drugs comported with requirements of substantive due process and did not unduly infringe upon prisoner's liberty interest in avoiding unwanted treatment, notwithstanding contention that alternatives to forced treatment existed, e.g., state could find prisoner incompetent and obtain court approval of treatment or could make use of physical restraints; regulation applied only to prisoners who were mentally ill and who, as result of their illness, were gravely disabled or represented significant danger to themselves or others, drugs could be administered for no purpose other than treatment and only under direction of licensed psychiatrist, and alternatives suggested by prisoner would not effectively respond to state's legitimate interests.

Benjamin v. Hobbs, 2012 WL 3985940 (E.D.Ark.), 2 (E.D.Ark.,2012):

The Eighth Circuit has recognized that prison officials must test prisoners for TB and take adequate measures to prevent that disease from spreading. DeGidio v. Pung, 920 F.2d 525, 527–28 (8th Cir.1990). Thus, prison officials do not violate prisoners' constitutional rights by involuntarily testing or treating them for TB. See Lee v.

Armontrout, 991 F.2d 487, 489 (8th Cir.1993) (finding no Eighth Amendment violation where prisoner officials involuntarily tested and treated a prisoner for TB); McCormick v. Stalder, 105 F.3d 1059, 1061–62 (5th Cir.1997) (finding no Eighth Amendment or Fourteenth Amendment violation where prison officials involuntarily treated a prisoner for TB). Thus, Defendants did not violate Plaintiff's constitutional rights when they involuntarily tested him for TB.

Mack v. Campbell, 948 F.2d 1289, 1991 WL 243569 (6th Cir.1991) (administrative segregation for refusing tuberculosis screening test does not violate due process); I AM NOT SYMPTOMATIC, IN ADMIN. SEG SINCE 9/22/2017

Rhinehart v. Gomez, 1995 WL 364339, *3–*4 (N.D.Cal.1995) (Washington v. Harper justifies prison policy of involuntary testing and treatment for tuberculosis).

Karolis v. New Jersey Dept. of Corrections, 935 F.Supp. 523, 527–28 (D.N.J.1996) (involuntary administration of tuberculosis test to prisoner upheld against challenge under Religious Freedom Restoration Act because there is a compelling state interest in stopping the spread of tuberculosis).

IT APPEARS THAT THE JUDGE IS ACTING AS PROSECUTOR. SHE IS DOING ALL THE WORK TRYING TO SUPPORT HER PREDETERMINED POSITION.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

MICHAEL WAYNE PARSONS,

Defendant.

4:17CR3038

ORDER

The government has moved for an order compelling defendant to submit to testing for tuberculosis testing. (Filing No. 13). A hearing was held on the issue.

*[handwritten: US MARSHALS SERVICE POLICY 9.6 PRISONER AIRBORNE PATHOGEN CONTROL ONLY PERTAINS TO "ACTIVE TB" WHEN SYMPTOMATIC, CONGRESS HAS GIVEN NO AUTHORITY TO COURTS TO ENFORCE ANYTHING OUTSIDE OF LAW, USMS POLICY IS NOT LAW, THE US MARSHAL IS LYING TO COURT]*

To preserve the health and welfare of inmates, detainees, and prison staff,

*[handwritten: IMPLYING POLICY 9.6 PERTAINS TO ANYONE, IS ONLY FOR ACTIVE TB CASES.]*

the federal Marshal's policy requires all persons held in custody to submit to tuberculosis testing. This policy is consistent with Eighth Circuit law. See,

*[handwritten: THIS CASE PRE-DATES RFRA 1993]*

DeGidio v. Pung, 920 F.2d 525, 527-28 (8th Cir.1990). Although Plaintiff claims he has a right to refuse such testing on religious grounds, (see Religious Freedom Restoration Act of 1993, 42 U.S.C.A. § 2000bb et. seq.), even assuming Defendant has shown that tuberculosis testing will interfere with

*[handwritten: THE STANDARD SET BY SCOTUS + THE MYERS CASE DOES NOT ALLOW THIS ONE SIZE FITS ALL APPROACH.]*

Defendant's sincerely held religious beliefs, the court must balance Defendant's religious beliefs against the government's compelling interest is thwarting the outbreak and spread of a highly dangerous and potentially lethal infection among the inmate and detainee population and the staff tasked with guarding and providing services to that population.

*[handwritten: I HAVE MET THE MYERS 3 POINT STANDARD THAT EVEN THE U.S. ATTORNEY PRESENTED AS THE CONTROLLING STANDARD.]*

*[handwritten: THERE IS NO LAW REQUIRING TB TESTING.]*

After considering the evidence presented and the applicable law, (see

*[handwritten: THIS CASE PRE-DATES RFRA]*

Turner v. Safley, 482 U.S. 78, 84 (1987); Washington v. Harper, 494 U.S. 210 (1990); Benjamin v. Hobbs, 2012 WL 3985940 (E.D.Ark. 2012) (citing and relying

*[handwritten: ONLY APPLIES TO PRISON INMATES WITH ACTIVE MENTAL ILLNESS OR ACTIVE DISEASE]*

*THESE CASES* upon Eighth Circuit law); Rhinehart v. Gomez, 1995 WL 364339, *3-*4
*PRE-DATE THE* (N.D.Cal.1995); Karolis v. New Jersey Dept. of Corrections, 935 F.Supp. 523,
*MYERS CASE* 527-28 (D.N.J.1996) (holding involuntary administration of tuberculosis test did
*THAT SCOTUS* not violate the Religious Freedom Restoration Act because there is a compelling
*SET AS THE* state interest in stopping the spread of tuberculosis).
*STANDARD FOR*
*RFRA*

IT IS ORDERED:

1)    The government's motion to compel, (Filing No. 13), is granted.

2)    Defendant is subject to involuntary tuberculosis testing.

3)    Defendant is given until December 27, 2017 to decide whether such
testing will be by subcutaneous injection or by chest x-ray. If Defendant does not
timely do so, the Marshal is permitted to decide what means of testing will be
administered, and it shall thereafter promptly administer the testing.

4)    Until the tuberculosis testing results are available, the Marshal is
permitted to house Defendant in segregation.

December 21, 2017.

BY THE COURT:

s/ Cheryl R. Zwart
United States Magistrate Judge

2

*[handwritten top margin:]* 12/20/2017 BROUGHT INTO COURT AGAINST MY WILL BY FORCE OF U.S. MARSHALS. WITH NO ADVANCE NOTICE I WAS ADVISED IT WAS A HEARING TO DETERMINE IF THEY WOULD FORCE ME TO SUBMIT TO TB TEST AND DETERMINE MY IDENTITY. ASSISTANT U.S. ATTORNEY JAN SHARP (A MAN) ASKED AN UNKNOWN U.S. MARSHAL TO READ CAPTIONS FROM THIS "USMS POLICY." I OBJECTED DUE TO FACT I HAD NO ADVANCE NOTICE OF HEARING NOR ACCESS TO THIS DOCUMENT. THEY IMPLY THIS POLICY APPLYS TO EVERYONE. HOWEVER, YOU WILL NOTICE IT IS SPECIFICALLY FOR "ACTIVE" TB WHEN PEOPLE ARE SYMPTOMATIC. NOT ME! THIS IS JUST ANOTHER EXAMPLE OF THEIR LYES AND MANIPULATION EVEN UNDER OATH. I ASSERTED MY RIGHT NOT TO BE FORCED TO *[continuing below header:]* THEIR RELIGIOUS BELIEFS RECOGNIZED BY 42 USC 2000bb RELIGIOUS FREEDOMS ACT AND SCOTUS CASE LAW/U.S.A/RIGHTS.

# United States Marshals Service POLICY DIRECTIVES

*[handwritten:]* IS A CORPORATION LISTED ON DUN AND BRADSTREET. THEIR CORPORATION ID # IS 165329280. I HAVE NO CONTRACT WITH THEM. THEY ARE A BUSINESS. A BUSINESS OF LYING, CHEATING AND STEALING FROM WE THE PEOPLE.

**PRISONER OPERATIONS**

## 9.6 PRISONER AIRBORNE PATHOGEN CONTROL

*(Airborne pathogens include but are not limited to Tuberculosis (TB) and Severe Acute Respiratory Syndrome (SARS)).*

**A.** **Proponent:** Office of the Director/Deputy Director (DD), as supported by the Prisoner Operations Division (POD), Office of Medical Operations (OMO), 202-307-9680.

**B.** **Purpose:** This policy ensures that United States Marshals Service (USMS) prisoners who have contagious airborne diseases are identified as soon as possible and isolated to prevent the spread of the disease.

**C.** **Authority:** Standards set by the Centers for Disease Control and Prevention (CDC), American Correctional Association (ACA), the National Commission on Correctional Health Care (NCCHC) and good medical practices established by the professional medical community. Authority to manage prisoner health care is provided by 18 U.S.C. § 4006, 18 U.S.C. § 4013, and 18 U.S.C. § 4086

*[handwritten left margin:]* NOT TRUE! 18 USC 4006, ONLY WHO ING, NOT AUTHORIZE FORCE TB TEST, OR X-RAY!

*[handwritten:]* ONLY RELATES TO PAY → ONLY RELATING TO FUNDING ↓ ONLY REFERS TO USMS HOLDING PEOPLE UNDER AUTHORITY OF ENACTMENTS OF CONGRESS. DOES NOT AUTHORIZE TESTING PRTB.

**D.** **Policy:**

1. USMS intake cellblock officers will be alert for any symptoms of active contagious TB and other airborne diseases exhibited by USMS prisoners. Symptoms may include persistent cough, coughing up blood, and fever.

2. A healthcare professional will test USMS prisoners for TB as soon as possible after arrival at the intake facility but no later than 14 calendar days after admission to the facility, unless documentation of a TB clearance within the past 12 months is available.

*[handwritten left margin:]* I AM NOT AT AN INTAKE FACILITY

3. Prisoners who have been diagnosed with TB or who are suspected of having active contagious TB or other airborne diseases are not produced for court and transported (other than to a local medical facility) by USMS personnel until they have received a signed medical clearance by a healthcare professional.

4. USMS personnel responsible for transporting a prisoner suspected of having active contagious TB or other airborne diseases must wear an approved respirator/mask when they are sharing air space with that prisoner. The prisoner in question must wear a disposable surgical mask.

**E.** **Procedures:**

1. **USMS Intake Screening for Airborne Pathogens**

   a. **Observation:** The USMS intake cellblock officer screens USMS prisoners for active contagious TB and other airborne diseases through direct observation of any symptoms. The symptoms most closely associated with these diseases are persistent cough, coughing up blood, and fever.

GOVERNMENT EXHIBIT

b.  **Questioning:** The USMS intake cellblock officer will ask each prisoner if he or she has ever been diagnosed with or treated for TB. If the prisoner states that he or she is currently taking preventive drug therapy or drug treatment, it is imperative that this information be documented on a Form USM-130, *Prisoner Custody Alert Notice,* so medical evaluation may be completed. This information must be entered into the Prisoner Tracking System (PTS), TB clearance screen once validation is received from a health care professional. The Office of Interagency Medical Services (OIMS) must be promptly notified by the district to assist in planning appropriate continuation of drug therapy, as prescribed by a healthcare professional.

*THIS IS FOR "ACTIVE" TB*

c.  **Protective Measures:** If any TB symptoms appear to be present in a prisoner, the USMS intake officer must immediately put on his/her approved respirator/mask and place the prisoner in respiratory isolation (place a disposable surgical mask over the prisoner's mouth and nose). Ideally, the prisoner is placed in a negative pressure isolation room, if one is available, or in a room separate from other prisoners and staff.

d.  **TB Clearance:** Cellblock staff also look for a TB clearance documented on the Form USM-553, *Medical Summary of Federal Prisoner/Alien in Transit.* Results of TB testing are valid for 12 months unless symptoms of active respiratory disease are present. Acceptable TB clearance includes a negative Tuberculosis Skin Test (TST), also known as the Purified Protein Derivative (PPD) and Mantoux test, or a negative chest x-ray within the past 12 months signed by a healthcare professional. Refer to USMS Policy Directive 9.20, *Cellblock Operations.*

e.  **Reporting Suspected TB or Other Airborne Pathogens:** When a USMS prisoner is suspected of or confirmed as having active contagious TB or other airborne diseases, the district is to immediately report the case to OIMS, phone: 202-307-9680; fax: 202-307-5029. After hours, contact the USMS Command Center to reach the Prisoner Medical Duty Officer.

2.  **Cellblock Respiratory Isolation:**

a.  Respiratory isolation can be achieved by placing a disposable surgical mask over the symptomatic prisoner's mouth and nose and ensuring that all staff who share breathing space with the prisoner wear their approved respirators/masks. USMS district management or designee is responsible for maintaining a supply of surgical masks for prisoners and approved respirators/masks for staff. Refer to the Respiratory Protection Program.

b.  Whenever possible, the symptomatic prisoner is immediately isolated from other prisoners and staff, preferably in a separate room, but the mask(s) and respirators must still be used.

c.  USMS district management or designee shall ensure that used surgical masks are disposed of in a red biohazard plastic bag according to local regulations. Red biohazard plastic bags cannot be disposed of with the regular trash. USMS staff will wear disposable gloves when handling used masks and will wash their hands thoroughly after disposal. Refer to USMS Policy Directive 9.20, *Cellblock Operations,* D.8. Health and Safety.

d.  USMS district management or designee shall ensure that employees who have been exposed to prisoners with suspect or active TB complete the Form CA-2,

*Notice of Occupational Disease and Claim for Compensation.* Refer to Policy Directive 3.5, *Health Programs, Office of Workers' Compensation Programs (OWCP)*.

3. **Removal of USMS Prisoners with Potential TB or Airborne Diseases for Medical Evaluation:**

   a. As soon as possible, the symptomatic prisoner must be transported to a medical facility for isolation and TB testing. During transport, the prisoner continues to wear a surgical mask, and all accompanying staff wear their respirators/masks. If possible, the windows are opened and fans should be used to increase airflow.

   b. USMS intake staff will notify the receiving medical facility ahead of time that a possible TB or airborne disease case is being transported for admission.

   c. The medical facility shall perform the necessary testing and medical evaluation to determine whether or not the prisoner has active disease(s). The prisoner will remain in the medical facility until a diagnosis is confirmed. If the prisoner does have active contagious disease(s), he or she will remain in the medical facility for appropriate treatment. Reference E.7, *Hospital Detail for Potential Contagious Airborne Diseases* within this policy.

   *[handwritten: LATER TO "ACTIVE" DISEASE]*

4. **Routine TB Testing for USMS Prisoners in State and Local Detention Facilities:**

   a. Per the *NCCHC Standards for Health Services in Jails (2008)* using the full population assessment approach, all prisoners shall receive an initial health assessment as soon as possible, but no later than 14 calendar days after admission to the facility. Initial health assessments include diagnostic tests for communicable diseases, such as TB, unless there is documentation from the health department indicating that such testing is not warranted. USMS district management or designee is responsible for ensuring that prisoners are tested for TB by a medical professional within 14 days of admission into USMS custody, unless they have documentation of TB clearance within the past 12 months.

   b. TB testing (as defined in section E.10, *Guidelines for TB Testing and Documentation* within this policy) should be a routine part of prisoner processing in every detention facility. While the USMS cannot require Intergovernmental Agreement (IGA) detention facilities to perform TB tests on prisoners, the USMS strongly encourages state and local detention facilities to test all prisoners (state, local, and federal) for TB.

   *[handwritten: MS CANNOT REQUIRE ✗]*

   c. If a local detention facility housing USMS prisoners is unwilling or unable to do TB testing, the district will encourage the detention facility to work with the local health department to develop a testing plan that meets the latest NCCHC and CDC guidelines. If the health department cannot solve the problem, the district will notify OIMS for additional medical assistance as soon as possible. If a district experiences any problems obtaining TB testing in a particular detention facility, district management will also contact POD for assistance with IGA negotiations.

5. **Prisoner Refusal of TB Testing and/or Medical Treatment for Active TB:** If a prisoner refuses to be tested for TB or to receive appropriate medical treatment for active TB, the district will take the following actions:

   *[handwritten: RELATES TO ACTIVE TB]*

*[handwritten: FOR "ACTIVE" TB]* a.  Attempt to isolate the prisoner until he or she agrees to testing and/or treatment for suspected or active TB. If a prisoner is symptomatic or suspected of having active TB, the prisoner should be placed in a negative pressure isolation room, if available;

b.  Offer the prisoner counseling by the detention facility medical staff (when available);

c.  Offer the prisoner the alternative of a chest x-ray if the prisoner still refuses PPD testing;

d.  Contact OIMS for guidance; and/or

*[handwritten: COURT ORDER ISONLY IF SYMPTOMATIC]*  Request a federal court order to require testing if prisoner is symptomatic or there is a reasonable cause to suspect active contagious disease(s). A sample court order is available from OIMS.

6.  **Notifications:**

a.  When the USMS district management or designee learns that a prisoner in custody has been diagnosed by a health care professional as having active TB or some other contagious airborne disease(s), the USMS district management or designee will immediately inform the following individuals that the prisoner's current medical condition precludes transport or production without the express consent of the trial judge or magistrate and a health care professional:

1)  OIMS at 202-307-9680; fax: 202-307-5029. After hours, contact the USMS Command Center to contact the Prisoner Medical Duty Officer;

2)  The Court;

3)  The Assistant United States Attorney assigned to the case; and

4)  The defense attorney.

b.  Release of any further information regarding the prisoner's medical condition outside the USMS is accomplished through the court.

c.  USMS district management or designee will notify the Pre-trial Services Agency or the United States Probation Office of prisoners who test positive for active TB or other airborne diseases and are released on bond, so that they can be tracked for medical treatment by appropriate local authorities pursuant to a court order as a condition of release. OIMS is available to assist.

7.  **Hospital Detail for Potential Contagious Airborne Diseases:**

a.  All USMS personnel and hospital guards who share breathing space with a prisoner who has active contagious TB or other contagious airborne disease(s) (i.e., during transport to the hospital) must wear their approved respirator/masks. The contagious prisoner must wear a surgical mask over his/her mouth and nose while sharing breathing space with USMS personnel.

b.  After admission to the hospital, the contagious prisoner must have further testing to determine the extent of the disease. The hospital medical staff will keep the prisoner in respiratory isolation and begin treatment. If a prisoner is treated for TB, it is absolutely crucial that treatment continue for the full course prescribed

(usually 6 months) in order to prevent the development of drug-resistant organisms.

c.   If the prisoner is released from the hospital during treatment, upon discharge, USMS staff must ensure that the appropriate prescriptions and/or medications and discharge orders accompany the prisoner to the detention facility.

8.   **Medical Clearance Requests for Justice Prisoner and Alien Transportation System (JPATS):**

a.   Form USM-106, *Request for Prisoner Movement*:  JPATS scheduling does not process a form USM-106 unless the medically cleared line is marked, which indicates the prisoner has been TB cleared and medically cleared for transportation.  Any medical complication or issue which could create an in-transit movement problem/delay must be noted in the *Special Remarks* section so that these concerns can be addressed prior to movement.

b.   Form USM-553, *Medical Summary of Federal Prisoner/Alien in Transit*:  Must be completed by a healthcare professional and provided to the deputy or contract guard in charge of the trip for all prisoners who are moved.  The deputy or contract guard in charge of the trip is responsible for ensuring that a completed Form USM-553 accompanies all prisoners who are moved.

c.   USMS Prisoners with Deadlines:  Prisoners under a court-ordered deadline should have documentation of a TB clearance done within the past 12 months.  For any questions, the district should call JPATS, Medical Transport Coordinator, 816-467-1973.

d.   Co-op and Military Prisoners:  Co-op and military prisoners traveling on JPATS flights must have a documented TB clearance done within the past 12 months.

9.   **Payment for USMS Prisoner TB Program Costs:**

a.   Intergovernmental Agreements:  IGA facilities will, whenever possible, include TB testing in the calculated per diem rate.  If the existing cost data includes TB testing, there is no added cost for this testing to the federal government.

b.   Outside Prisoner Medical Care:  All outside prisoner medical care costs generated by TB testing of USMS prisoners are to be charged to the Federal Prisoner Detention (FPD) appropriation as outside medical costs.  The USMS pays only those costs for testing and treatment of USMS prisoners.

10.   **Guidelines for TB Testing and Documentation:**

a.   **Documentation – Roles and Responsibilities of Staff:**

1)   Form USM-553:

a)   USMS Intake Officer:  The prisoner identification section of Form USM-553 (*Name* through *Date in Custody*) is completed by the USMS intake officer.  The form is transferred with the prisoner to the detention facility and given to the detention facility medical staff for retention. If the detention facility has no medical staff, TB testing and medical clearances are accomplished by another resource.

b)    Health Care Professional:  Documents, signs, and dates the USMS prisoner's TB test results in the *TB Clearance* section in the upper left corner of Form USM-553.  TB clearance is good for one (1) year.  The healthcare professional will also complete the *Current Medical Problems*, *Medication Required*, and *Special Needs* sections.  This information is used by the district staff to complete the *Special Remarks* section of form USM-106, *Request for Prisoner Trip*.

c)    District Management or Designee:  Ensures completion of Form USM-553 and that TB test results will be documented by the district in the PTS TB Clearance Screen within one month of testing.  Test results must also include the date the tests were administered, TB clearance ("Y" or "N" to be entered into the PTS TB Clearance Screen) in order to verify that the TB clearance is still valid.  For more details, reference the TB Clearance Procedure listed under Archived PTS Information on the POD web site.

2)    Distribution:  After all sections of Form USM-553 have been completed, the original is provided to the deputy-in-charge or contract guard of the prisoner trip.  The deputy provides the Form USM-553 to the flight nurse if the prisoner is to be transported on a JPATS aircraft, to the bus lieutenant if the prisoner is to be boarded on a Federal Bureau of Prisons (BOP) bus, or to the appropriate person at an institution or detention facility.  A copy of the form is kept by the district in the prisoner file and a copy retained by the medical staff at the detention facility or by the attending physician.

b.   **TB Test Information and Results:**

1)    TST, PPD or Mantoux test:  This test should be administered to every prisoner upon admission unless he or she has had this test in the past 12 months or has tested positive in the past.  The PPD is injected under the skin, and the resulting reaction must be read 48 to 72 hours later.  This test is done by a health care professional in accordance with the latest CDC standards.

a)    If the PPD is negative, and the prisoner is not exhibiting symptoms of active contagious TB, the prisoner can be housed or moved as necessary.

b)    If the PPD is negative, but the prisoner is exhibiting symptoms of active contagious TB, the prisoner must be taken to a hospital or other appropriate medical center immediately for further testing.

c)    If the PPD is positive, a chest x-ray must be done as soon as possible to rule out active contagious TB.

2)    Chest X-ray:  If a prisoner is known to be or reports being pregnant, a healthcare professional is notified as soon as possible before an x-ray is done.

a)    If the chest x-ray is negative, the prisoner can be housed or moved as necessary.

        b)      If the chest x-ray is positive, the prisoner will require further testing.

**Table 1. USMS TB Clearance Requirements Summary**

| USMS TB Clearance Status | PPD Test Results | Symptoms of TB | Chest X-Ray Results |
|---|---|---|---|
| Cleared | Negative | No | Not Applicable |
| Cleared | Positive | No | Negative |
| Not Cleared | Negative | Yes | Positive or Pending* |
| Not Cleared | Positive | No | Positive or Pending* |
| Not Cleared | Positive | Yes | Positive or Pending* |

* Must have a chest x-ray report that states no TB findings to receive a TB clearance.  Contact OIMS at 202-307-9680 for further assistance.

      3)      Requirements for Prisoners Housed in BOP:

        a)      BOP facilities must perform TB testing on all prisoners (including USMS prisoners) at intake if there is no documented TB clearance;

        b)      BOP facilities are prohibited from releasing any prisoner to another BOP facility without a documented TB clearance.  However, a USMS prisoner traveling with a deadline to a state or local detention facility can be released from a BOP facility prior to completion of TB clearance; and

        c)      USMS prisoners who do not have a documented TB clearance and are to be transferred to other BOP facilities may be subject to delays en route.

**F.**    **Definitions:**

    1.    **Tuberculosis (TB):**  TB is an infection caused by exposure to mycobacterium tuberculosis; latent TB infection can progress to disease.  TB infection and TB disease make up the two dimensions of TB.

      a.    **Latent TB Infection:**  A person with latent TB:

        1)      May feel healthy;

        2)      May have no signs of illness (active contagious disease);

        3)      Tests positive on either TST, PPD or Mantoux test;

        4)      Is not contagious (cannot infect others); and/or

        5)      Is at risk for developing active contagious TB disease in the future (especially if the person's immune system is compromised by other diseases such as the Human Immunodeficiency Virus infection (HIV infection), diabetes, and/or cancer).

      b.    **Active Contagious TB Disease:**  A person with active contagious TB:

1)     May or may not feel ill;

2)     May or may not display signs and symptoms of disease (fever, chills, night sweats, coughing up blood, weight loss);

3)     Usually tests positive on either TST, PPD or Mantoux test; and/or

4)     Is contagious (can infect others) and can spread infection by such simple actions as coughing and sneezing.

2.     **TB Skin Test (TST):** A standard test used to identify latent or active contagious TB which is known as the PPD or Mantoux test.

3.     **TB Clearance:** A determination made by a medical care provider that a prisoner has no signs or symptoms of active contagious TB and has either a negative result for TST, PPD or Mantoux test or a negative chest x-ray within the past 12 months.

4.     **Multiple Drug-resistant TB (MDR TB):** Several strains of mycobacterium tuberculosis (the bacteria that cause tuberculosis) have developed resistance to the medications used to treat the disease. As a result, some people with active contagious tuberculosis cannot be treated with conventional medications. These drug-resistant strains of bacteria pose a great risk to the public health of this nation and others. Bacteria develop resistance when treatment is started but not completed. This is why courses of drug treatment must always be completed.

5.     **Approved Respirator:** Respirators classified by the National Institute for Occupational Safety and Health (NIOSH) as type 100, 99, or 95 are acceptable for worker protection against exposure to TB.

6.     **Airborne Pathogens:** Infectious agents (usually bacterial or viral) that are carried by or through the air usually in small droplets (i.e., TB, SARS).

G.     **Cancellation Clause:** Supersedes Policy Directive 9.4, *Prisoner Health,* regarding the section on *Prisoner Airborne Pathogen Control.* (This section has been moved from under Policy Directive 9.4 to Policy Directive 9.6.)

H.     **Authorization and Date of Approval:**

**By Order of:**                     **Effective Date:**

_____/S/_____                              _____7/28/10_____

John F. Clark
Director
U.S. Marshals Service




FILED

JAN 09 2017

MIKE FORBESS, CLERK

File No:U-15-6030;
W2010-02073-CCA-R3-CD;
Hearing Date: December 02, 2015

# IN THE UNIVERSAL SUPREME COURT
## OF THE T'SILHQOT'IN

Between:

Michael Wayne Parsons

Appellant

And:

State of Tennessee

Appellee

## <u>REASONS FOR JUDGMENT</u>

[1] This is a final appeal proceeding relating to the wrongful conviction and travesty of justice in case 6030 and subsequent proceedings brought before me, this 2nd day of December 2015 for correction from the Circuit Court of Tennessee at Covington Twenty-fifth Judicial District regarding Mr. Michael Wayne Parsons. As, the duly appointed Chief Justice of the Universal Supreme Court of the Tsilhqot'in, an international aboriginal court under the authority of the host Tsilhqot'in Nation's *Constitution of the Tsilhqot'in Nation*, now dispose of this here international matter which the guest nation, the United States of America and the Twenty-fifth Judicial District of the State of Tennessee is obliged to uphold under the full faith and credit doctrine as well as the Host/Guest Nation concept. Pursuant to sections 3(17) of the *Constitution of the Tsilhqot'in Nation* "All rulings by the Universal Supreme Court of the Tsilhqot'in are final and without appeal and must be upheld by guest nations and international courts and governments;"

1


DEFENDANT'S
EXHIBIT
1D4
NO.4:17cr3038

Exhibit # S
Case # CR17-S
Date 1-20-17
Initials ___ pgs. 12

[2] On December 02, 2015 the appellant, Mr. Parsons, of aboriginal descent, attorned to the Universal Supreme Court for relief, pursuant to section 3(16) of the *Constitution of the Tsilhqot'in Nation* and section 2 & 3 of the *Universal Supreme Court Act*. It is unknown if service was duly rendered upon the appellee, therefore the State of Tennessee has 30 days after service to apply by written submissions to this court, and only this court, to change or vary this ex parte order/ judgement, pursuant to section 3(17) of the *Constitution of the Tsilhqot'in Nation* and has 45 days to appear before me at the Kamloops USCT Division, British Columbia, to show cause why these findings should not be fixed. I note that nothing in these reasons preclude Mr. Parsons from proceeding with his civil claim either in this court or another venue.

HELD:      Mr. Michael Wayne Parsons is hereby exonerated of all prior 2007 convictions; 2 counts of aggravated assault, 2 counts of theft, and burglary of a vehicle are hereby nullified.

## HISTORY OF THE CASE:

[3] On September 24, 2007 a neighbour Mr. Barry D. Laxton across the street from 444 Hughes Road in a rural Tennessee community of Brighton, USA, where Mr. & Mrs. Parsons resided, was according to Mr. Laxton's own testimony mowing his lawn when he spotted some of Mr. Parson's dogs (which happened to be a wolf/dog cross, hereafter referred to as "dogs", "dog" or in particular "Brandi"; simply for brevity and dispelling of any myth that a wolf/dog cross is of any other temperament other than the ordinary range of dog breeds) running loose.

[4] There was evidence presented to the court by both parties that Mr. Parsons was a responsible dog owner who kept his dogs in an enclosed, fenced space unless on a leash or otherwise controlled but on this day as at times animals and children sometimes do, some of the dogs escaped or intentionally were, and unknown to the Parsons, let loose from their enclosure and were at large.

[5] I note here that it is highly suspect that the incident which occurred that day just so happened to coincide with a meeting that Mr. Parsons had with his attorney regarding a civil suit against the State of Tennessee with respect to election fraud. I also note  it was improper during the underlying proceedings for  the General Sessions Judge William Peeler and a Circuit Court Judge, Joseph H. Walker III to have anything to do with this case against Mr. Parsons due to the conflict of interest with respect to the civil suit in which they were named as parties. Instead of recusing themselves from the proceedings as other judges properly had done, they purposefully interjected

2

themselves into this case and continued to be seized of this case, giving not only the semblance of impropriety but outright conspiracy, collusion and corruption against Mr. Parsons, above Mr. Parsons repeated objections.

**THE ALLEGED CRIME:**

[6] So on September 24, 2007, while Mr. Laxton, claimed he was mowing his daughter's lawn across the street from the Parsons property to the south. Another neighbour, Mr. King, on the property adjacent to Mr. Parsons's property on the north side of the street, doing mechanical work near a hanger on his father in law's property. Mr. King testified that he saw Mr. Laxton attempting to "shushing away" Mr. Parsons dogs who were at large, on their own property, across the street. Mr. King also testified all the dogs left the vicinity except for one dog named Brandi. Mr. King and Mr. Laxton testified Mr. Laxton went into his daugher's house, retrieved a rifle and went back outside. It has never been explained why Mr. Laxton had his rifle in his daughter's house. Mr. Laxton did not call the Parsons or animal control. Any reasonable person would have called the Parsons, animal control or the police.

[7] Mr. King testified that he incited or egged Mr. Laxton on, becoming an accomplice to the actions of Mr. Laxton by saying, "When the wolf then crossed the ditch, I said, 'You better do something now. He's coming at you.'" By his own testimony he refused or neglected to stop, hinder, or dissuade Mr. Laxton from going across the street with his rifle. Mr. King later told Mr. Laxton to hide his rifle in his (King's) truck.

[8] It was at the point Mr. Laxton stepped off of daughter's property and crossed the street with a semi-automatic rifle in hand that Mr. Laxton ceases to be a victim and becomes the predator, hunter, stalker and perpetrator of the crime that ensues. If Mr. Laxton would have gone inside his daughter's house, instead of going back outside with his rifle, for his protection, in case the dog crossed the road to attack him, he might have had an arguable defence for shooting the dog in self-defense. Instead, Mr. Laxton crossed the street, off his daughter's property, putting himself in close proximity to the dog which he claimed was endangering him. He then fired his semi-automatic weapon towards the north into the Parsons property, fatally killing the dog, attacking Mr. and Mrs. Parsons who were outside looking for their dog. Whether Mr. Laxton shot in the air at first or not, whether the lay of the land had any depressions or ditches in it does not matter because at some point his spray of bullets flew low

3

enough to hit the dog on the ground, simultaneously endangering the life of Mr. and Mrs. Parsons. Mr. Parsons testified that he heard several bullets fly past him while witnessing Mr. Laxton shooting in his and his wife's direction, eventually killing his dog Brandi, who was in close proximity to both Mr. and Mrs. Parsons. It is here that proof of malice aforethought with willful intention to commit murder of Mr. & Mrs. Parsons exists, that *mens rea* is met . It is plain and obvious if one bullet had been shot into the Parsons property with intent, a crime had been committed. There is ample evidence a barrage of bullets were shot into the Parson residence.

[8] Any reasonable person would question Mr. Laxton's motives for going back outside with a rifle if he felt unsafe outside with Mr. Parson's dogs at large. Mr. Laxton not only went back outside on his daughter's property, but then took steps off his daughter's property, toward the dog across the street, coming into closer proximity to the dog, spraying Mr. Parson's property with bullets, endangering the life of the Parsons. It is to be noted neither Mr. Laxton nor Mr. King reside in the neighbourhood where Mr. Parsons live but were on September 24, 2007 visiting relatives and both happened to be outside doing yard work. In other words, neither were on their own property. This event coincidently was only the 3rd time the Parsons's dogs were ever at large. At trial the issue or possibility of foul play was never raised but attempted murder can be proven.

[10] During the trial, both Mr. Laxton and Mr. King both provided oral and written testimony. Both men testified that they were only shooting at the dog Brandi and not at Mr. & Mrs. Parsons and in effect could not see them therefore were not targeting them. Yet both make admissions of hearing, which can also be heard on tape, that Mr. Parsons yells at them to "Stop shooting", placing Mr. Parsons in Mr. Laxton's line of fire. Whether they had seen Mr. Parson or not is irrelevant, they heard Mr. Parson and continued shooting. Mr. Parsons would not have to say, "Stop shooting!" if the shooting had ceased before he arrived. Mr. Parsons testified he even fired his gun in order to get Mr. Laxton's attention to stop shooting in his presence. It was only at this time Mr. Laxton stopped shooting and walked over to Mr. King's vehicle instead of taking his gun to the house of his relatives. Mr. Laxton hid the evidence of his crime. It is the subsequent actions of Mr. Laxton and Mr. King that determine the degree of the crime in my view. Any reasonable person who discovered that they nearly shot another person by accident would have displayed some sort of shock or horror. None of that exists in this case. Had Mr. Laxton and Mr. King

4

been apologetic when they discovered Mr. & Mrs. Parsons were in their line of fire after the fact or shown some sort of remorse or regret for what could have resulted in the death of the Parsons, it could have been argued that Mr. Laxton had only committed aggravated assault and reckless endangerment. But that is not what occurs. What happens is that Mr. King tells Mr. Laxton to hide the weapon, then Mr. King retrieves his own gun from his truck, claiming the act of picking up his gun was self defense. The question remains as to why the actions of Mr. King were found by the court to be justified as self-defense while the actions of Mr. Parsons were not. Mr. Parsons cannot be guilty of any crime. There was not a word of remorse by either Mr. Laxton or Mr. King for the actions that could have resulted in murder of the Parsons and did result in the death of their dog. Throughout the proceedings, their lack of remorse tends to demonstrate intent to commit bodily harm if not murder, and Mr. King's intent to assist him.

[11] Now I turn my attention to Mr. Parsons. Simply put, a man who cries, "Stop shooting!" is using words of self-defense not aggression. It is clearly evident Mr. and Mrs. Parsons were in Mr. Laxton's line of fire, which renders all subsequent actions of Mr. Parsons to be that of self-defense. Under the law of self-defense even if Mr. Parsons could have returned fire and shot Mr. Laxton, (which he mercifully does not do, I might add, and both Mr. Laxton and Mr. King should be very grateful to Mr. Parsons for that) Mr. Parsons could not be guilty of a crime as he was acting in self-defense in response to a shooter shooting at him, his wife and his dog. [See paragraph 25 herein, Necessity Defense.] Further, Mr. Parsons confiscated Mr. Laxton's rifle as evidence and nothing more, which was prudent to do in this case as the evidence may have disappeared or could have been used by the perpetrator to further his crime. It has been noted Mr. King told Mr. Laxton to hide Mr. Laxton's rifle. Seizing a weapon from a perpetrator at a crime scene can not be deemed as "theft" under any circumstances. Also, Mr. King's actions of reaching for his cell phone instead of his pistol speaks of no imminent danger imposed upon him by Mr. Parsons therefore it was Mr. Parsons who was at all times material the true victim. Fundamentally speaking, due to the fact Mr. Laxton fired the first shot at Mr. and Mrs. Parsons, it should have been clear to law enforcement, judges, the Grand Jury, the trial jury and all those involved with this case Mr. Parsons was acting in self-defense. The fact Mr. Parsons was charged with false and malicious charges which can not in any way be misconstrued or judgment

5

wrested from actions of self-defense speaks of judicial misconduct, apprehension of bias, discrimination, perjury, fraud, conspiracy and collusion.

[12] Mr. Parsons had every right under law to protect himself by diffusing the danger and threat to himself, his wife, his pets and belongings caused by Mr. Laxton and Mr. King. Mr. Parsons is in the truest sense a hero and an example of courage and bravery, yet as the victim in this case, he was without cause made to suffer, without limiting the scope of his suffering; calumny, false accusation, slander, libel, false arrest, false prosecution, false conviction and false imprisonment, denial of due process, loss of income, loss of business, loss of dog, mental anguish, hardship, assault, pain and cruelty. I am satisfied that the actions Mr. Parsons took on September 24, 2007 was legally correct and in my view worthy of commendation and his suffering worthy of compensation.

[13] Out of an abundance of evidence and proofs of Mr. Parsons's innocence that were brought out in this case, particulars of which I will not reiterate except for Mr. Parsons's dog being found upon examination by the veterinarian and examiner to have no head or frontal bullet fragments or holes only bullet damage to the back which attests to fact that the claim with respect to the dog charging the stat´ witness, Mr. Laxton is a lie.

THE TRAVESTY OF JUSTICE:

[14]   Mr. Parsons as a matter of federal and international law had an undeniable right to counsel. Quoting from the trial transcript at lines 18-10, pp. 2&3 Mr. Parson states that:

> ...I object to this Court taking me to trial today without counsel. Let the record reflect that I do not waive my right to counsel. "We hold that no person may be deprived of his liberty who has been denied the assistance of counsel as guaranteed in the 6th Amendment. This holding is applicable to all criminal prosecutions including prosecutions for violations of municipal ordinances. The denial of assistance of counsel will preclude the imposition of a jail sentence. Under the rules we announce today every judge will know when the trial is a misdemeanor start that no imprisonment may be imposed even though local law permits it unless the accused is represented by counsel. He will have a measure of the sentences and gravity of the offenses and therefore, know when to name the lawyer to represent the accused before the trial starts. And this is Argersinger v Hamlin, 407 U.S. 25th, 27th, 31st, 37th, 38th, 40th, of June 12, 1972. Your Honour, I do not waive my right to counsel as guaranteed by the 6th Amendment again.

Judge Walker erred in law by not providing Mr. Parsons an attorney after Mr. Parsons advised the court the previous court appointed attorney withdrew twice, two weeks before the trial date. In response Judge Walker abused his powers by compelling Ms. Mills to sit side chair or as "elbow counsel" to Mr. Parsons during the trial as

6

well as compelling Mr. Parsons to conduct his own trial. The travesty of justice that occurred at trial included the following elements:

    a)  Mr. Parsons a pro se litigant had to prepare an entire trial by himself in less than 2 weeks.

    b)  Mr. Parsons was unable to give instruction to counsel because counsel would not speak to him.

    c)  Mr. Parsons "elbow counsel" did not utter a word during the trial in Mr. Parsons's defense.

    d)  Mr. Parsons was suing Ms. Mills, so Ms. Mills was in conflict of interest with respect to Mr. Parsons best interests.

    e)  In consequence, Mr. Parsons conviction must be nullified because Mr. Parsons neither had counsel nor had waived the right to counsel.

    f)  The trial court engaged in substantive judicial error by allowing the trial to proceed without effective counsel.

    g)  It was unconscionable for the Tennessee Court of Appeal to not reverse Mr. Parsons's conviction based on the denial of due process rights to counsel in a matter where incarceration is at issue; this is a flagrant violation of USCA, AM 14 &6.

[15] In addition to the previously stated travesty of justice, both Judge Walker and Peeler were named in the civil suit regarding election fraud by Mr. Parsons. They did not recuse themselves. Quoting again from the trial transcript lines 25,1, pp. 14,15 Mr. Person and Judge Walker state:

...And of course, now that there is a civil lawsuit against the judge, I would ask the judge to recuse yourself. I make that motion now. Court: That request will be denied.

And again at trial transcript lines 11-18, p. 13 it reads:

And then we had the probable cause hearing in April, for which I asked Judge Peeler to recuse himself, citing the fact that he, individually, ordered my arrest the date of the event via phone conversation with the officers, according to eye witnesses who will testify to that effect and of course, myself, who was told that by officers at the scene."

These judicial indiscretions and improprieties are suspect. On the day of the shooting, Judge Peeler ordered Mr. Parsons's arrest; creating a conflict of interest by subsequently ruling against Parsons at the probable cause hearing, suggesting a set up and conspiracy by these two judges against Mr. Parsons; which is illegal and a criminal offense, violating the laws of Tennessee and the US Constitution, rendering all their rulings against Mr. Parsons void on their face. Judges Peeler and Walker engaged in judicial misconduct by not recusing themselves

7

due to a conflict of interest. Judges Walker and Peeler erred by seizing themselves with matters relating to Mr. Parsons, abusing their authority over Mr. Parsons and control of this case.

[16] Mr. Parsons was repeatedly denied due process and his rights during this case which consequently resulted in a miscarriage and travesty of justice. The majority of Mr. Parsons objections were denied when they ought not to have been. For example, Mr. Parsons had rightful claim to the witnesses he chose found at trial transcript lines 24– 1 pp. 15,16 stating:

> Your Honour, I do not waive my right to compulsory process to subpoena a key witness, Dr. Tina Fisher, whose testimony is crucial to my case.

This right was wrongfully denied by the court along with several other times Mr. Parsons was denied his evidence.

[17] Deputies, sheriffs private investigators and other law enforcement personnel at the scene of the crime were negligent and/or failed to take statements from either Mr. or Mrs. Parsons, and refused to investigate all the evidence at the crime scene.

[18] At some point during the trial it was discovered that during the voir dire, jurors lied about their relationship to the state's witnesses and officials, denying Mr. Parsons of an impartial jury; it was this same partial jury which wrongfully convicted Mr. Parsons.

[19] I accept the 15 page Chronology of Mr. Parsons's in the form of a letter with a Nexus attached to it, as being an accurate depiction of the denials of due process, violations, atrocities, cover ups and travesties of justice suffered by him and his family and I therefore attach it hereto.

[20] There is ample evidence suggesting a collective motive to silence Mr. Parsons during the trial; a travesty of justice done to frame, wrongfully convict and wrongfully imprison Mr. Parsons.

ERROR IN LAW:

[21] The Rule Book of all rule books states at Proverbs 17:15, "He that justifieth the wicked, and he that condemneth the just, even they both are abomination to the Lord, " and at Zephaniah 3:3, "...her judges are

8

evening wolves; they gnaw not the bones till the morrow." This herein case is a prime example of a gross miscarriage and travesty of justice which must be corrected and Mr. Parsons fully exonerated. The said Judges, district attorney and government employees involved with Mr. Parsons's had a vested interest in silencing Mr. Parsons and preventing him from his civil claim against them which they eventually succeeded obtaining.


[22] The 6th Amendment of the *US Constitution* states:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

In *Gideon v Wainwright*, 372 U.S. 355 (1563) rules that indigent defendants must be provided with counsel in all felony cases, especially where incarceration is an issue as stated before in the American seminal case of *Argersinger v Hamlin*. This 6th Amendment was violated during these proceedings by failure to provide Mr. Parsons with effective counsel, by failure to order witnesses and allow evidence in his favor, and failure to provide Mr. Parsons with an impartial jury therefore all 2007 convictions of Mr. Parsons are rendered a nullity and set aside.


[23] The 14th Amendment of the *US Constitution* states:

> Amendment XIV, Section 1.

> "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Mr. Parsons was deprived of his liberty and property, without due process of law or equal protection of Law.

[24] Under the *Constitution of Tennessee*, Mr. Parsons was denied his rights as the victim in this case, whereat section 35 states:

> "Section 35.

> To preserve and protect the rights of victims of crime to justice and due process, victims shall be entitled to the following basic rights:

> (a) The right to confer with the prosecution.

(b) The right to be free from intimidation, harassment and abuse throughout the criminal justice system.

(c) The right to be present at all proceedings where the defendant has the right to be present.

(d) The right to be heard, when relevant, at all critical stages of the criminal justice process as defined by the General Assembly.

(e) The right to be informed of all proceedings, and of the release, transfer or escape of the accused or convicted person.

(f) The right to a speedy trial or disposition and a prompt and final conclusion of the case after the conviction or sentence.

(g) The right to restitution from the offender.

(h) The right to be informed of each of the rights established for victims.

The General Assembly has the authority to enact substantive and procedural laws to define, implement, preserve and protect the rights guaranteed to victims by this section"

[25] In my view this is a classic case where the Tennessee laws of the Necessity of Self-Defense applies and is

quoted following:

"The Necessity Defense. Under Tennessee law, conduct that would otherwise be criminal is justified if it is immediately necessary to avoid imminent harm. Moreover, the need to avoid harm must outweigh the harm to society or the interests of others brought about through the defendant's act. T.C.A. § 39-11-609.

Self-Defense. The following statute set forth the defense of self-defense under Tennessee law. Note in particular the italicized provision, which represents an important change in the law.

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force. [emphasis added]

Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

The threat or use of force against another is not justified if the person consented to the exact force used or attempted by the other individual. The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless: The person abandons the encounter or clearly communicates to the other the intent to do so; and The other nevertheless continues or attempts to use unlawful force against the person. (e) The threat or use of force against another is not justified to resist a halt at a roadblock, arrest, search, or stop and frisk that the person knows is being made by a law enforcement officer, unless:

The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and The person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary. T.C.A. § 39-11-611.

10

In *State v. Renner* (1995), the Supreme Court expounded on an important recent change in Tennessee law as it relates to self-defense.

Birch, J. ...

Until recently, Tennessee has traditionally followed the common law "duty to retreat" rule. Under this rule, one is required to retreat, "if reasonably feasible, except in defense of one's home or habitation or in the discharge of official duty."

In 1989, the General Assembly added a "no duty to retreat" rule to the law of self-defense. ... With this enactment, Tennessee joined the majority of jurisdictions which adhere to the "true man" doctrine. ... Under the "true man" doctrine, one need not retreat from the threatened attack of another even though one may safely do so. Neither must one pause and consider whether a reasonable person might think it possible to safely flee rather than to attack and disable or kill the assailant.

... As in all cases of self-defense, the force used must be reasonable, considering all of the circumstances. Moreover, the "true man" rule implies no license for the initiation of a confrontation or an unreasonable escalation of a confrontation in progress.

Whether the "true man" rule applies in a particular case is a matter to be determined by the jury. The jury determines not only whether a confrontation has occurred, but also which person was the aggressor. It also decides whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault. ...

Related Defenses. In Tennessee, a person is also justified in using force against another person to defend a third person who is in immediate danger. T.C.A. § 39-11-612. One is also justified in using force to prevent a suicide of self-infliction of serious injury. T.C.A. § 39-11-613.

Protection of Property. Tennessee law permits a property owner to use force to prevent or terminate a trespass to land, but deadly force is not permitted. T.C.A. § 39-11-614. This extends to the use of devices, as long as they do not carry a substantial risk of causing death or serious bodily harm. T.C.A. § 39-11-616."

[26] Under the *Constitution of the Tsilhqot'in Nation* section 4-Bill of Rights1(a-q) states:

4-Bill of Rights:

1)      This CONSTITUTION OF THE T'SILHQOT'IN NATION guarantees and extends the following fundamental rights and freedoms and the right to not be deprived thereof, to people who elect to stand under this CONSTITUTION OF THE T'SILHQOT'IN NATION;

a)      The right to life, liberty, safety and happiness;
b)      The right to freedom of religion and conscience;
c)      The right to freedom of thought, belief, opinion, press and speech;
d)      The right to be treated fairly and equally at all times;
e)      The right to not be subjected to any abuse, discrimination, cruel or unusual punishment;
f)      The right to freedom of mobility, association, peaceful assembly;
g)      The right to vote, call s referendum, peaceful protest and voice grievances;
h)      The right to pursue a livelihood, own and advance property without oppressing others;
i)      The right to be free from corrupt, immoral and tyrannical practices, laws and rulings;
j)      The right to be free from crime and criminals;
k)      The right to be presumed innocent and treated as such, until proven guilty;

11

l)   The right to a speedy, just and fair trial;
m)  The right to choose family rehabilitation, family counseling and parental training in lieu of family separation;
n)   The right to personal rehabilitation, edification, alternative medicines, therapies;
o)   The right to be informed of the truth;
p)   The right to freedom from oppression, genocide, poisoned food, air, water, bodily harm;

CONCLUSION:

[27] For all the reasons above, it is hereby ordered that Mr. Michael Wayne Parsons was wrongfully and falsely charged and wrongfully and falsely convicted on counts of aggravated assault, burglary of a vehicle , theft by the State of Tennessee. The wrongful convictions are nullified and set aside and Mr. Parsons is fully exonerated henceforth. I make a *Vancouver (City) v Ward*, 2010 SCC 27 ruling. The State of Tennesssee is ordered to pay Mr. Parsons $5000 per diem accrued for each day Mr. Parsons spent in incarceration with respect to the 2007 conviction.

[28] Mr. Parsons is free to seek further relief and compensation for business loss, aggravated and punitive damages, and libel and slander. The 2007 felony conviction is to be expunged from Mr. Parsons's record. The Appellees are to pay court costs to the Universal Supreme Court in the amount of $10,000. The 2014 indictment will be dealt with separately.

By the Court:

The Honourable Chief Justice
of the Universal Supreme Court

12

ATTACHMENT 3

 

CHILCOTIN NATIONAL CONGRESS

March 20, 2016

File No: U-15-6030;
W2010-02073-CCA-R3-CD;
Hearing Date: December 02, 2015

## IN THE UNIVERSAL SUPREME COURT
## OF THE T'SILHQOT'IN

Between:

Michael Wayne Parsons

**Appellant**

And:

State of Tennessee

**Appellee**

### AMENDED ORDER

Coming on before me on appeal in the sovereign T'silhqot'in Territory under the authority of the *Constitution of the Tsilqhot'in Nation* is the wrongful conviction and wrongful prosecution matter of Mr. Michael Wayne Parsons therefore;

**THIS COURT ORDERS that:**

1. Mr. Michael Wayne Parsons's 2009 wrongful conviction of aggravated assault, burglary of a vehicle and theft is overturned and nullified.

2. Mr. Michael Wayne Parsons is fully exonerated from the 2009 wrongful conviction of aggravated assault, burglary of a vehicle and theft.

3. Mr. Michael Wayne Parsons is awarded compensation for his wrongful incarceration in the amount of $5000 per diem for each day he was incarcerated.

4. Mr. Michael Wayne Parsons's record, including NCIC records shall be expunged from the 2009 wrongful conviction of aggravated assault, burglary of a vehicle and theft, within 21 days of this order.

By the Court:

_____
The Honourable Chief Justice
of the Universal Supreme Court

[The 18 Jan. 2016 order is amended to correct the date of conviction.]

DEFENDANT'S EXHIBIT
IDS
NO. 4:17cr3038

Exhibit # 9
Case # CRN-8
Date 1-30-17
Initials ___ pgs. 1

 

PO Box 115, Anahim Lake, BC, Canada V0L 1C0
Ph: 250-394-7042 or 250-305-8704

*Tsilhqot'in Nation's Letter of Appointment to*
*Tribal Membership*

Pursuant to the *Universal Supreme Court Act* section 15, Practice Directives of Chief Justice, Rule 3 and by virtue of Michael Wayne Parsons appointment as Associate Justice of the Universal Supreme Court of the Tsilhqot'in, full Tribal Membership to the sovereign Tsilhqot'in Nation of the sovereign Tsilhqot'in Territory, with all rights, privileges and responsibilities of the sovereign Tsilhqot'in Nation is hereby conferred. Full tribal membership is also hereby conferred upon the family of Michael Wayne Parsons as per Rule 3 of Practice Directives of the Chief Justice of the Universal Supreme Court.

This Tsilhqot'in Nation's Letter of Appointment authorizes and enables you and your family to travel freely without interference, obstruction or restraint across borders as an Internationally Protected Person having full Diplomatic Immunity and protections afforded under the *Vienna Convention of Diplomatic Relations*, the *Jay Treaty* and the *Constitution of the Tsilhqot'in Nation*.

It is hereby enjoined upon you as Associate Justice of the Universal Supreme Court and full Tribal Member of the Tsilhqot'in Nation to serve the Tsilhqot'in people with pride, devotion and sincerity, abiding by the laws and jurisdiction of the sovereign Tsilhqot'in Nation. We hereby congratulate you on your appointment as Associate Justice and therefore a full Tribal Member of the host Tsilhqot'in Nation and with great pleasure welcome you and your family as a permanent adopted relation!

Dated: December 13, 2015

Respectfully,

The Honourable Chief Justice of the
Universal Supreme Court of the Tsilhqot'in



DEFENDANT'S EXHIBIT
107
NO. 4:17-cr-3038



Chilcotin National Congress
Box 100, Hanceville, BC V0L 1K0
Ph: 250-394-7042

June 20th, 2016

United Nations Headquarters
Secretary General Ban Ki-moon
1st Ave. and 46th Street,
New York, NY, 10017
Ph: 212-963-1234
Fax: 212-963-4879

Re: Declaration of a New Country Called the "Chilcotin" Upon Sovereign Tsilhqot in Territory

Dear Secretary General Ban Ki-moon and the General Assembly of the United Nations:

We, the collective sovereign Tsilhqot'in Nation via the government of the Chilcotin National Congress and I, Grand Chief Stanley Stump Senior, do hereby bring to the attention of, the Secretary General and all the members of the General Assembly, that we, the collective sovereign Tsilhqot'in Nation hereby assert our rights to declare ourselves, our people, our children, our land, and all that is upon our land the independent country of the "Chilcotin." [Please see attached map for boundries for the country of the Chilcotin.]

Therefore, we, the collective sovereign Tsilhqot'in Nation of the country of the Chilcotin do claim the right of independence from Canada and from the Province of British Columbia; we claim the right to self-government and autonomy, without the interference from British Columbia and Canada or any other nation, government or country[see attached *Constitution of the Tsilhqot'in Nation*, ratified on March 15, 2015] We the collective sovereign Tsilhqot'in Nation of the country of the Chilcotin, claim the right to our own law enforcement/national security, our own national-international judicial system entitled the Universal Supreme Court of the Tsilhqot'in [see attached *Universal Supreme Court Act*], our own economic system, our own health care system, our own inter-governmental relations, our own departments of welfare, agriculture, environment, child protection, transportation, citizenship, fisheries, wildlife, forestry, mining, hydro, natural resources, statistics, travel/tourism, education, revenue/taxation, without the interference from British Columbia and Canada or any other nation, government or country.

Further, we, the country of the Chilcotin do hereby come in peace before all the members of the General Assembly of the United Nations, inviting (yet not depending on) recognition and peaceful relations with other countries of the world as per our *Constitution of the Tsilhqot'in Nation*. We, the country of the Chilcotin want to inform the General Assembly of the United Nations that according to the 1933 Montevideo Convention on the Rights and Duties of States, the country of the Chilcotin is a de jure and de facto state, which a) has a permanent population, b)a defined territory, c) a government called the Chilcotin National Congress constituting both hereditary and non-hereditary officials, d) has the capacity to enter into relations with other states, including claims to diplomatic immunity and international Protected Persons status. The country of the Chilcotin hereby relies upon and adopts articles 1-16 of the

Page 1 of 2

DEFENDANT'S EXHIBIT 1D3 NO.4:17cr3D38

Exhibit # 1D
Case # CBN-6
Date 1-30-17
Initials ___ pgs. 2

stated Convention on the Rights and Duties of States. The country of the Chilcotin particularly emphasizes article 8 & 11 which say,

6)"No state has the right to intervene in the internal or external affairs of another."

and,

11)"The contracting states definitely establish as the rule of their conduct the precise obligation not to recognize territorial acquisitions or special advantages which have been obtained by force whether this consists in the employment of arms, in threatening diplomatic representations, or in any other effective coercive measure. The territory of a state is inviolable and may not be the object of military occupation nor of other measures of force imposed by another state directly or indirectly or for any motive whatever even temporarily."

By accession and by vote, I am the Grand Chief of the country of the Chilcotin on Tsilhqot'in Territory, rightful spokesperson for the Tsilhqot'in Nation and constituent to the United Nations, welcoming all people around the world, admonishing them to live in peace and cooperation according to our Creator's example and design.

Thank you,

Hereditary Grand Chief Stanley Stump Sr.
Spokesperson for the Chilcotin Nations Congress
cc Prime Minister Justin Trudeau
cc President Barak Obama

# Nemenhah Indigenous Traditional Organization and Native American Church of Nemenhah

*The Tehk Tiwehkthihmpt of the Native American Church of Nemenhah*

*Certifies*

## Mike Parsons

*Having requested Spiritual Adoption (Making Relations), and having made an appropriate Covenant and Sacred Giveaway Offering, is hereby inducted into full faith and fellowship, and is designated:*

## Medicine Person / Traditional Leader

*With all the rights, privileges, duties and responsibilities appertaining thereto, including but not restricted to the Sacred Ceremonies of Healing, as well as all other Ceremonies, Performances, Rites, Celebrations and so forth, associated with the full execution of the Calling of the Nemenhah Minister., in the Healing of the Individual, the Family, the Community, the Society and the Planet.*



6/13//2013

*Executed on this date:*

*Phillip R. Landis*

**President and Tehk Tiwehkthihmpt of the Native American Church of Nemenhah**



DEFENDANT'S
EXHIBIT
109
NO. 4:17cr 303

**Alternative Health Empowerment, Inc.**
**670 Colonial Road, Suite 5**
**Memphis, Tennessee  38117**
**(901) 683-8200 / www.AHE4Life.com**

To whom it may concern;                                                                    January 30, 2017

My name is Dr. Bradley M. Frezza, ND, I am a naturopathic doctor practicing in the Memphis, TN area.
Mike Parsons is a client of mine (*natural medicine is illegal in the state of Tennessee and by law I cannot
call him a patient and I have to work as a natural health counselor*).  I saw him on July 5th, 2016 just
after his release from jail on parole.  Mr. Parsons had lost approximately 30 pounds in the 5 1/2 months
since the last time that I had seen him, and appeared to be very pale and weak.  He had a bruise on the
right side of his forehead, three broken ribs appeared to be suffering from malnutrition.

At my recommendation, Mr. Parsons used natural healing methods and herbal products from my
clinic to recover from his injuries and regain his health and weight.  It is my personal opinion that the
law enforcement officials in Tipton County, Tennessee have a personal vendetta against Mr. Parsons and
that his very life could be at risk if he were to be re-incarcerated at one of their facilities.

If you have any questions for me that do not violate HIPPA laws, please feel free to contact me at the
above address or telephone number or you may reach me at DrFrezza@AHE4Life.com.

Sincerely,

Dr. Bradley M. Frezza, ND



DEFENDANT'S
EXHIBIT
106
NO. 4:17cr3038

LEGAL MAIL

Saline County Law Enforcement
From Inmate: Anderson Michael Person
P.O. Box 911
Wilber, NE 68465
* Inmate Mail Uncensored *

  

U.S. POSTAGE
PAID
WILBER, NE
68465
JAN 05 18
AMOUNT
$2.24
R2304Y123185-04

1023        68508

RECEIVED

JAN 0 3 2018

CLERK
U.S. DISTRICT COURT
LINCOLN

8TH CIRCUIT COURT OF APPEALS
C/O CLERK OF THE COURT OF APPEALS
100 CENTENNIAL MALL, FEDERAL BUILDING
LINCOLN, NEBRASKA 68508