```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEBRASKA
 2

 3    UNITED STATES OF AMERICA,     )    Case No. 4:17CR3038
                                    )
 4              Plaintiff,          )
                                    )
 5    vs.                           )
                                    )
 6    MICHAEL W. PARSONS,           )
                                    )    Omaha, Nebraska
 7              Defendant.          )    August 30, 2018

 8

 9                            VOLUME III
                       TRANSCRIPT OF PROCEEDINGS
10          BEFORE THE HONORABLE JOHN M. GERRARD
              UNITED STATES DISTRICT JUDGE AND A JURY
11

12                     A-P-P-E-A-R-A-N-C-E-S

13    FOR THE PLAINTIFF:          Mr. Jan W. Sharp
                                  Mr. Jody B. Mullis
14                                U.S. Attorney's Office
                                  1620 Dodge Street
15                                Suite 1400
                                  Omaha, NE 68102-1506
16

17    FOR THE DEFENDANT:          Mr. Donald L. Schense
                                  Law Office of Donald L. Schense
18                                1304 Galvin Road South
                                  Bellevue, NE 68005
19

20    COURT REPORTER:            Ms. Lisa Grimminger, RDR, CRR, CRC
                                  111 South 18th Plaza
21                                Suite 3131
                                  Omaha, NE 68102
22                                (402) 661-7379

23

24    Proceedings recorded by mechanical stenography, transcript
      produced with computer.
25
```

1          (At 8:37 a.m. on August 30, 2018, with counsel for the

2     parties and the defendant present; WITHOUT the jury:)

3               THE COURT:  You may be seated.  Good morning,

4     everyone.

5               MR. SCHENSE:  Good morning.

6               THE COURT:  We are day three of trial in the United

7     States of America versus Michael Wayne Parsons.  We're outside

8     of the presence of the jury.  Counsel, there were a couple of

9     matters that we needed to take up from yesterday at the end of

10    the day.  First of all, the government had requested that I

11    take judicial notice of what had previously been marked as

12    Exhibits 32 and 33, the Tennessee statutes.

13         I have taken a look at the Tennessee statutes, and I am

14    going to have -- if they -- if they haven't been marked, I do

15    want Exhibits 32 and 33 marked, because there was some dispute

16    as to whether those are the applicable exhibits.  The Court --

17    or the applicable statutes.  The Court has examined the

18    statutes.  Exhibit 32 is Tennessee Section 39-13-102.  The

19    Court will take judicial notice of that.  The applicable

20    offense in this case -- or the underlying offense was

21    September 24, 2007, and Section 39-13-102 was effective June 7,

22    2005, through June 8 of 2009.  The Court will take judicial

23    notice of Exhibit 32.

24         With respect to Exhibit 33, that's Tennessee Code

25    Annotated Section 40-35-111, and the Court will take judicial

 1    notice of Exhibit 33.  Again, the date of offense was

 2    September 24 of 2007.  Exhibit 33 was effective July 1 of 2007

 3    through August 10 of 2010.

 4         So if the -- if the government would mark and offer

 5    Exhibits 32 and 33, I am -- I will take judicial notice.  I am

 6    not going to send those statutes back to the jury.  I will

 7    appropriately instruct, but I do want them marked and offered.

 8    They will not go back to the jury, but since there was an

 9    objection, I do want them marked and offered.

10              MR. SHARP:  Your Honor, the government offers

11    Exhibits 32 and 33 in support of its request that the Court

12    take judicial notice.

13              THE COURT:  Any objection?

14              MR. SCHENSE:  Yes, Your Honor.

15              THE COURT:  I'll hear it.

16              MR. SCHENSE:  Yes, Your Honor.  Thank you.  The

17    objection would be to relevance, and I would ask the Court to

18    also consider my comments that I made up at the bench yesterday

19    in support of my objections.

20              THE COURT:  All right.  And the Court has noted those

21    objections and will overrule the objections and receive

22    Exhibits 32 and 33.

23              MR. SHARP:  May I approach, Your Honor?

24              THE COURT:  Yes, you may.

25              THE DEFENDANT:  I was objecting because I never

1    received --

2           THE COURT:  Just a moment.  And when I say I'm

3    receiving Exhibits 32 and 33, that will be for the purpose of

4    judicial notice.  They will not go back to the jury.  The Court

5    will instruct.  Okay.  There was another -- the defense had

6    requested that the Court take judicial notice of 26, U.S.C.,

7    Section 5845(a), and as with any federal statute, the Court

8    will take judicial notice of 26, U.S.C., Section 5845(a).

9        Do you wish to add any comment?  I'm not sure the Court

10   understands how it's relevant or applicable to this particular

11   case.  It's an Internal Revenue code, but I'll take judicial

12   notice of it.

13          THE DEFENDANT:  May I respond?

14          THE COURT:  No.  Your counsel may respond.

15          THE DEFENDANT:  It's tied back to that section of the

16   code.

17          MR. SCHENSE:  Judge, I went into that area with Agent

18   Shelton yesterday after conferring with Mr. Parsons and so,

19   frankly, I wasn't going to -- and I know that it's part of the

20   portion regarding the IRS.  Nonetheless, having said that, I

21   still would ask the Court, as it's indicated it will, to take

22   judicial notice, and I would also suggest to the Court that it

23   is appropriate consideration for the jury to at least be not

24   only advised of that section, knowing that the statute itself

25   will not go -- or a copy of the statute will not go back to the

1    jury, but it would be appropriate at least for their

2    consideration.  So I'd offer that, Judge.

3            THE COURT:  And I understand the argument.  The Court

4    will take instructions up in just -- when we complete the

5    taking of evidence.  The Court will note that the defendant is

6    charged under 18, U.S.C., Section 922, and the definition of a

7    firearm is found at 18, U.S.C., Section 921, and that's the

8    Court -- the Court will instruct appropriately on the law, but

9    I will take up all of those arguments at the time of

10   instruction.

11       Ask your counsel.

12           THE DEFENDANT:  This was dated after the charge

13   occurred.  This is not valid, this charge.  The charge --

14           MR. SCHENSE:  Judge, Mr. Parsons has picked up on the

15   dates contained in the applicable statutes.  As the Court will

16   remember and as Mr. Sharp will recall, that was part of my

17   objection yesterday about the dates that are contained on the

18   various Tennessee statutes that now have been admitted, 32 and

19   33.  And so for the record I would like Mr. Parsons to

20   understand that what he's just said to me I have already and

21   previously brought to the attention of the Court.

22           THE COURT:  Yes, you have, and your objections are

23   overruled.  I guess I want to be sure that as I understand it,

24   the underlying conviction, judgment and conviction has been

25   entered into evidence.  The underlying date of offense is

1    September 24 of 2007.  Is the Court correct in that?

2            MR. SHARP:  Correct.

3            THE COURT:  Then my ruling stands.

4            MR. SHARP:  Will Mr. Mullis be able to step out and

5    visit with the witness while we proceed here?

6            THE COURT:  Yes.  And the Court has nothing else at

7    this point in time.

8         First I'll ask:  Does the government have anything that

9    you wish the Court to take up?

10           MR. SHARP:  No, Your Honor.  As soon as Mr. Shelton

11   is done, we intend to rest.

12           THE COURT:  Very well.  Defense, is there anything we

13   need to take up?

14           MR. SCHENSE:  Judge, I do want to tell the Court that

15   I met with Mr. Parsons this morning.  We discussed his right to

16   testify or not to testify.  As we all know, whatever he

17   decides, the jury would be instructed that the fact that he did

18   not testify, they have to disregard that and they can't discuss

19   it.  It's of no consequence.

20           THE COURT:  Absolutely.  The jury will be instructed

21   if he chooses not to testify.  The jury will be instructed that

22   they are not to consider that in any way and that he is

23   presumed to be innocent until proven guilty beyond a reasonable

24   doubt.

25           MR. SCHENSE:  Judge, I won't go into the specifics of

1    our discussion, but after thoughtful consideration it's my

2    belief that Mr. Parsons will choose not to testify given the

3    facts and circumstances.

4         THE COURT:  All right.  Do you wish to have the

5    colloquy now?  Because that will save -- I mean, we can have

6    the government rest and the defense may rest at that point in

7    time, or we can have the jury go out and have the colloquy at

8    this point in time.  I just want to be sure that Mr. Parsons

9    understands his right to testify or not to testify.

10        MR. SCHENSE:  I believe that he does, Judge.

11   Whatever the Court prefers is fine with me.

12        THE DEFENDANT:  I would prefer that we wait.

13        THE COURT:  Okay.  That's perfectly fine.  Okay.  The

14   Court will do that.

15        THE DEFENDANT:  May I submit these?  I have a few

16   things to submit to the Court before we begin, if possible.

17        THE COURT:  All right.

18        THE DEFENDANT:  Witnesses -- affidavits of witnesses

19   that were to be subpoenaed.  I have affidavits of them that I

20   request they make copies of.  Those are my originals.

21        THE COURT:  Let's do this.  I'll have Ms. Miller make

22   copies of those.  We will take up those matters as offers of

23   proof.  Let's finish up with Agent Shelton.  The government can

24   rest, and then we'll let the jury retire for a few moments, and

25   we'll take those up as offers of proof.

1          All right.  Does that sound appropriate?

2          MR. SCHENSE:  It does, Judge.  And then if I could

3     just bring up one last topic.  There was -- well, there is a

4     videotape of the aircraft, and I would offer this to the Court

5     after reviewing all of the discovery that Mr. Weverka is on one

6     of the wings of the aircraft, and there is some belief by my

7     client that -- or Mr. Parsons, Mr. Parsons, that that might be

8     during the time that the search warrant was being executed on

9     the plane.

10         THE DEFENDANT:  It was two weeks before the search

11    warrant.  There's a photograph --

12         THE COURT:  Just a minute.

13         MR. SCHENSE:  But I think the time of that, Weverka

14    around the plane, may have been at the time that -- and I

15    don't -- the bounty hunter or the person from New Orleans, one

16    of the undercover types that was working on the covert part of

17    the case with the FBI, may have been up there, and I do not and

18    I will not allow any -- well, any evidence to go forward that

19    may open the door for rebuttal in terms of all of the -- the

20    situation behind the scenes that we have tried very desperately

21    to stay away from.

22         THE COURT:  That's appropriate because it's not

23    relevant.

24         MR. SCHENSE:  And I don't want to open that up now

25    because in my professional opinion that would be extremely

1    prejudicial to Mr. Parsons, and I just wanted to bring that to

2    the Court's attention now.

3              THE DEFENDANT:  I do not waive my right to present

4    evidence of my choosing.  It was provided as exculpatory

5    evidence.  It clearly demonstrates that the state's *[sic]*

6    witness had access to the plane prior to, and he verbally on

7    the video asserted the plane has never been locked.  He's been

8    in it daily and that other pilots have been in the plane moving

9    it in and out of the hangar, thereby rendering the search

10   warrant obtained by Mr. Monte Czaplewski --

11             THE COURT:  Czaplewski, yes.

12             THE DEFENDANT:  -- in question regarding the

13   truthfulness that the plane had been secured the entire time.

14             THE COURT:  Those are arguments.  Those are arguments

15   that the Court will hear and, if relevant, the jury will hear,

16   but at this point in time, what we're going to do is bring the

17   jury in.  We're going to finish up Agent Shelton's testimony.

18   The government will rest, and then I will hear any motions, any

19   offers of proof, anything else from the defense before we bring

20   the jury back in.

21       All right.  Now, if there's something we can make copies

22   of, let's do so while we finish our --

23             MR. SCHENSE:  May I approach?

24             THE COURT:  Kathy, if you could give that to David or

25   one of my clerks to bring back.

1          THE DEFENDANT:  Miss Clerk, there may be fronts and

2     backs on some of them.

3          THE COURT:  Yeah.  Advise them to do fronts and back,

4     and we just need a copy for Mr. Parsons.

5          THE DEFENDANT:  Just one for the Court unless the

6     prosecutor wants a copy.

7          MR. SHARP:  I'd like to see a copy as well.

8          THE COURT:  All right.  So three.

9          MR. SCHENSE:  Judge, could I address, if we may, the

10    last issue?  Given the Court's ruling and stance on the IRS

11    statute as it relates to a definitional term of "firearm" --

12         THE COURT:  Yes.

13         MR. SCHENSE:  -- I'm assuming the Court will let me

14    go further into that regard, and I don't want to go further in

15    that regard.  I don't want to muddy the waters or bring -- so

16    as far as I'm concerned, I'm done with this.  I'm done with

17    this witness.

18         THE COURT:  Very well.  Will there be any redirect?

19         MR. SHARP:  A couple questions.

20         THE COURT:  All right.  So when the jury comes back

21    in, we'll advise that cross-examination is concluded, and I'll

22    ask if there's any redirect.

23         THE DEFENDANT:  Your Honor, just so that you're

24    aware, I don't know what I have, whether it's flu or a bug.  I

25    think I've given it to Mr. Schense, but today I have a fever,

1    and other than just chest congestion today, I have an upset

2    stomach.  If I need to make an abrupt exit for the restroom, is

3    there a signal I can --

4              THE COURT:  Give me one of those, all right, and

5    we'll take -- we want to make sure everybody's comfortable in

6    the courtroom, and that means everybody.  Okay?  All right.

7              THE DEFENDANT:  I'm limited on my access to

8    medications and things to deal with this.

9              THE COURT:  We're going to try to get through these

10   proceedings today, so we'll get you back and comfortable

11   hopefully soon.

12         All right.  Are we ready to bring the jury?

13              MR. SHARP:  We are.

14              THE COURT:  Very well.  Let's do so.

15         CORY SHELTON, PLAINTIFF'S WITNESS, RESUMED THE STAND

16         (Jury in at 8:53 a.m.)

17              THE COURT:  All right.  You may be seated, and

18   welcome back, ladies and gentlemen of the jury.  Hopefully we

19   have the courtroom comfortable for you today.

20         We're on day three of trial.  Yesterday when we broke, we

21   were in cross-examination of Agent Shelton.

22         Is there any further cross-examination, counsel?

23              MR. SCHENSE:  No, Your Honor.

24              THE COURT:  All right, very well.  Is there any

25   redirect?

Shelton - Redirect (Mullis)                                      561

1          MR. MULLIS:  Briefly, Your Honor.

2          THE COURT:  All right.  You may redirect Agent

3     Shelton.

4      I'll remind you that you still remain under oath.

5          THE WITNESS:  Yes, sir.

6          THE COURT:  All right, very well.  You may proceed,

7     Mr. Mullis.

8          MR. MULLIS:  Thank you, Your Honor.

9                    REDIRECT EXAMINATION

10    BY MR. MULLIS:

11    Q.   Special Agent Shelton, good morning.

12    A.   Good morning.

13    Q.   I'm going to follow up with a few questions that pertain

14    to some of the questions that you were asked by defense

15    yesterday afternoon.  All right?

16    A.   Okay.

17    Q.   And just let me know if there's anything you want me to

18    remind you of.  Okay?

19    A.   Okay.

20    Q.   Yesterday I had asked you questions about Government's

21    Exhibit 1.  Do you recall what this item was?

22    A.   Yes.

23    Q.   And without the need to actually physically get it out and

24    show it to you, do you recall what Government's Exhibit 1 was?

25    A.   It was a Rock River Model LAR-15 5.56 semi-automatic

Shelton - Redirect (Mullis)                                    562

1    rifle.

2    Q.   And, again, is this the rifle that you analyzed for

3    purposes of making the nexus determination we discussed

4    yesterday?

5    A.   Yes.

6    Q.   Special Agent Shelton, in determining -- let me rephrase.

7         Is test-firing an object like this rifle necessary in

8    making a determination of whether such an object is, in fact, a

9    firearm?

10   A.   No.

11   Q.   And can you explain for us why it is not necessary?

12   A.   Because by definition the frame or receiver of the firearm

13   constitutes a firearm.

14   Q.   Let me ask the question a little differently.  When you

15   analyzed that item, Government's Exhibit 1, did you -- were you

16   able to determine what it was designed to do?

17               MR. SCHENSE:  Judge, I would object to this testimony

18   as to, well, foundation and relevance and the definition that

19   the witness is referring to.

20               THE COURT:  The foundational objection is sustained

21   at this time.

22        You may proceed.

23               MR. MULLIS:  And may I ask, is that same -- is there

24   an objection to that question or the answer to the previous

25   one, your answer -- Your Honor?

Shelton - Redirect (Mullis)                                    563

1          THE COURT:  To that particular question.

2    BY MR. MULLIS:

3    Q.   Special Agent Shelton, in analyzing that firearm were you

4    able to look at its characteristics and features?

5    A.   Yes.

6    Q.   And were you able to look at some of the parts that

7    composed the entire item?

8    A.   Yes.

9    Q.   And in going back to your training and experience, were

10   you trained in analyzing what certain items were designed to

11   do?

12          MR. SCHENSE:  Objection, beyond the scope of the

13   cross-examination.

14          THE COURT:  Overruled.

15   A.   Yes.

16   BY MR. MULLIS:

17   Q.   Okay.  Now, what type of features, generically speaking,

18   of an item such as Government's Exhibit 1 do you look at in

19   determining what it's designed to do?

20   A.   Primarily, it's training, experience and familiarization

21   through the nexus course.  Different types of firearms have

22   different characteristics.  In this particular case, when

23   analyzing an AR-15-type rifle, the lower portion where the

24   trigger guard is, if you use that as a center point, the bottom

25   plate, that bottom piece of metal is the actual firearm on an

Shelton - Redirect (Mullis)                                    564

1    AR-type rifle.

2    Q.   Now, would it be easier if I just showed you the exhibit

3    so you could point out some of its features?

4    A.   Yes.

5               MR. MULLIS:  Okay.  May I approach the witness --

6    approach the exhibit and then approach the witness with it,

7    Your Honor?

8               THE COURT:  You may.

9    BY MR. MULLIS:

10   Q.   Special Agent Shelton, I just handed you what's been

11   premarked Government's Exhibit 1, and this is the item we just

12   were talking about without it in front of you, but you're now

13   holding it; is that correct?

14   A.   Yes.

15   Q.   And just so we're clear, is this the same item that you

16   were testifying about yesterday afternoon?

17   A.   Yes.

18   Q.   Okay.  So, again, let me ask this question:  When

19   conducting your analysis and analyzing this firearm, what

20   features of it did you look at in trying to come -- in

21   determining what it was intended to do?

22   A.   So on this particular firearm, when we talk about an

23   AR-type rifle, it's this lower portion, this portion right

24   here.  That's actually what we look at.  We're looking for a

25   selector switch, but in general it's this piece, often

Shelton - Redirect (Mullis)                                      565

1    called -- we refer to it as the lower.  That is what I actually

2    looked at.

3    Q.   And for what purpose do you look at that?

4    A.   To make sure that it's complete.  As long as this lower is

5    complete, the necessary holes, the pins that are set in the

6    actual receiver are there, it's deemed a complete lower, which

7    then justifies it as an actual firearm.

8    Q.   Well, without getting into that, since the complete --

9    since this is complete, the lower is there, can you describe

10   for us how this firearm actually works?

11   A.   So in this particular case, look at this other side here.

12   Internally there's two parts to this.  There's a lower which

13   contains your trigger and your trigger mechanisms inside, and

14   then there's the upper which is where -- if you see, here is

15   our bolt.  This is where the actual round is loaded and fired.

16         So this particular -- when the trigger is pulled, there's

17   a -- the hammer inside is released from a spring, and it flies

18   up, and it hits the firing pin, and the firing pin goes

19   forward.  And it's sharp pointed at the end, which strikes the

20   primer on the back of the cartridge, which causes an explosion,

21   and then the bullet leaves the barrel because of the explosion,

22   the pressure that's generated from that.

23   Q.   Thank you, Special Agent Shelton.

24         MR. MULLIS:  Based on that the government has no

25   additional questions for this witness.  Thank you, Your Honor.

1          THE COURT:  All right, very well.  That was covered

2    in cross.  Is there -- Mr. Schense, is there any brief recross?

3    There was a matter that -- that was opened so if you wish a

4    brief recross just on this matter.

5          MR. SCHENSE:  Yes, very briefly.

6                    RECROSS-EXAMINATION

7    BY MR. SCHENSE:

8    Q.   Good morning, Agent Shelton.

9    A.   Good morning, sir.

10   Q.   Now, what you just told the jury, was that -- was that as

11   a result of your training?  You referred to a definition

12   earlier.  The testimony you just gave to the jury was pursuant

13   to training you received in this area; is that correct?

14   A.   Which portion are you referring to?

15   Q.   The portion you just described for the jury about how a

16   bullet is expelled from a firearm, particularly that firearm,

17   Exhibit No. 1.

18   A.   Correct, that's -- the actual process of how it works is

19   from my training and experience.

20   Q.   All right.  So what you've testified to does not rely upon

21   any definition.  It simply relies upon your training and

22   experience pursuant -- your training and experience.  Is that a

23   fair statement?

24   A.   As far as how the actual firearm fires a projectile, yes.

25   Q.   Yes.  Okay.

1              MR. SCHENSE:  Judge, a moment, please.

2              THE COURT:  Yes.

3              THE DEFENDANT:  That's not my question.

4         (An off-the-record discussion was had between the

5    defendant and counsel.)

6    BY MR. SCHENSE:

7    Q.   All right.  Agent Shelton, I'm going to ask you one last

8    question, okay?

9    A.   Yes, sir.

10   Q.   What you just testified to, is that a training definition

11   or a legal -- it's not a legal definition, is it?  It's a

12   training definition.

13   A.   You're referring to the process of firing?

14   Q.   Yes.

15   A.   It's -- that's my familiarization with firearms.

16   Q.   Through your training?

17   A.   Correct.

18             MR. SCHENSE:  Thank you.  That's all I have, Judge.

19             THE DEFENDANT:  No, Your Honor, it's not.  I'm not

20   finished.

21             THE COURT:  Just a moment, sir.  Discuss this matter

22   with counsel.

23             THE DEFENDANT:  You keep walking around it.  Ask him

24   the right question.  Please do your job.

25             THE COURT:  Okay.  Ladies and gentlemen -- go ahead.

1    Ladies and gentlemen of the jury, we're going to take a brief

2    break, a very brief break.  I will instruct you once again that

3    until this case is completely submitted and has been argued to

4    you, do not discuss any of the evidence or this matter with

5    anyone, including each other.  We'll just take a very brief

6    break, and we'll come back.

7         (Jury out at 9:03 a.m.)

8              THE COURT:  You may be seated.

9         All right.  Mr. Parsons, we've done well for two days and

10   a little more.  This proceeding will be orderly and it will be

11   respectful.  So if you have something to discuss with your

12   counsel, you may do so.  I'm going to exit the courtroom for

13   just a minute or two, give you an opportunity to discuss this

14   matter with your counsel.  We're going to bring the jury back

15   and complete the recross-examination.

16        Very well.  So we'll stand in recess for a couple of

17   minutes, but there will be no further outbursts.  These

18   proceedings will be orderly, they'll be respectful, and they

19   will not be disruptive.  And so we've done well thus far.

20   Let's continue.

21        All right.  We'll take a two-minute recess.

22        (Recess taken at 9:04 a.m.)

23        (At 9:07 a.m. on August 30, 2018, with counsel for the

24   parties and the defendant present; WITHOUT the jury:)

25             THE COURT:  All right.  We're back on the record

1    outside of the presence of the jury.

2         All right.  Counsel, are we ready to proceed?

3              MR. SCHENSE:  We are, Your Honor.  Thank you for the

4    time.

5              THE COURT:  All right, very well.  Now, I'm not going

6    to get into a big dispute or debate, Mr. Parsons.  I do want to

7    issue this as a formal warning.  If there are any more

8    disruptions or disorder in front of the jury, I will have you

9    removed from the courtroom, and I don't want to do that.

10             THE DEFENDANT:  I apologize, Your Honor.  I didn't

11   realize how loud I was talking.  I have virtually no hearing in

12   my left ear, and I didn't realize I was talking -- my intent

13   was not to be disruptive.

14             THE COURT:  All right, very well.  As long as we have

15   an understanding of each other.  This is a clear warning.

16             THE DEFENDANT:  It was not my intent to disrupt.

17             THE COURT:  All right, very well.  Let's bring the

18   jury.  Thank you.

19        (Jury in at 9:09 a.m.)

20             THE COURT:  All right.  You may be seated.  Thank

21   you, ladies and gentlemen.

22        Counsel, are you ready to proceed on recross?

23             MR. SCHENSE:  Yes, I am.  Thank you.

24             THE COURT:  You may do so.

25             MR. SCHENSE:  Thank you.

Shelton - Recross                                                        570

```
 1                   RECROSS-EXAMINATION RESUMED
 2    BY MR. SCHENSE:
 3    Q.   Agent Shelton, is it your opinion that Exhibit No. 1 is a
 4    firearm through a training definition or a legal definition?
 5    A.   Legal definition.
 6    Q.   And what statutes are you referring to?
 7    A.   I believe it's in 921 is where the definition lies.
 8    Q.   When you say "921," what does that mean?
 9    A.   U.S. Code.  I believe it's 18-921.  I'm not familiar with
10    the actual subset, but 921 is where the definitions lie.
11               MR. SCHENSE:  Thank you.
12               THE COURT:  All right.  Very well.  May this witness
13    be excused?
14               MR. MULLIS:  Yes, Your Honor.  Thank you.
15               MR. SCHENSE:  Yes, yes.  Thank you.
16               THE COURT:  Agent Shelton, you may be excused, and
17    thank you.
18               THE WITNESS:  Thank you, Judge.
19               MR. SHARP:  Your Honor, at this time the United
20    States rests.
21               THE COURT:  All right, very well.  I apologize for
22    this, ladies and gentlemen of the jury.  We have a couple of
23    matters to take up.  The government has rested its case at this
24    point in time.  I'm going to excuse you for a few minutes.
25          Again I will remind you, as I have several times before,
```

1    that you're not to discuss the evidence or anything about this

2    case until this matter is entirely submitted to you yet later

3    today.  So we will stand in recess for a few moments and have

4    you back.  Thank you.

5         (Jury out at 9:11 a.m.)

6              THE COURT:  All right.  You may be seated.  We are

7    outside the presence of the jury.  The government has rested.

8    Are there any matters that we need to take up outside the

9    presence of the jury?

10             MR. SCHENSE:  Yes, Your Honor, please.  If I may?

11             THE COURT:  You may.

12             MR. SCHENSE:  Judge, comes now Michael Parsons

13   through counsel, Donald L. Schense, and moves the Court for a

14   motion of judgment and acquittal pursuant to Federal Rule of

15   Evidence Rule 29.  In support of that judgment, that motion for

16   judgment of acquittal, I would submit to the Court that the

17   evidence has been insufficient to sustain a conviction on the

18   indictment.

19        In further support of that, Judge, I would ask the Court

20   to consider the evidence that has been adduced and also the

21   evidence that has not been adduced in order to sustain such a

22   conviction.  And more specifically, in terms of the single

23   count of the indictment, I would ask the Court to find that

24   there has been little, if any, sufficient evidence to

25   support -- and I'm looking at the fifth line down on the

1    indictment after the term "assault rifle," comma.  I would put

2    a bracket there.

3         And if I could read this into the record.  "637 rounds of

4    ammunition," and then in parens, "87 rounds of .223 ammunition

5    further identified as Light Armor Piercing ammunition and 550

6    rounds of .300 Blackout ammunition," and I would put the other

7    bracket there.

8         I don't believe there's been any sufficient evidence in

9    that regard under the single count of the indictment, certainly

10   not for the jury's consideration, and that it's insufficient to

11   sustain a conviction on those particulars of the indictment.

12        And for all of those reasons stated, Judge, I would ask

13   the Court to consider and then to conclude that the government

14   has failed under Rule 29 and they have produced for the jury

15   insufficient evidence to sustain a conviction on Count I of the

16   indictment against Mr. Parsons.  Thank you.

17             THE COURT:  All right, very well.  Thank you,

18   counsel.

19        Government's response, please.

20             MR. SHARP:  Your Honor, the United States

21   respectfully submits that there has been more than sufficient

22   evidence presented to establish -- to support a jury's verdict

23   on all three elements of the offense.  With regard to the count

24   of the ammunition, it's true we did not prove up the exact

25   number.  That's not an element of the offense.  That was put in

1    the indictment to put the defendant on notice as to what the

2    charges are.

3         All that the statute requires is that it be ammunition,

4    and describing it as ammunition or multiple rounds of

5    ammunition is sufficient.

6              THE COURT:  All right, very well.  The Court is

7    prepared to rule.  There has been sufficient evidence adduced

8    if believed by the jury -- now, this is a jury question, and

9    many of these matters are still up for the jury to decide, but

10   there has been sufficient evidence adduced on all three

11   elements of the single-count indictment that the defendant was

12   convicted of a crime, a felony, in the state of Tennessee; that

13   he knowingly possessed a firearm, specifically the Rock River

14   Arms LAR-15; and there's been sufficient evidence that multiple

15   rounds of ammunition were found with that, that it's not

16   necessary for the government to prove up the exact number of

17   rounds of ammunition; and, finally, that the firearm or

18   ammunition was transported across state lines at some time

19   either during or before the defendant's possession of it.

20        So there has been sufficient evidence adduced to go to a

21   jury, and so the Rule 29 motion for judgment of acquittal is

22   overruled.

23             MR. SCHENSE:  Yes, Judge.  May we -- can we go over

24   the offer of proof again, Judge, or address that?

25             THE COURT:  Do you have copies?  Have copies been

1    made?  I believe they have.

2              MR. SCHENSE:  They have.

3              THE COURT:  All right, very well.  There are a couple

4    of matters that we'll take up.  We'll do the offer of proof and

5    then the colloquy with Mr. Parsons.

6              MR. SCHENSE:  Yes, Judge.  May I approach --

7              THE COURT:  Yes, you may.

8              MR. SCHENSE:  -- to have these marked?

9              THE DEFENDANT:  I believe those are the originals.

10   She should have a copy up there.

11             THE COURT:  I have a copy here.

12             MR. SCHENSE:  May I mark the copies?

13             THE COURT:  Certainly.

14             MR. SCHENSE:  Can I take that back, please?  Thank

15   you.

16        Sorry.  Mr. Sharp, do you have a copy of all this?

17             MR. SHARP:  You're talking about these affidavits?

18             THE COURT:  Everybody should have copies, and we'll

19   just take those up one at a time, then.

20             MR. SCHENSE:  Thank you very much.

21             THE COURT:  Do you have a copy, Mr. Schense?

22             MR. SCHENSE:  I don't have a number.  Perhaps, if I

23   could, could I give you Mr. Parsons' originals, and then we

24   could exchange them?

25             THE COURT:  Yes.  I need to examine them while he's

1   telling me what it is, what the offer is.

2       Okay.  We are outside the presence of the jury, and as I

3   understand it, the defense is about to make an offer of proof.

4           MR. SCHENSE:  Yes, Judge.  On behalf of Mr. Parsons,

5   I make the following offer of proof.  I hope yours are in the

6   same order as I've got them, Judge.  I'm going to refer to

7   Defendant's Exhibit 108.  That is the notification of

8   reservations of rights that was signed by Mr. Parsons, and it

9   refers to UCC 1-308, UCC 1-207, and it's captioned as a public

10  communication to all.

11      I would offer this as an offer of proof, that he is

12  protected as a live man ambassador of the Tsilhqot'in Nation,

13  the country of Chilcotin, that he is protected under the Vienna

14  Convention, and he is entitled to special protection against an

15  attack upon his freedom of dignity.

16      I also would cite 18, U.S.C., 242, 18, U.S.C., 241, the

17  Montevideo Convention, and the Constitution of the United

18  States of America, in support of Defendant's Exhibit 108.

19          THE COURT:  All right.  Is there any objection to the

20  offer of proof, Exhibit 108?

21          MR. SHARP:  There is, Your Honor.  I object on

22  relevance grounds.

23          THE COURT:  All right.  Is that --

24          MR. SHARP:  On relevance grounds.  I'm sorry.

25          THE COURT:  Yeah, yeah.  And the objection to the

1    offer of proof will be sustained under Rule 401 and 403 as well

2    as my filing yesterday.  That's Filing No. 146.  I will say in

3    general, as Exhibit 108 -- I'll see what the other offers are.

4    If these offers are going to Mr. Parsons' asserted immunity,

5    immunity is a question of law, it's not a question of fact, and

6    the Court will make its determination, and these matters are

7    not appropriate to go to the jury.

8         So based on -- and all of my reasoning is set forth in

9    Filing 146.

10             MR. SCHENSE:  Yes, Judge.

11             THE COURT:  So based on 401, 403, and Filing 146, the

12   objection is sustained.

13        All right.  You may proceed.

14             MR. SCHENSE:  Judge --

15             THE COURT:  I am going to make each one of these,

16   just for Mr. Parsons, a part of the record so as this matter

17   goes up -- if there's a conviction and if it goes up on appeal,

18   all of these matters will be a part of the record that you can

19   argue to the appellate court if you disagree with my rulings.

20   So all of these objections are preserved.

21             MR. SCHENSE:  Thank you.

22             THE COURT:  All right, very well.  Next exhibit.

23             MR. SCHENSE:  Yes.  Defendant's Exhibit 109, it's an

24   affidavit, another affidavit by Mr. Parsons' mother, Clete

25   Webster, and it appears that it was notarized on January 30th

1    of 2017, and it's a description of Ms. Webster's -- of her son,

2    Michael Parsons, about how he has lost a lot of weight, looked

3    like a skeleton.  He's in a lot of pain because somebody had

4    beat him up in the facility, some inmate named Tolliver, so --

5              THE COURT:  I can review it.

6              MR. SCHENSE:  -- I would offer Exhibit 109.

7              THE COURT:  All right, very well.

8              MR. SHARP:  Objection on 401, 403 for relevance

9    grounds.

10             THE COURT:  The objection is sustained on 401 and 403

11   as going to any of the elements of the crime in this particular

12   case.  So the objection to the offer of proof is sustained.

13             MR. SCHENSE:  Judge, the next one is Defendant's

14   Exhibit --

15             THE COURT:  In case I haven't said, 109 is received

16   for purposes of the offer of proof.

17             MR. SCHENSE:  Yes, sir.  Defendant's Exhibit 110 in

18   support of the offer of proof as to Patricia Parsons is an

19   affidavit.  It appears that it was accomplished on the 24th of

20   January, also of last year, 2017.  Much like Ms. Webster's,

21   Ms. Parsons, in 110, indicates that she went to the Tipton

22   County Jail and saw her husband and he had lost a lot of

23   weight, and he was in severe pain because this Tolliver inmate

24   had attacked him, beat him up.  So I would offer that as an

25   offer of proof.

```
1           THE COURT:  All right, very well.

2           MR. SHARP:  Objection on relevance grounds, 401, 403,

3    and not relevant to any issue in the case.

4           THE COURT:  The objection to the offer of proof is

5    sustained for the reasons that I've previously given under 401

6    and 403, not relevant to this particular case.  Very well.

7    Next.

8           MR. SCHENSE:  Is Defendant's Exhibit 111 in support

9    of the offer of proof.  It's an affidavit of Mr. Parsons' wife,

10   Mrs. Patricia Parsons, and that is dated February 8th of this

11   year, and the offer of proof would be that Mrs. Parsons

12   attended the hearing of Mr. Parsons on September 1st of 2017 at

13   the Tipton County courthouse.

14       During that hearing Mr. Parsons apparently said to the

15   Assistant DA, Walt Freeland, "You are trying to put me away for

16   10 years."  The Assistant DA Freeland then replied, "Oh, I am

17   trying to put you away for a lot longer than that."  I would

18   offer that as an offer of proof.

19           THE COURT:  All right.  Any objection?

20           MR. SHARP:  Objection, relevance, 401, 403.

21           THE COURT:  All right.  And for the same reasons

22   under 401 and 403, the relevance objection to the offer of

23   proof is sustained.  That may or may not be relevant to a

24   sentencing proceeding if indeed we get to a sentencing

25   proceeding, but it's not relevant to the issues of trial.
```

```
1              MR. SCHENSE:  Yes, sir.

2              THE COURT:  All right, very well.  And again, in case

3    I haven't noted it, I am receiving Exhibits 110 and 111 for the

4    purposes of the offer of proof.  The objection is sustained.

5              MR. SCHENSE:  The next one, Judge, is Defendant's

6    Exhibit 112 in support of the offer of proof.  Again, this is

7    another affidavit by Ms. Webster, the mother of Mr. Parsons,

8    and this is dated August -- notarized August 31st of last year,

9    2017.  The crux of this affidavit is about the incidence in

10   2014, about a raid that happened at her son and

11   daughter-in-law's home and property.

12        She was not in any -- Mr. Parsons at the time was not in

13   possession of any type of weapon, and then Chief Deputy Donna

14   Turner of the Tipton County Sheriff's Department had a

15   discussion with Ms. Webster, and that's addressed in this

16   exhibit.  And then also Ms. Webster makes reference to a parole

17   hearing for Mr. Parsons in 2014, and she makes claims against

18   Tipton County Officer Michael Green and that her son had at

19   times been falsely accused of failure to appear and that it was

20   the fault probably of the -- Brent Chun, C-h-u-n, who appeared

21   at the parole revocation hearing and testified against her son.

22   I would offer Defendant's Exhibit 112.

23             THE COURT:  Any objection?

24             MR. SHARP:  Objection, relevance, 401 and 403.

25             THE COURT:  The objection to the offer of proof,
```

1    Exhibit 112, is sustained on relevance grounds, 401 and 403.

2    Exhibit 112 will be received for purposes of the record.  The

3    offer of proof is denied.

4            MR. SCHENSE:  Judge, in support of the offer of proof

5    further, I would offer Defendant's Exhibit 113.  Defendant's

6    Exhibit 113 as the offer of proof is what appears to be a court

7    opinion.  The date of release is 8 March 1994, in the Supreme

8    Court of British Columbia.  The caption indicates between

9    Francis Laceese, L-a-c-e-e-s-e -- he apparently was the chief

10   of the Toosey, T-o-o-s-e-y, Indian Band -- on behalf of himself

11   and all members of the Toosey Indian Band.

12       And this -- the defendants in that particular case were

13   West Fraser, F-r-a-s-e-r, Mills Limited in the province of

14   British Columbia as represented by the Minister of Forests.

15   They were the defendants.  This case had to deal with an

16   injunction, and it essentially went to the aboriginal rights

17   within the Bald Mountain area, and more specifically it went to

18   a declaration about cutting permits apparently covering Bald

19   Mountain, and it was an issue as to whether they were void and

20   of no effect and whether or not any sort of cutting permits

21   unconstitutionally infringed upon the plaintiff's aboriginal

22   rights.

23       And that is the -- the Court found that -- and I would say

24   that it references the Tsilhqot'in Nation in terms of an

25   assertion that in 1872, the land in the Valley of the

```
 1    Chilcotin, a life treaty was set aside as a hunting and fishing
 2    reserve designated for the benefit of the Chilcotin people, and
 3    the Court in this particular opinion went on to go through a
 4    little bit of the history in terms of that.
 5         This offer of proof is being made to suggest to the Court
 6    and reference the Court to aboriginal rights that Mr. Parsons
 7    claims the Tsilhqot'in Nation, the country of Chilcotin, still
 8    have and enjoy, and I would offer in terms of the motion to --
 9    I'm sorry, in terms of the offer of proof Defendant's
10    Exhibit 113.
11              THE COURT:  All right.  Let me ask on Exhibit 113
12    what is -- I have three pages, and then I have several other.
13    What is contained in 113?
14              MR. SCHENSE:  Judge, it's actually -- I apologize.
15    It's -- you mean how many pages?
16              THE COURT:  Yes.
17              MR. SCHENSE:  Yes.  It's five pages.  Right.
18              THE COURT:  Okay.  I've got it.
19              MR. SCHENSE:  Five pages.  They were back --
20              THE COURT:  I've got it.
21              MR. SCHENSE:  Okay.  Good.
22              THE COURT:  I just wanted to be sure I had the right
23    pages, and I do.
24              MR. SCHENSE:  Yes, Judge.  I would offer 113.
25              THE COURT:  Any objection?
```

```
1              MR. SHARP:  Objection, 401, 403.  Also, it's
2    pertaining to legal matters which would be the province of the
3    Court and would not go to the jury anyway.
4              THE COURT:  The objection to the offer of proof is
5    sustained for those reasons under 401, 403, relevance, as well
6    as the rights, duties and immunities are a legal question for
7    this Court to determine.  I've covered that in Filing No. 146.
8    The offer of proof -- the objection to the offer of proof is
9    sustained.  I will receive 113 for the purposes of the record.
10             MR. SCHENSE:  Judge, if I may?
11             THE COURT:  You may.
12             MR. SCHENSE:  Defendant's Exhibit 114.
13             THE COURT:  Now let me ask, these are -- are these
14   one page at a time, or are these several?
15             MR. SCHENSE:  There are back pages, apparently, on
16   here too.  It would be six pages.  The last page would be the
17   maps.
18             THE COURT:  All right.
19             MR. SCHENSE:  I hope the Court has all of that.
20             THE COURT:  All right.  So I have one, two, three,
21   four, five -- I have six pages that ends with the map.
22             MR. SCHENSE:  Thank you.
23             THE COURT:  We're at Exhibit 114.
24             MR. SCHENSE:  Yes, sir.
25             THE COURT:  Thank you.
```

1           MR. SCHENSE:  Judge, Exhibit 114.  The first page for

2   purposes of this offer of proof is a letter dated March 15th of

3   2015, and it's to Susannah or Suzanne, last name is

4   H-e-g-e-d-u-s, dash, Holland, H-o-l-l-a-n-d, and it is sent by

5   Dorothy Boyd, B-o-y-d.  She is the Honourable Queen Clan

6   Mother, and this letter is to -- it's a letter of delegation

7   and appointment for Ms. Suzanne -- I'm just going to refer to

8   her as -- you've heard that -- her testimony as Sue Holland.

9           THE COURT:  Ms. Holland, yes.

10          MR. SCHENSE:  It's the same person, Judge, and this

11  is a Letter of Delegation and Appointment of Honourable Chief

12  Justice to the Universal Supreme Court of the Tsilhqot'in, or

13  the USCT.

14      Also, Judge, contained in that is a letter from the

15  Chilcotin National Congress dated the 20th of June of 2016 to

16  the United Nations Headquarters in New York City, and this

17  letter is in regards to a Declaration of a New Country Called

18  the "Chilcotin" Upon Sovereign Chilcotin -- Tsilhqot'in in

19  Territory, and this was sent to the secretary general at the

20  time, and it was referencing the desire and the declaration

21  that they are the new country of the Chilcotin, country of

22  Chilcotin, and that was signed, Judge -- and this name has come

23  up also in the course of these hearings -- by the hereditary

24  chief -- I'm sorry, Hereditary Grand Chief Stanley Stump,

25  Senior.  He signed under his name, as he was the spokesperson

1      for the Chilcotin National Congress.

2            Attached to that particular letter was the Universal

3      Supreme Court Act which gave them -- which the Chilcotin

4      alleged gave them the rights to be declared as an independent

5      free country, and that Universal Supreme Court Act was also --

6      was signed by the Queen Clan Mother Dorothy Boyd on March 15th

7      of 2015.  And that goes into also the Constitution of the

8      Tsilhqot'in Nation, the Preamble, the Authority and Powers

9      Vested in the Constitution of the Tsilhqot'in Nation, Governing

10     authorities, and it covers the Bill of Rights.  All of that is

11     contained in the body of Exhibit 114.

12            THE COURT:  114, yes.

13            MR. SCHENSE:  114.  And, again, that Constitution of

14     the Tsilhqot'in Nation is also signed by the -- Her Majesty the

15     Queen Dorothy Boyd on March 15th of 2015.

16            Now, the last page, Judge, of that particular exhibit is

17     the territory that the Tsilhqot'in claim, and you can see on

18     Schedule A it's a map of the Tsilhqot'in Territory, and very

19     clearly on those maps it delineates and outlines the map of the

20     Tsilhqot'in Territory, and that was part of the Denqay Deni

21     Accord.  I'd like to spell that.  D-e-n-q-a-y, D-e-n-i, Accord.

22            And that was offered as further proof to the Secretary

23     General of the legal status and the desire to be -- their

24     declaration of legal status as part of the letter that was sent

25     to the Secretary General of the United Nations, and that's the

1    map on the last page.  And I would offer Defendant's

2    Exhibit 114.

3               THE COURT:  All right.  Any objection?

4               MR. SHARP:  Objection, 401, 403, and it goes into

5    legal matters that are not before the jury.

6               THE COURT:  And the objection is sustained.  It's not

7    relevant under 401, 403, and it's also covered by my Filing

8    146.  It does go into legal matters which the Court will

9    determine, not the jury.  So Exhibit 114 will be received for

10   the purposes of the record.  The objection to the offer of

11   proof is sustained.  Next.

12              MR. SCHENSE:  Judge, as further offer of proof, I

13   would ask the Court to consider Defendant's Exhibit 115.

14   Exhibit 115 is an application.  It's the International Court of

15   Justice.  The date is March 26th of 2018.  The Court Registry

16   is The Hague, and it's an International Court of Justice matter

17   between the Chilcotin, which they are the Applicant State, and

18   the United States of America and Canada.  They are the

19   Respondent States.

20        The agents appearing on behalf of the Chilcotin were again

21   Chief Justice Zsuzsanna Holland and Mr. Parsons as the

22   Chilcotin Ambassador and as the -- one of the associate judges

23   for the country of Chilcotin.  Appearing as counsel in this

24   application were another name that we've addressed earlier in

25   these proceedings.  It was the Chilcotin Attorney General, R.

1    Charles Bryfogle -- again, that's B-r-y-f-o-g-l-e -- and also

2    the Clan Mother, Fanny Stump.  I might add that Fanny Stump, a

3    person I've spoken to, is the wife of Stanley Stump, Senior.

4        (Court reporter requested clarification.)

5            MR. SCHENSE:  F-a-n-n-y.  And then this.

6        Judge, this particular document was an Urgent Interim

7    Protection Requested: to preserve the rights of the parties

8    Article 42, 1 through 3, statute of the ICJ in accordance with

9    Articles 73 through 77, of the rules of that court and any

10   other proceedings due to the hostage taking of agents and

11   counsel and advocates by the respondents detailed below, and

12   that was the Subject of Dispute.

13       And this application consists of three pages and --

14           THE COURT:  And I see it's -- actually, it's three

15   pages, but it's -- within the copies it's -- refers to page 5

16   of 6, page 6 of 6; correct?

17           MR. SCHENSE:  Yes, Judge.

18           THE COURT:  I have it.

19           MR. SCHENSE:  I'm sorry.  Yes, it does.  Yes, it

20   does.

21           THE COURT:  All right, very well.

22           MR. SCHENSE:  If I may, I'm just going to refer to

23   page 5 and 6 close to the bottom of that page, and I want to

24   just say this in terms of the offer of proof.  The Applicant

25   State of the Chilcotin hereby request filing of this

1    Application at the International Court of Justice seeking

2    emergency interim protection, again implementing Article

3    41(1) -- that's sub (1) -- and 42(1) through (3) of the Statute

4    of the ICI *[sic]* to preserve the rights of the parties, and

5    that is -- copies were sent to Sue Holland, ambassador -- or M.

6    Parsons -- that would be Michael Parsons here in court -- and

7    also Mr. Bryfogle, and this was signed by the Honourable Grand

8    Chief Stanley Stump, Sr.

9         I would offer Exhibit 115.

10             THE COURT:  All right, very well.  And this is 115?

11             MR. SCHENSE:  Yes, Judge.

12             THE COURT:  Okay, very well.  Objection to --

13             MR. SHARP:  Objection, 401 and 403.

14             THE COURT:  And the objection is sustained under 401

15   and 403.  Exhibit 115 is received for purposes of the record.

16   The objection to the offer of proof is sustained.  All right.

17   Next.

18             MR. SCHENSE:  Yes, Judge.  Exhibit 116.

19             THE COURT:  All right.

20             MR. SCHENSE:  This is entitled In The Supreme Court

21   of British Columbia, Regina versus Zsuzsanna Holland, and I

22   should spell -- I'll spell Zsuzsanna, Z-s-u-z-s-a-n-n-a.  And

23   this was a submission of points and authorities in support of

24   the contention the Tsilhqot'in Nation's sovereign, as found in

25   colonial, provincial, Canadian, and English declarations and

1    determinations and contractual commitments, comma, that dates

2    1863 through the present year, 2018.  This submission was

3    prepared by Mr. Bryfogle, the Attorney General for the country

4    of Chilcotin, and this had to deal with the criminal

5    proceedings against Susannah Holland, who is the Chief Justice,

6    Universal Supreme Court of the Tsilhqot'in.

7         And I would say that this particular exhibit goes into the

8    history and the supporting documentation that was relied upon

9    by Mr. Bryfogle in support of his contentions against the --

10   against the principals.  And in this exhibit on page 3 and 4,

11   there are numerous references to law, previous court

12   proceedings, previous court opinions in support of this

13   pleading, and also the history of the Tsilhqot'ins and how

14   they've had property seized unfairly, illegally, and the rights

15   in which they -- it also goes into the rights that should be

16   declared sovereign to them and what they should enjoy.

17        It also references a map produced by British Columbia in

18   February 2016 that altered the political landscape.  All of

19   these cites are offered by Mr. Bryfogle in support of this

20   pleading, and this pleading he ends with -- it's under the

21   legal premises of paragraph 20 and 21 of this document and more

22   specifically would be on page 7 of 7 of this submission, and

23   it's signed by R. Charles Bryfogle, April 23rd, 2018.

24        As part of the exhibit, there also is an eight-page

25   document that is attached in the Supreme Court of British

1    Columbia versus Zsuzsanna Holland and this --

2              THE COURT:  And that's part of the exhibit.  I've got

3    it.  That's part of this exhibit.  Okay.

4              MR. SCHENSE:  It is.  I guess it could have been

5    made --

6              THE COURT:  No.  That's fine.  I just want to be

7    sure.

8              MR. SCHENSE:  It is part of the exhibit.  It's eight

9    pages.  And it's the Defacto Officer Doctrine as It Relates to

10   the Universal Supreme Court of the Tsilhqot'in, and the

11   submission was made as a preliminary assessment of the De Facto

12   Officer Doctrine by the former Tsilhqot'in Attorney General and

13   how the -- that doctrine applies to the validity of the office

14   of the Chief Justice of the Universal Supreme Court of the

15   Tsilhqot'in and her actions as Chief Justice and that the

16   Universal Supreme Court of the Tsilhqot'in is valid.

17        And during -- in this pleading, Judge, the author of the

18   pleading is also Mr. Bryfogle, and he addresses Canadian

19   precedent and, as part of the Canadian precedent, cites various

20   laws, acts to support the de facto officer immunities that

21   should be accorded and afforded to Chief Justice Susannah

22   Holland.  He also, on page 4, addresses A Preliminary

23   Memorandum of Points and Authorities on the Issue of the De

24   Facto Officer Doctrine and the Immunities Arising Therefrom,

25   obviously coming to the conclusion that Chief Justice Suzanne

1    Holland should be immune from the actions that were being

2    contemplated and/or taken against her as Chief Justice of the

3    country of Chilcotin.

4         And also there are numerous cases and acts cited in

5    support of that contention on page 7, Judge, of that eight-page

6    pleading.  Mr. Bryfogle also discusses the Separate and

7    Distinct Issue of the Hereditary Chief Tsilhqot'in Nation in

8    International Law, and Mr. Bryfogle then in the pleading goes

9    into detail -- or some details about -- again in support of the

10   de facto officer entitlements and immunities that were in

11   issue, and he cites the Royal Proclamation of 1763 that is law

12   binding upon B.C., which he's referencing British Columbia, and

13   also Canada's Indian Act and other assorted case law and acts.

14        THE COURT:  Counsel, I note on the exhibit, or at

15   least the original that I have, there are a number of arrows.

16   I take it that's -- is that Mr. Parsons' arrows that are

17   pointing to specific paragraphs?

18        MR. SCHENSE:  It is, Your Honor.

19        THE COURT:  Okay, very well.

20        MR. SCHENSE:  So given that Mr. Parsons made those

21   arrows and he's acknowledged that for the Court, those

22   obviously are to highlight the important aspects of this

23   opinion and directing the Court to those aspects of this

24   pleading that would be in support of this offer of proof, and

25   that is dated April 23rd, on page 8, 2018, by Mr. Bryfogle,

 1    Attorney General and Solicitor General of the Tsilhqot'in

 2    Nation.

 3         And then lastly, Judge, we have a four-page document, and

 4    this is in the Supreme Court of British Columbia, Regina versus

 5    Suzanne --

 6              THE COURT:  Is this part of the same exhibit?

 7              MR. SCHENSE:  Yes, sir, it is.

 8              THE COURT:  Okay.

 9              MR. SCHENSE:  I'm sorry.  It's four pages.

10              THE COURT:  All right.

11              MR. SCHENSE:  And it's entitled -- well, it's under

12    number 33443, Williams Lake Registry, and the caption is In The

13    Supreme Court of British Columbia, Regina versus Zsuzsanna

14    Holland.  This particular pleading was also by -- submitted by

15    Mr. Bryfogle on April 23rd of this year.  Again, he's the

16    Attorney General and Solicitor -- or former -- and Solicitor

17    General of the Tsilhqot'in Nation.

18         And this pleading really addresses the malicious

19    prosecution and the abuse and the unclean hands that are taken

20    against Zsuzsanna Holland, the Chief Justice of the country of

21    Chilcotin, and Mr. Bryfogle in this pleading alleges perjury,

22    fabrication and suppression, all which have -- all which were

23    used and may be still being used against Chief Justice Sue

24    Holland in a malicious prosecution of her.

25         And there are certain dates about -- regarding prior

1    constructive notice that are cited by Mr. Bryfogle and also

2    proof of what he alleges were -- this is on page 2 of the

3    document -- proof in support of his allegations of perjury,

4    fabricating evidence, suppression of evidence, false

5    statements, accessory after the fact, and breach of the Crown

6    Counsel Policy Manual.

7        On page 3 he cites certain investigations under paragraph

8    4 and 5 on the top of that page.  He then cites the law and the

9    facts in support of and then also the unclean hands and, again,

10   the malicious prosecution being heaped upon Chief Justice Sue

11   Holland.

12       And then, of course, on page 4, lastly, there's a

13   discussion in this pleading about charter rights breached,

14   abuse of process, abuse of a public office, conspiracy, and

15   false imprisonment, and Mr. Bryfogle cites appropriate cases in

16   that regard and submitted this matter as a pleading April 23rd,

17   2018, signed by Mr. Bryfogle.

18       I would offer Exhibit 116.

19           THE COURT:  All right.  Is there any objection to

20   116?

21           MR. SHARP:  Objection on relevance grounds, 401 and

22   403.

23           THE COURT:  All right.  The objection on relevance

24   grounds is sustained, 401, 403, as well as my filing at 146.

25   Once again, this is a matter that is a question of law, not a

1    question of fact.  I will say somebody did go to a heck of a

2    lot of work to produce these, but the Court finds that United

3    States law is applicable in this particular matter.

4    Exhibit 116 is received for the purposes of the record.

5                    MR. SCHENSE:  May I?

6                    THE COURT:  You may.

7                    MR. SCHENSE:  Defendant's Exhibit 117, this is a

8    12-page document, and it's got a file number, a stamp of the

9    Universal Supreme Court of the Tsilhqot'in, January 18, 2016,

10   Alexis Creek Court Registry.

11        The hearing date was December 2nd, 2015.  The caption is

12   In The Universal Supreme Court of the Tsilhqot'in between

13   Michael Wayne Parsons, the appellant, and the State of

14   Tennessee, the appellee.  This exhibit, Judge, goes as an offer

15   of proof to the Court asking the Court to allow the jury to

16   know that this matter was decided in the Universal Supreme

17   Court of the Tsilhqot'in, and it was decided back in December

18   of 2015.

19        And this has to go to the exoneration of Mr. Michael

20   Parsons in the case from the state of Tennessee and

21   specifically in terms of the -- in terms of the conviction and

22   judgment rendered against Mr. Parsons which is contained in

23   Exhibit No. -- that's been offered by the government,

24   Exhibit 31, and this -- reasons for judgment.  That was signed

25   by -- well, there's no signature on mine, but it's The

```
 1    Honourable Chief Justice of the Universal Supreme Court, and

 2    that would be Sue Holland.

 3              THE DEFENDANT:  I didn't have access to an original.

 4              MR. SCHENSE:  That's okay.

 5              THE DEFENDANT:  They pulled it off the internet, and

 6    it's filed on their website.

 7              MR. SCHENSE:  Judge, if I may, the only reason it's

 8    not signed is because it's on the website signed.  Mr. Parsons

 9    was not able to -- or there is no sign.  But nonetheless,

10    Judge, I'd ask the Court to consider it even absent the

11    signature, but the reasons for judgment go to a long, detailed

12    history of the allegations of abuse, conspiracy, unlawful

13    prosecution, denying Mr. Parsons his constitutional rights, and

14    malicious police prosecution and the local DA in Tipton County,

15    Tennessee.

16         After going through the alleged crime, the history of the

17    case, the applicable state law as interpreted -- I'm sorry, the

18    applicable law as determined by the Chief Justice of

19    the Tsilhqot'in -- or the country of Chilcotin, Chief Justice

20    Holland found that Mr. Parsons had suffered an injustice.  She

21    goes into great detail about how Mr. Parsons suffered an

22    injustice and what a travesty of justice the case in Tennessee

23    was and how Mr. Parsons was treated.

24         After going through the history and the facts and her

25    legal analysis, Chief Justice Holland concludes on page 12, For
```

1   the reasons above, it is hereby ordered that Mr. Michael Wayne

2   Parsons was wrongfully and falsely charged and wrongfully and

3   falsely convicted on counts of aggravated assault, burglary of

4   a vehicle, theft by the state of Tennessee.  The wrongful

5   convictions are nullified and set aside, and Mr. Parsons is

6   fully pardoned *[sic]* henceforth by myself.  I make a Vancouver

7   (City) versus Ward, 2010 SCC 27, ruling.  The state of

8   Tennessee is ordered to pay Mr. Parsons $5,000 per diem accrued

9   for each day Mr. Parsons spent in incarceration with respect to

10   the 2007 conviction.

11       Also, she then concludes in paragraph 28 of the 12-page

12   document, Exhibit 117, that Mr. Parsons is free to seek further

13   relief and compensation for business lost, aggravated and

14   punitive damages and libel and slander.  The 2007 felony

15   conviction is to be expunged from Mr. Parsons' record.  The

16   appellees are to pay court costs to the Universal Supreme Court

17   in the amount of $10,000.  The 2014 indictment will be dealt

18   with separately.

19       So, Judge, I would offer Defendant's Exhibit 117 in

20   support of the offer of proof.

21            THE COURT:  Very well.  Thank you.  Any objection?

22            MR. SHARP:  Objection on 401 and 403 grounds.  This

23   issue was addressed in the government's trial brief that was

24   filed before we started.  What constitutes a conviction is

25   determined in accordance with the law of the jurisdiction in

1    which the proceedings were held, and that's out of the statute

2    18, U.S.C., 921(a)(20).  The U.S. Supreme Court has held

3    determining whether someone's civil rights have been restored

4    by expungement or set aside, et cetera, is governed by the law

5    of the convicting jurisdiction.

6         In other words, even if the Universal Supreme Court of the

7    Tsilhqot'in Nation exists, it's not up to them to decide

8    whether or not that conviction is overturned.  For all of those

9    reasons, the government objects on relevance grounds.

10         THE COURT:  All right.  The objection to the offer of

11    proof to Exhibit No. 117 is sustained on 401 and 403 grounds,

12    also my Filing 146.  More specifically, this is an improper

13    collateral attack on a valid judgment based on 18, U.S.C., 921,

14    922.  The Universal Supreme Court of Tsilhqot'in, if indeed it

15    does exist, does not have authority to set aside the valid

16    judgment in the state of Tennessee which is contained in

17    Exhibit No. 31, and evidence of exoneration will not be

18    instructed to the jury.

19         Now, we can take that up during jury instructions, but I

20    want to be clear that such an instruction will not be given.  I

21    will receive Exhibit 117 for purposes of the record.  If the

22    Eighth Circuit tells me that I'm wrong, then we'll be doing

23    this again, but I will tell you that the jury will not be

24    instructed as to exoneration or sovereign immunity.

25         All right.  So Exhibit 117.  The objection to the offer of

1    proof is sustained.

2          MR. SCHENSE:  Judge, may I have -- on Exhibit 117,

3    Mr. Parsons found in his materials -- it's a photocopy, but a

4    copy that on page 12 of the exoneration is signed by the Chief

5    Justice.  Does the Court --

6          THE COURT:  The signing doesn't make any difference

7    to me, but if you want to offer it, maybe it'll make a

8    difference to the Eighth Circuit.  I don't want to impinge on

9    anybody's rights.

10          MR. SCHENSE:  No.  I'm happy to -- could we

11    substitute page 12 with this page 12, please?

12          THE COURT:  You may do so.

13       Is there an objection to that?

14       That's fine.

15          MR. SHARP:  No, Your Honor.

16          THE COURT:  I have the original up here.

17          MR. SCHENSE:  I'm afraid -- could we make a copy for

18    Mr. Parsons also?

19          THE COURT:  You may.

20          THE DEFENDANT:  This is actually in the record.  It

21    was filed in a preliminary hearing.

22          THE COURT:  Yeah.  We've got it.

23          MR. SCHENSE:  They need to mark this also.

24       Judge, Mr. Parsons would like me to address one last issue

25    in the offer of proof, please.

```
 1            THE COURT:  So, anyway, page 12 being signed is not
 2    an issue with this Court.  It is contained in the records, and
 3    I have all of the originals for Mr. Parsons.
 4        Okay.  And is there one other matter?  Yes.
 5            MR. SCHENSE:  Yes.  Thank you.
 6            THE COURT:  Okay.
 7            MR. SCHENSE:  Judge, may I give those back to
 8    Mr. Parsons?
 9            THE COURT:  Those are -- the originals of those may
10    be given back to Mr. Parsons.
11            MR. SCHENSE:  Thank you.  Then, Judge, I have
12    apparently one more exhibit I'd like to address, please.
13            THE COURT:  You may.
14        Mr. Parsons, check.  Your originals should be back with
15    you.  I've just given you everything back.
16        (An off-the-record discussion was had between counsel and
17    the defendant.)
18            THE COURT:  Is there something on 12-20 of '17?
19            MR. SCHENSE:  Mr. Parsons, Judge, has provided me
20    four more documents he would like me to present to the Court as
21    part of the offer of proof.  They've all been marked in this
22    case earlier, but the dates have -- these are the original
23    stickers on them, and they're all from the 20th of December of
24    2017, and that was way before I was on board.  So I don't know
25    what happened on December 20th of last year.
```

```
1              THE COURT:  I just lost my docket here.
2        Kathy, can you -- can you get ECF uploaded again?  Get
3   ECF.
4        Thank you.
5        It was Mr. Parsons' detention hearing --
6              MR. SCHENSE:  Oh, okay.
7              THE COURT:  -- by Judge Zwart on December 20, 2017.
8              MR. SCHENSE:  Mr. Parsons has handed me four more
9   documents and told me this is the rest of the documents he
10  would like to have the Court consider.  They've been marked.
11  If we could have another exhibit sticker placed on the top of
12  these.
13       And if I may ask, with the Court's assistance, if we could
14  give these back to Mr. Parsons and make copies for Mr. Parsons
15  of these four exhibits.
16             THE COURT:  All right.  Let's make -- are they going
17  to be four separate exhibits?
18             MR. SCHENSE:  Yes, sir.
19             THE COURT:  Have they been offered --
20             MR. SCHENSE:  No, they haven't.
21             THE COURT:  -- at the prior -- okay, all right.
22  Let's mark them, then.
23       Okay.
24             MR. SCHENSE:  May I approach?
25             THE COURT:  You may.  So these are going to be
```

1    Exhibits 118, '19, '20, and '21.

2              MR. SCHENSE:  Yes, sir.

3              THE COURT:  And we can take up the merits of them

4    first, and then we'll make copies.

5              MR. SCHENSE:  Yes, Judge.

6              THE COURT:  Why don't we do this.  I'm going to have

7    Kathy make copies of these.  Let's go through the colloquy.  I

8    want to make sure Mr. Parsons understands his right to testify

9    or not testify.  In the meantime we can make three copies.

10        Please.  Thank you, Ms. Miller.

11        All right.  While she's doing that -- we'll take up those

12   four exhibits before we bring the jury back.

13        We are outside of the presence of the jury, and it's my

14   understanding that Mr. Parsons is going to exercise his

15   constitutional right to not testify.  Is that correct?

16             MR. SCHENSE:  Mr. Parsons and I -- can I give -- I

17   know that's a yes or no, but can I just --

18             THE COURT:  No.  You may.  I want to be sure.  I'm

19   going to ask both you and Mr. Parsons if you've had full

20   opportunity to discuss this, the advantages and the

21   disadvantages.  I'm not going to go through each one of them if

22   you have discussed those, but I want to hear what you talked

23   about without breaching any type of attorney-client privilege.

24             MR. SCHENSE:  I would say we have discussed it.  It's

25   my understanding Mr. Parsons will waive his right to testify.

```
1     I think Mr. Parsons is indicating he needs a break quickly.

2              THE COURT:  Okay, all right.

3              MR. SCHENSE:  Is that true?

4              THE COURT:  All right.  We'll take a break here just

5     for a minute.  Let's take about a five-minute recess or however

6     long is necessary.

7              (Recess taken at 10:05 a.m.)

8              (At 10:15 a.m. on August 30, 2018, with counsel for the

9     parties and the defendant present; WITHOUT the jury:)

10             THE COURT:  We're back on the record outside the

11    presence of the jury.  Is everybody ready to go?

12             MR. SCHENSE:  Yes, Your Honor.

13             THE COURT:  Okay, very well.  Yes.  I believe there

14    were four other offers of proof.

15             MR. SCHENSE:  Yes, Judge.  And could I ask:  Does the

16    Court have a copy of the court documents?

17             THE COURT:  I do.

18             MR. SCHENSE:  Mr. Parsons has just expressed an

19    interest to me of having the -- what we call -- even though

20    they're photocopies, these were out of his file that I've had

21    them marked.  He would like to have them back so -- if there's

22    a procedure we might use to take the copies and substitute

23    those for --

24             THE COURT:  We can do that at break.  When we're

25    doing our informal instruction conference, we can do that at
```

1      the break.  That's fine.  But I do have copies so you may

2      proceed.

3                  MR. SCHENSE:  Thank you.  Defendant's Exhibit 118.

4      This is in further support of Mr. Parsons' offer of proof.  It

5      is an Amended Order signed by the Honourable Chief Justice of

6      the Universal Supreme Court, and it indicates that Mr. Parsons'

7      2009 wrongful conviction of aggravated assault, burglary of a

8      vehicle, and theft is overturned.  He is fully exonerated from

9      the 2009 wrongful conviction.  He's awarded compensation for

10     his wrongful incarceration, $5,000 per day, and this should

11     all -- this should serve as notice, and it should also include

12     all NCIC records.

13         We've had some testimony in this case about NCIC and what

14     it is and how it's used.  The Chief Justice from the Universal

15     Supreme Court included that as part of her order on the Amended

16     Order, and again that it was expunged and all of this should be

17     done within 21 days of this order.

18         I will offer Exhibit 118.

19                  MR. SHARP:  Objection, relevance.  Also an improper

20     collateral attack on a prior conviction.

21                  THE COURT:  With respect to Exhibit 118, the

22     government's objection to the offer of proof is sustained under

23     401 and 403.  It is an improper collateral attack, and for all

24     of the reasons that I just gave for Exhibit 117, the objection

25     to the offer of proof is sustained.  I will receive Exhibit 118

1    for purposes of the record.

2                MR. SCHENSE:  May I?

3                THE COURT:  You may.

4                MR. SCHENSE:  Defendant's Exhibit 119 is a letter to

5    whom it may concern dated the 30th of January of last year

6    signed by Dr. Bradley M. Frezza, F-r-e-z-z-a, M.D.

7                THE COURT:  That's fine, counsel.  I can review the

8    letter.  I understand what it is.

9                MR. SCHENSE:  Yes, Judge.  Would you like me to go

10   over it as a part of the offer of proof?

11               THE COURT:  I guess it is an offer of proof so you

12   may.  I mean, you're offering the written version, and so it's

13   a letter from a doctor as far as his medical condition as of

14   January 30 of 2017.

15               MR. SCHENSE:  Yes, Judge.  I would offer 119.

16               THE COURT:  All right.  Is there any objection?

17               MR. SHARP:  Objection, relevance, 401, 403.

18               THE COURT:  The objection is sustained as to 401 and

19   403.  Exhibit No. 119 is received for purposes of the record.

20   The objection to the offer of proof is sustained.

21        Next, Exhibit 120.

22               MR. SCHENSE:  Yes, Judge.  That is a Tsilhqot'in

23   Nation Letter of Appointment to Tribal Membership signed by Sue

24   Holland, honorable -- I'm sorry.  Stanley Stump.  I'm sorry.

25   Yes.  Signed by Stanley Stump, Senior, his Honourable Chief

1    Justice of the Universal Supreme Court of the Tsilhqot'in dated

2    December 13, 2015.  It just goes over the rights and dignities

3    that Mr. Parsons accrues as this -- as a tribal member.  I

4    would offer 120 as part of my offer of proof.

5              THE COURT:  Very well.  Any objection?

6              MR. SHARP:  Objection on relevance grounds, 401, 403.

7    Also presenting legal matters not before the jury.

8              THE COURT:  The government's objection to the offer

9    of proof is sustained on 401, 403 grounds, as well as this,

10   again, is a matter that is a matter of law, not for the jury to

11   consider.  So Exhibit 120 is received for purposes of the

12   record.  The government's objection to the offer of proof is

13   sustained.

14        Exhibit 121.

15              MR. SCHENSE:  Yes, Judge.  It's a Notice to the

16   Court -- I guess the State of Tennessee dated March 12, 2016,

17   signed by Grand Chief Stanley Stump, Senior, Hereditary Grand

18   Chief, Chilcotin National Congress, indicating that Mr. Parsons

19   is a diplomat and dignitary of the Tsilhqot'in Nation.  He's an

20   ambassador and an associate justice, and he's free from the

21   jurisdiction of all Tennessee and U.S. Courts.

22        And I would offer Exhibit 121 for -- in support of the

23   offer of proof.

24              THE COURT:  All right.  Is there any objection?

25              MR. SHARP:  Objection -- objection on relevance

1    grounds, 401, and 403.  Also referencing legal matters not

2    properly before the jury.

3              THE COURT:  All right.  Once again, for the reasons I

4    gave on Exhibit -- I want to make sure it was 120.  Yes.  For

5    the reasons I gave on Exhibit 120, the objection -- the

6    government's objection to the offer of proof is sustained.

7    401, 403, as well as all other reasons I gave for 120.  Exhibit

8    No. 121 is received for the purposes of the record.  The

9    government's objection to the offer of proof is sustained.

10             MR. SCHENSE:  Thank you, Judge.  May I approach the

11   courtroom deputy with the originals and the copy?

12             THE COURT:  Yes.  And we will have the courtroom

13   deputy substitute those at break, then, when we're doing our

14   informal instruction conference.

15             MR. SCHENSE:  Yes, Judge.  Sorry.

16             THE COURT:  So you'll receive those back.  You'll

17   receive the originals back, Mr. Parsons.

18             MR. SCHENSE:  Mr. Parsons had indicated to me, Judge,

19   before we broke that that was the last of his documentary

20   evidence he wanted me to present to the Court.

21             THE COURT:  All right.  I want you to know,

22   Mr. Parsons, all of the documentary evidence has been received.

23   The objections have been sustained, but they are preserved.

24   Your rights are preserved for the appellate court if there is

25   an appellate court.  All right?  Or if there are appellate

1    proceedings, I should say.  All right, very well.

2            MR. SCHENSE:  Judge, could we have just a minute,

3    please?  Mr. Parsons has referenced something else to me.  It

4    would be a verbal offer of proof.

5        (An off-the-record discussion was had between the

6    defendant and counsel.)

7            MR. SCHENSE:  Judge, Mr. Parsons has asked me as a

8    further offer of proof to make a verbal offer to the Court in

9    support of the offer of proof, and that is to ask the Court to

10   take judicial notice of 28, U.S.C., 3002(15), which I don't

11   have in front of me, but apparently it may be a definition of

12   what the United States is, according to Mr. Parsons.

13           THE COURT:  I'm not sure that's an offer.  I will

14   take judicial notice of 28, U.S.C., Section 3002(15).  I have

15   no idea whether it has any relevance to these proceedings, but

16   I'll take judicial notice of a federal statute.

17           MR. SCHENSE:  I appreciate that, Judge.

18           THE COURT:  All right.  Are we ready to proceed to

19   the colloquy?

20           MR. SCHENSE:  I believe we're very, very close.

21           THE COURT:  Very good.

22           MR. SCHENSE:  Judge, Mr. Parsons believes he has a

23   copy of that statute.

24           THE COURT:  That's okay.  I can find the statute.  I

25   can find that.  I'm not worried about that.  I have taken

1    judicial notice of it.

2              THE DEFENDANT:  One last thing I need to bring to the

3    judge's attention.

4          (An off-the-record discussion was had between the

5    defendant and counsel.)

6              MR. SCHENSE:  May I?

7              THE COURT:  Yes, you may proceed.

8              MR. SCHENSE:  Thank you.  Judge, I don't know if this

9    goes to my offer of proof or not, but I'm going to offer to the

10   Court -- Mr. Parsons has asked me to.  Mr. Parsons has heard

11   through the grapevine or through -- from somebody that all of

12   these proceedings that are going on in court are being uploaded

13   on the internet, and there's some website called trader --

14             THE DEFENDANT:  Frader 67II.

15             MR. SCHENSE:  There's a website with Frader,

16   something, F-r-a-d-e-r or something.  I don't know.

17             THE COURT:  Well, let's stop for a minute.  This is

18   not an appropriate offer of proof.  I will tell you this is not

19   being recorded in any form or fashion.  If somebody is

20   uploading anything on the internet, it has nothing to do with

21   the United States Courts or anybody in this courtroom.

22   There's --

23             THE DEFENDANT:  They said the trial is being

24   uploaded, the audio of this hearing.  Yesterday's is on the

25   internet as of 30 minutes after I left and got back to the

1    jail.  I called, and they said it's playing right now on the

2    internet for people to hear yesterday's hearings.  So I don't

3    know if the clerk's putting it out on the internet or if

4    someone else is getting it from the clerk, but it's out there,

5    and there're people that are blogging about this case and the

6    proceedings as --

7              THE COURT:  Well, number one, this is a public

8    courtroom, so if somebody is recording it or if it is out

9    there, this is a public proceeding.  Anybody can walk into this

10   courtroom, friends of yours, the government, or anybody else.

11   This is not a sealed proceeding.  So if anything is out there,

12   there is nothing illegal or improper about that, but I can tell

13   you nobody is recording this proceeding other than this court

14   reporter right here.  She's taking down every word that we are

15   emitting in this court, but there -- so I'm not sure what the

16   objection is, if there is one.

17             THE DEFENDANT:  I would move the Court to make a

18   verification, because it's prejudicial for this matter to be

19   out there in case someone -- since the jury has not been

20   sequestered, someone could be relaying information to the jury.

21       There's actually -- what I've been told, this Mr. Frader

22   has made a threat to Mr. Schense regarding petitioning or

23   submitting a complaint to the bar against him, and I find that

24   threatening to him, and I'm concerned that there might be some

25   undue influence upon this proceedings.

1          THE COURT:  Okay.  Well, unless somebody brings

2     something to me as a matter of evidence, I'm not making any

3     ruling.  There's no objection that is pending.  The jury has

4     been instructed clearly each and every day not to have

5     communication with and not to consult the internet or any other

6     source other than the evidence adduced in court.

7          So Mr. Schense, are we ready to proceed with the --

8          (An off-the-record discussion was had between the

9     defendant and counsel.)

10          THE COURT:  Just do it briefly.

11          MR. SCHENSE:  Mr. Parsons would like to know if

12     anybody -- if there's being any payments made to federal

13     employees for cooperating and/or testifying in this matter, and

14     as a result of this trial, are -- any federal employees who are

15     assisting and/or testifying in this matter, are they going to

16     be awarded time off?  In support of that he cites 5, U.S.C.,

17     4503, 4504, 5, U.S.C., 7342(a) --

18          THE COURT:  Okay.  Counsel, I'll stop you there.

19     That is a matter of evidence.  If there are any cooperating

20     witnesses that were to receive time off or any payments, that

21     is to be adduced as a matter of evidence.  There has been no

22     evidence.  In fact, there has been evidence adduced that there

23     has been no promises and no payments, and the Court's not going

24     to make any findings on that.  That's a matter of evidence.

25          THE DEFENDANT:  This is not pertaining to witnesses,

```
 1    Your Honor.  It's pertaining to court officials, the judge, the

 2    prosecutor, and the attorney assigned to me.  This is what this

 3    pertains to.

 4              THE COURT:  Well, I'm not going to -- I can tell you

 5    the Court, the prosecutor, anybody involved in this case is --

 6    are public officials and are paid as public officials, not as a

 7    result of this case or any other case that's in this courtroom.

 8    All right?

 9         Very well.  Now, are we ready to proceed to the colloquy?

10              MR. SCHENSE:  Yes, Your Honor.

11              THE COURT:  All right.  And it's my understanding

12    that Mr. Parsons is going to exercise his constitutional right

13    not to testify, and, counsel, I would like to --

14              THE DEFENDANT:  I want to testify.

15              MR. SCHENSE:  What?

16              THE COURT:  Counsel, you can proceed.

17              MR. SCHENSE:  All right.

18              THE COURT:  I'm bringing the jury in, so he's either

19    going to testify or he isn't.

20              MR. SCHENSE:  Judge, I need a couple of -- it was my

21    understanding after early morning discussions with Mr. Parsons

22    he was not going to testify.  You obviously heard what he just

23    said.  Can I just have a couple of minutes, please?

24              THE COURT:  It's 10:32.  We'll be back here at 10:35,

25    and you can advise me whether or not Mr. Parsons is going to
```

1    testify, and we'll bring the jury.

2         So we'll take a three-minute break.

3         (Recess taken at 10:32 a.m.)

4         (At 10:41 a.m. on August 30, 2018, with counsel for the

5    parties and the defendant present; WITHOUT the jury:)

6         THE COURT:  We're back on the record outside of the

7    presence of the jury.  You may be seated.

8         All right.  For the last time the Court is going to ask --

9    well, I'll ask defense counsel.  How are we going to proceed?

10        MR. SCHENSE:  Judge, thank you for the time to visit

11   with Mr. Parsons.  We have discussed this matter, and I have

12   advised strongly my thoughts and opinions in my professional

13   capacity, my experience over 35 years, that Mr. Parsons should

14   not take the stand, weighing all of the pros and cons, all of

15   the facts and circumstances and the cross-examination that I

16   believe Mr. Parsons will subject himself to.

17        And he knows I feel strongly that he should not take the

18   stand because of all of my concerns, but I told him that this

19   is his case and he has to make that decision, and I think he's

20   prepared to have that discussion with you, Judge, in terms of

21   what he will exercise.

22        THE COURT:  All right.  Good.  Very well.

23   Mr. Parsons.

24        THE DEFENDANT:  Am I entitled to --

25        THE COURT:  Are you prepared to testify or not to

```
1    testify?

2              THE DEFENDANT:  Yes.  Am I entitled to call witnesses

3    still?

4              THE COURT:  You are always entitled to call

5    witnesses, but you have to have them here.

6              THE DEFENDANT:  He's right there.

7              THE COURT:  Well, number one, the witness --

8    whatever either you testify to or you call witnesses to, it'll

9    be relevant evidence.

10             THE DEFENDANT:  It is.

11             THE COURT:  All right.  So it'll be subject to any

12   relevancy objection that's out there.  Anybody that you call,

13   including yourself, will be subject to cross-examination on

14   relevant matters to this case.

15             THE DEFENDANT:  Yes.

16             THE COURT:  So if your question is may you call

17   witnesses, you certainly may.

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  All right.  Is there anything else that

20   we need to -- that we need to -- are you planning on

21   testifying, sir?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  You are planning on testifying?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  Okay.  Now, you understand that if you --
```

1    and you have an absolute constitutional right to, to testify

2    and present a defense.  You understand that if you do testify,

3    you will be, A, subject to cross-examination?  You understand

4    that?  You have to say yes or no.

5              THE DEFENDANT:  Oh.  I understand.

6              THE COURT:  Okay.  Very well.  Anything that you

7    testify to can or would be used against you in a proceeding,

8    including this trial in front of the jury.  You understand

9    that?  Is that a yes?

10             THE DEFENDANT:  Yes.

11             THE COURT:  You understand that.  All right.  And you

12   will only be able to testify to relevant matters.  In other

13   words, another -- a number of these matters that we've

14   discussed that have been the subject to an offer of proof will

15   not come before the jury.  If there is a relevance objection,

16   it will be sustained.  So I want you to know that what you are

17   able to testify to will be subject to the rules of evidence.

18   You understand that?

19             THE DEFENDANT:  If I'm not mistaken, what I've

20   observed is the United States' position that they've had their

21   witnesses brought forward.  They've asked them questions, and

22   they've referenced their knowledge, and other than the last

23   gentleman that quoted a law, that was, I guess, the exception,

24   but the jury, I believe, has a right to know what the law is

25   and who it pertains to, and I think --

1          THE COURT:  And I will give them that.  The Court

2     will give them that.

3          THE DEFENDANT:  And I think the jury also has the

4     right to know that I'm a victim of malicious prosecution and an

5     assault, and without them hearing the testimony firsthand, it's

6     not going to be something for them -- do I have the right to

7     present to them how I've been -- this is an ongoing history of

8     how I've been attacked, and this is nothing more than just

9     another attempt to put me in a cage to silence me because I'm

10    outspoken against corruption in government?

11         THE COURT:  Well, I'm not going to tell you what you

12    have a right to testify to and not until the testimony is

13    presented and objections are made and ruled upon.  I will tell

14    you this, that the crime that has been charged in this case is

15    that you are a felon in possession of either a firearm or

16    ammunition, and that's the testimony that will be allowed, but

17    it'll be allowed that goes to that particular charge and to

18    nothing else.  So anything that's attempting to collaterally

19    attack the Tennessee conviction will not be allowed.  You're

20    not going to be able to try that case again.

21         THE DEFENDANT:  This --

22         MR. SCHENSE:  No.  Let the judge finish, please.

23         THE COURT:  So, I mean, if that's answering your

24    question, that's where we're at.

25         THE DEFENDANT:  Well, the element of interference

1    with interstate commerce is part -- is part of the charge.

2              THE COURT:  You can certainly testify to anything you

3    wish, not as to what the law is, but if you believe that

4    whatever evidence is in has either been subject to or not

5    subject to interstate commerce, you have a right to testify to

6    that.  You're going to open yourself up to cross-examination.

7    I want you to know that.

8              THE DEFENDANT:  And so I'm not allowed to reference

9    the Constitution?

10             THE COURT:  No, you're not, no.  You're not going to

11   be able to give up -- get on the stand and talk about the

12   Constitution or the laws.

13             THE DEFENDANT:  But yet the United States is able to

14   argue the law from the very beginning, and I can't object to

15   that.

16             THE COURT:  Your counsel is going to be able to argue

17   the law in closing arguments.  I'm going to give them the law.

18   Both counsel -- the government and your counsel -- are going to

19   be able to argue the applicable law.  It might not be the law

20   as you understand it, but they will be able to argue the

21   applicable law.  All right.

22             THE DEFENDANT:  That was my concern, that my focus is

23   on the Constitution and what the statute actually says versus

24   what people just do in generality.  People perceive things that

25   are not actually in the law as it --

1              THE COURT:  Mr. Parsons --

2              THE DEFENDANT:  -- as I understand the statutes.

3              THE COURT:  -- I will give the law that's applicable

4    to this case.  You may or may not agree with that.  If you

5    don't agree with it, you can't get on the stand and argue about

6    it.  You can't give a closing argument that does not contain

7    the applicable law as I give it.

8         What you can do is if you are convicted, which you may or

9    may not be, I -- incidentally, your counsel has done an

10   excellent job in cross-examination, and I'm sure he will in

11   closing argument.  There may or may not be a conviction in this

12   case.  Just a second, Mr. Parsons.

13        If you are convicted and you disagree with certain of my

14   rulings, you have preserved the record, and you may make your

15   arguments to the Eighth Circuit and then to the United States

16   Supreme Court if your petition for certiorari is accepted, and

17   you can make any arguments that you wish in those forums, but

18   you're not going to make them to the jury.  Okay?  Understand?

19        All right.  So are we ready to proceed?

20        (An off-the-record discussion was had between the

21   defendant and counsel.)

22              THE COURT:  Okay.  I think he understands his rights.

23              MR. SCHENSE:  Judge, I just want to make the record

24   extremely clear.  This is completely against my advice to

25   Mr. Parsons.  Many of the things, if not all of the things, the

1    Court has just engaged Mr. Parsons with, I have discussed with

2    Mr. Parsons, about preserving the record, reasonable doubt,

3    closing arguments, cross-examination, and the fact, I might

4    add, also that he cannot declare any sort of diplomatic

5    immunity or assert any privileges while he's being

6    cross-examined by Mr. Sharp.  This is a bad decision, and I

7    want that to be very clear on the record.  I am against my --

8    against Mr. Parsons doing this.

9            THE COURT:  All right, very well.  It'll be -- and I

10   understand that, and the Court has engaged in the colloquy, and

11   you've advised Mr. Parsons.  But at this time, I mean, it'll be

12   Mr. Parsons' decision whether or not he testifies and what he

13   can testify to.  I've already been very clear about what may or

14   may not be relevant.

15       So are we ready to bring the jury?

16           MR. SCHENSE:  We probably need to address one last

17   issue.  Mr. Parsons wants to call the marshal who he alleges

18   assaulted him while obtaining a blood sample for a TB test.

19   The Court is aware of the issues regarding the TB test.  I told

20   him that's not relevant to these proceedings.  I don't think

21   the Court's going to even get close to allowing that in, but

22   nonetheless I'm presenting that to the Court as a potential

23   issue, and I don't believe the testimony -- as an officer of

24   this court, I'm going to say that's not even relevant to the

25   proceedings at hand.

```
 1                    THE COURT:  Yeah.

 2                    MR. SCHENSE:  It's not.

 3                    THE DEFENDANT:  Your Honor, the relevance is that the

 4         state's [sic] witness testified they did not have DNA evidence

 5         available to do an analysis.  They've had two vials of my blood

 6         since March 28.  That's DNA evidence.  He's misled this court.

 7         I think the jury needs to hear that.

 8                    THE COURT:  As far as having vials of your

 9         evidence -- or vials of your blood?

10                    THE DEFENDANT:  Yes, sir.  They've had my DNA.

11                    THE COURT:  Is that what the testimony is going to

12         be?

13                    THE DEFENDANT:  That's applicable because the state's

14         [sic] witness --

15                    THE COURT:  Right, if that's what the testimony is

16         going to be.

17                    THE DEFENDANT:  That's it, yes, sir.

18                    THE COURT:  Okay.  It's not going to be about any

19         assault or anything that occurred.  That's a civil matter.

20         Number one, I don't know that that's occurred in any matter,

21         but, number two, that's not relevant to this case whatsoever.

22                    THE DEFENDANT:  And it's relevant to how they

23         obtained it.

24                    THE COURT:  It's not relevant to this case.

25                    THE DEFENDANT:  Yes, sir.  When the United States
```

 1    government seeks to assault the people that it's supposed to be

 2    there to protect and frame them and steal from their body in

 3    violation of the Constitution and the First Amendment right to

 4    freedom of religion, that is a crime against this country that

 5    should not stand, and this Court should respectfully take

 6    judicial notice of that.

 7              THE COURT:  All right.  Are you ready to proceed?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  All right.  Let's bring the jury.

10        (Jury in at 10:55 a.m.)

11              THE COURT:  You may be seated.  Thank you for your

12    patience, ladies and gentlemen of the jury.  We are back on the

13    record.  The government has rested.  The defense may now call

14    its first witness.

15              MR. SCHENSE:  Judge, I'm going to call the Deputy

16    U.S. Marshal who's in the courtroom who has been assisting with

17    this trial during its entirety to ask some very extremely

18    limited questions of him.

19              THE COURT:  All right.  You may do so.

20              MR. SCHENSE:  Sir.

21              THE COURT:  Is that mister -- who are you calling?

22              MR. SCHENSE:  Yes.  That's him, Judge.

23              THE COURT:  If you'll come around the witness stand.

24        Take a seat.

25        If you'll take a seat, and we'll have you sworn.

Anderson - Direct                                                    620

1          Please swear the witness.

2               COURTROOM DEPUTY:  Please state and spell your name

3     for the record.

4               THE WITNESS:  Mark Anderson, M-a-r-k, S., last name

5     Anderson, A-n-d-e-r-s-o-n.

6               COURTROOM DEPUTY:  Please raise your right hand.

7            MARK S. ANDERSON, DEFENDANT'S WITNESS, SWORN

8               THE COURT:  Very well.  You may inquire.

9               MR. SCHENSE:  Thank you.

10                        DIRECT EXAMINATION

11    BY MR. SCHENSE:

12    Q.   Good morning.

13    A.   Good morning.

14    Q.   Could you please state your full name again?

15    A.   Mark Anderson.

16    Q.   Mr. Anderson, how are you employed?

17    A.   I'm a Deputy United States Marshal.

18    Q.   And you're one of the deputy marshals who has been sitting

19    in the courtroom during the entirety of this trial; is that

20    true?

21    A.   Yes.

22    Q.   Do you know Michael Parsons?

23    A.   Yes.

24    Q.   Do you see him in the courtroom?

25    A.   I do.

Anderson - Direct                                                          621

1  Q.   Could you point to him, please, and state what he is

2  wearing?

3  A.   He's the gentleman sitting over there at the defense

4  counsel wearing a black suit and glasses, ponytail.

5          MR. SCHENSE:  Your Honor, if the record will reflect

6  the proper identification.

7          THE COURT:  The record will so reflect.

8  BY MR. SCHENSE:

9  Q.   Deputy Anderson, you've known Mr. Parsons for a number of

10  months; is that a fair statement?

11  A.   Yes, I'm familiar with him.

12  Q.   And do you recall a time in late March, I want to say

13  right around on or about March 28th, that you had any contact

14  with Mr. Parsons on that day?

15          MR. SHARP:  Your Honor, I'm going to object on

16  foundation as to which year we're talking about.

17          MR. SCHENSE:  I'm sorry.  2018.

18          THE COURT:  All right.  Very well.

19          MR. SCHENSE:  Yes, 2018.

20  A.   I -- was that the date of the blood draw that we're

21  talking about?

22  BY MR. SCHENSE:

23  Q.   Yes, yes, it is.

24  A.   I don't have anything in front of me.  I don't necessarily

25  remember that being the exact date, but I wouldn't challenge it

Anderson - Direct                                                    622

1     if you said that was the date.

2     Q.   Did you and fellow deputies take Mr. Parsons to a local

3     facility here in Omaha for the purpose of a blood draw?

4     A.   Yes.  We had a court order to do so.  So on that day I

5     presume, yes, we transported him to a facility with the purpose

6     of drawing blood.

7     Q.   Yes.  And to be fair, that was pursuant to a court order?

8     A.   Yes, it was.

9     Q.   And so you were just performing your duties?

10    A.   Correct.

11    Q.   Can you -- if you remember, do you remember where you took

12    Mr. Parsons?

13    A.   I can't remember the address of the place.  It was off, I

14    believe, "I" Street, South Omaha, right off Highway 75.

15    There's an exit right there.

16    Q.   And how many -- to the best of your memory -- and I want

17    to be fair about this.  You and I have not previously discussed

18    this testimony; is that fair?

19    A.   Yes.

20    Q.   So I apologize for calling you cold on this, so I want to

21    make that known.  But you and fellow deputies took Mr. Parsons

22    to this facility pursuant to court order for the purpose of a

23    blood draw.  So far so good?

24    A.   Yes.

25    Q.   And when you arrived at this place to have the blood draw,

Anderson - Direct                                                        623

1    did you go in with -- did all of the deputies go in with

2    Mr. Parsons?

3    A.    Yes.

4    Q.    And can you tell us what happened inside, to the best of

5    your recollection?

6    A.    We escorted Mr. Parsons from our prisoner van into the

7    facility.  When we got into the facility, at the threshold of

8    the door, he became combative and resisted, would not walk on

9    his own, so we had to forcibly pull him into the clinic and

10   forcibly put him down into -- take him into a room, forcibly

11   put him down in a chair, where at that point the four of us

12   attempted to hold him down while he was yelling, screaming, and

13   being resistant to our lawful verbal commands to stop, to

14   attempt to draw blood, and a medical personnel staff was there

15   to attempt to draw the blood.

16        At that point in time, we were not successful in getting

17   the blood draw because he would not stay still long enough for

18   the nurse to do it.

19   Q.    And ultimately was there a blood draw?

20   A.    Yes.  We kind of prepared for that.  We had brought a

21   restraint chair with us, which is a special chair that the U.S.

22   Marshal Service uses, and we transferred him from the restraint

23   chair -- or from the exam chair to the restraint chair.  We

24   physically tied him down, you know, strapped his arms, legs,

25   strapped everything down so he could not move.  We still held

Anderson - Direct                                                          624

1    him down, and then at that point we were able to keep him still

2    enough so the nurse or the medical staff there could get a

3    blood sample.

4    Q.    And through those efforts a blood draw and a blood sample

5    was completed?

6    A.    To my knowledge, it was.

7    Q.    And do you have any independent recollection of what

8    happened with that blood draw?

9    A.    Like, what they do with the blood?

10   Q.    Like, what happened to it after that?

11   A.    I have no idea what happened to it.  I would assume it got

12   sent to -- for -- the purpose of the whole test was for a TB

13   test, which is standard procedure for anybody in custody.  I

14   would assume it went to be tested for TB, and I would assume

15   that we got the results, you know, the results were given back

16   as far as TB, but I don't know for sure.  That wasn't -- we

17   don't -- I don't handle that part of it.

18   Q.    I understand.  Was Mr. Parsons asserting that he was not

19   subject to such a blood draw?

20   A.    Yes.

21   Q.    All right.  And lastly, I just want to make sure it's fair

22   to say that this was done on or about March 28th of 2018.

23   A.    Like I said, I can't recall exactly if that was the date,

24   but I wouldn't argue.  If that was the date, then I would agree

25   with that.

Anderson - Cross (Sharp)                                              625

1              MR. SCHENSE:  All right.  May I have a moment, Judge?

2              THE COURT:  You may.

3              MR. SCHENSE:  I just want to -- one last question.

4    BY MR. SCHENSE:

5    Q.   You're confident that there was a court order for a blood

6    draw on that particular day?

7    A.   Yes.  My supervisor informed me there was a court order to

8    get this done.

9              MR. SCHENSE:  Thank you.  That's all I have.

10             THE COURT:  Very well.  Cross-examination.

11             THE DEFENDANT:  More questions, Your Honor.

12             THE COURT:  No.  Just a moment.  Counsel, you may

13   proceed.

14                         CROSS-EXAMINATION

15   BY MR. SHARP:

16   Q.   Deputy Anderson, as I understand it, you were carrying out

17   a court order for the purposes of collecting a blood draw to

18   test for tuberculosis; is that correct?

19   A.   That is the way I understood it, yes.

20   Q.   And this happened earlier this year, not back in 2017; is

21   that correct?

22   A.   Yes.

23   Q.   Does the marshal's office from time to time get called

24   upon to collect samples for DNA?

25   A.   Yes.  When we process prisoners, we occasionally will take

Anderson - Redirect                                                    626

1    DNA if the investigating agency hasn't already done so.

2    Q.    Is that -- is it correct that that's done by using buccal

3    swabs to basically swish it around in someone's mouth, and then

4    you put it in a tube and take their fingerprint?  Is that

5    correct?

6    A.    That is correct.

7    Q.    Was that done in March of this year with Mr. Parsons?

8    A.    Not as far as I know of, no.

9    Q.    Okay.  You didn't have a court order for collection of DNA

10   in March of this year; is that correct?

11          MR. SCHENSE:  I'm sorry to interrupt, Mr. Sharp, but

12   that is beyond the scope of direct, any DNA testimony.

13          THE COURT:  Okay.  Overruled.

14   A.    As far as I know, there was no court order for DNA, and I

15   did not take any DNA, and I'm not aware of anybody else taking

16   DNA, to my knowledge.

17          MR. SHARP:  Nothing further, Your Honor.

18          THE COURT:  Redirect.

19        (An off-the-record discussion was had between the

20   defendant and counsel.)

21                        REDIRECT EXAMINATION

22   BY MR. SCHENSE:

23   Q.    Do you recall the name of the facility or the address?

24   A.    I do not.  I wrote a report on it.  I don't have it in

25   front of me.  I do not recall the name or address of the

1    facility at this time.

2    Q.    Fair enough.  Did you see the court order, or were you

3    advised that a court order existed?  If you recall.

4    A.    I don't recall.  I may have seen it briefly.  I just can't

5    remember.  I was definitely made aware there was a court order,

6    though, but I can't remember if I physically saw it or not.

7              MR. SCHENSE:  Very good.  Thank you.  That's all.

8              THE COURT:  Very well.  May this witness step down?

9              MR. SCHENSE:  Yes, Judge.

10             THE COURT:  All right.  Thank you.  Deputy Anderson,

11   you may step down.

12        You may call your next witness.

13             MR. SCHENSE:  I'd call Mr. Michael Parsons.

14             THE COURT:  Mr. Parsons, if you'd approach the stand.

15             THE DEFENDANT:  May I have something to write with in

16   case I need to make a note?

17             THE COURT:  You're a witness, sir.  You don't need

18   anything to write with.

19             THE DEFENDANT:  I typically take notes.

20             THE COURT:  You can bring your pen.

21        Marshal, I'll have you stay with him.  Thank you.

22        You may take a seat.

23        Adjust the microphone.

24        We'll have you sworn.

25             COURTROOM DEPUTY:  Please state and spell your name

Parsons - Direct                                                      628

1    for the record.

2            THE WITNESS:  Your Honor, may I pass this back to

3    Mr. Schense?  This is the question list.  I didn't have an

4    extra copy for him, sir.

5            THE COURT:  Mr. Schense, you may approach.

6        All right.  And the deputy clerk has asked you to state

7    your name and spell it for the record.

8            THE WITNESS:  I am Ambassador Michael Parsons,

9    M-i-c-h-a-e-l, P-a-r-s-o-n-s.

10           COURTROOM DEPUTY:  Please raise your right hand.

11          MICHAEL W. PARSONS, DEFENDANT'S WITNESS, SWORN

12           THE COURT:  All right.  Very well.  You may proceed.

13                        DIRECT EXAMINATION

14   BY MR. SCHENSE:

15   Q.   You've identified yourself as Ambassador Michael Parsons;

16   true?

17   A.   That's correct.

18   Q.   You are the ambassador for whom?

19   A.   I am the ambassador for the Tsilhqot'in Nation, country of

20   Chilcotin, and I'm more than happy to spell it if that would

21   assist in identifying the nation.  It's --

22   Q.   Go ahead.

23   A.   The Tsilhqot'in Nation is spelled T-S-I-L-H-Q-O-T-I-N.

24   There's a hyphen *[sic]* between the "T" and the "I" at the end

25   of the word.  It's pronounced Tsilhqot'in.  It is a Native

 1    American nation in what you would recognize as British

 2    Columbia.  As a matter of fact, two-thirds of British Columbia

 3    is the Tsilhqot'in Nation.

 4              MR. SHARP:  Your Honor, I'll object to this as being

 5    voluntary.

 6              THE COURT:  Narrative.  The objection is sustained.

 7    It'll be question and answer.

 8         You may proceed, counsel.

 9    BY MR. SCHENSE:

10    Q.   Wait.  Wait.

11    A.   And the country is --

12              THE COURT:  No, sir.  There's no question pending.

13              THE WITNESS:  Oh.  He asked me the spelling.  Okay.

14    I'm sorry.

15              THE COURT:  You did spell it.  Thank you.

16    BY MR. SCHENSE:

17    Q.   And do you hold any other positions with the Tsilhqot'in

18    Nation, the country of Chilcotin?

19    A.   When I was originally adopted by the nation, I was made an

20    associate justice of their court system.  Shortly after that

21    they ascertained that my skill sets allowed me to be more of a

22    benefit to the nation as their ambassador, so I was redirected

23    as to the status of their ambassador.  I am a member of the

24    Chilcotin National Congress, which is the governing body of the

25    Tsilhqot'in Nation.  That is where the hereditary chiefs govern

Parsons - Direct                                                    630

1    from.

2    Q.   And when were these -- when were these designations

3    afforded to you, what year?

4    A.   The adoption was in 2015.  The appointment as an associate

5    justice was in 2015.  The appointment as their ambassador was

6    January 1st, 2016, and being made a member of the Chilcotin

7    National Congress occurred shortly after that.  Somewhere

8    around March of 2016 is when I received notice of that.

9    Q.   You referenced your skill set was such that you were a

10   more valued individual for the country of Chilcotin; is that

11   true?

12   A.   That's correct.

13   Q.   And in terms of your skill set, does that have to do with

14   your educational background along with your employment

15   background?

16   A.   It has to do with educational experience, work experience,

17   life skills, my ministry, my culture.

18   Q.   Well, let's go through those, then.

19   A.   The entire package.

20   Q.   Yes.  I want you to tell the jury a little bit about

21   your -- and we'll go through them individually.  What is your

22   educational background?

23   A.   I have a degree in mechanical engineering.

24   Q.   And what is your employment background?

25   A.   Well, I've been a manager with Federal Express over

Parsons - Direct                                                    631

1    aircraft and trucking operations for a number of years with

2    Federal Express before I left.

3         Then I was involved as an adjunct faculty member teaching

4    professional small business at Southwestern College in Memphis.

5    I did that for about six years.

6         The Mrs. and I own a farm.  We raise organic hay and dairy

7    goats.  We have a very simple lifestyle.  We're both engineers,

8    we both have similar interests, but I am a licensed general

9    contractor still trying to finish building my home.  I've been

10   a licensed home inspector in Tennessee.

11        I have held virtually all of the mechanical licenses that

12   Tennessee offers at one time or another.  Been a consultant.

13   Actually, I've been an expert witness, deemed by Shelby County

14   as an expert witness regarding construction evaluation.

15        I was also a volunteer for the United States Air Force for

16   four years as a pilot in their Civil Air Patrol program.

17        And as you might notice, this -- this is part of my

18   ministry.  I am a Native American minister almost born in the

19   church.  My family is members of the Frayser Baptist Church in

20   Memphis.

21        I was saved at five, baptized at eight by Brother

22   Campbell, and I've been a follower of Christ my whole life.  My

23   desire to teach --

24             MR. SHARP:  Your Honor, I'm going to object to this.

25   It's turning into a narrative.

1          THE COURT:  The objection is sustained.

2          Question and answer, please.  Thank you.

3     BY MR. SCHENSE:

4     Q.   Is it because of all of what you've just described to the

5     jury that formed this special skill set that you referenced

6     earlier?

7     A.   That, including that I have a desire to have the truth be

8     known, and I do research.  I do a lot of research.  World

9     history, Native American history, European history, all kinds,

10    biblical history, and what I try to do is expose the truth in

11    corruption in government to which -- I had a radio talk show

12    called the Voice of Truth with Mike Parsons.

13         MR. SHARP:  We're engaging in a narrative.

14         THE COURT:  The objection is sustained.

15         Question and answer, please.

16    BY MR. SCHENSE:

17    Q.   So all of that too supported the skill set which the

18    Tsilhqot'in Nation and the country of Chilcotin thought was --

19    thereby thought was prudent to give you these positions within

20    the country of Chilcotin.  Is that fair to say?

21    A.   In the Native American culture --

22    Q.   No, no, no.  Yes; is that fair to say?

23    A.   Yes.

24    Q.   And you said you came into the Tsilhqot'in Nation, or you

25    were accepted, you and Mrs. Parsons, your wife, in -- I'm

Parsons - Direct                                                    633

1    sorry.  What year did you say that was?

2    A.    That was in 2015.

3    Q.    And the process in which to be accepted into the country

4    of Chilcotin that you went through with you and your wife, that

5    was done by whom?  Who authorizes that?

6    A.    Well, the power in the Tsilhqot'in Nation is with the

7    hereditary chiefs, and we were recommended for adoption by the

8    Universal Supreme Court Chief Justice.  Sue Holland had made

9    reference to me to the grand chief -- he's the top grand chief,

10   there's six of them in the nation -- about me and bringing me

11   on as someone to assist and work with the Nation and after --

12            MR. SHARP:  Your Honor, I'm going to object.  The

13   witness has answered the question.

14            THE COURT:  Sustained.  Question and answer, please.

15   BY MR. SCHENSE:

16   Q.    And so --

17   A.    -- the hereditary grand chiefs --

18            MR. SHARP:  Your Honor, I object.

19            MR. SCHENSE:  Let me -- I know what question to ask.

20            THE COURT:  Okay.

21   BY MR. SCHENSE:

22   Q.    Who actually then -- you were -- you were adopted into the

23   country of Chilcotin?

24   A.    Yes.

25   Q.    But who actually approved that?  That's my question.  Who

Parsons - Direct                                                              634

1    approved it?

2    A.    The hereditary grand chiefs and the queen clan mothers.

3    Q.    And what is a clan mother?

4    A.    Well, they have the highest position of authority within

5    the Tsilhqot'in Nation.  They are the highest level of elders

6    there, the hereditary bloodline of the Tsilhqot'in Nation.

7    Q.    And who are the hereditary grand chiefs?  I don't want

8    names, but how do they get to such a position?

9    A.    These are bloodline Chilcotin.  They are pure Chilcotin

10   traditionalists in every way.  They've lived on the land

11   perpetually, and they derived their status as a grand chief

12   through an election process by which the elders of the

13   communities select them, and they remain in that position

14   perpetually.

15   Q.    You were accepted into the country of Chilcotin, then, by

16   not only the hereditary grand chiefs, but also by the clan

17   mothers?

18   A.    Correct.

19   Q.    Did you exercise your authority as an ambassador or an

20   associate chief justice or a diplomat with the country of

21   Chilcotin?

22   A.    I did.

23   Q.    How?

24   A.    On many occasions.  I have reviewed a few of their cases

25   and made rulings on those.  I have provided a copy and

Parsons - Direct                                                    635

1    follow-up of the notification of new country of the Chilcotin
2    to the United Nations Secretary General Ban Ki-moon in July of
3    2016.  I have communicated with the United Nations on many
4    occasions as well as the State Department and the Secretary of
5    State with the state of Tennessee because I am currently
6    working on, have been for ongoing two years, a timber deal with
7    a Chinese company that's actually owned by the Chinese
8    government who wants to purchase a billion dollars' worth of
9    timber a year from the Tsilhqot'in nation.
10   Q.   Okay.  But let's stop there.  Now, were you still
11   exercising those duties in January of 2017?
12   A.   When I was traveling?
13   Q.   Yes.
14   A.   Yes.  I was on official business for the Tsilhqot'in
15   Nation.
16   Q.   Very good.  Okay.  Now, before we go any further, is there
17   an area or a body of land contained in Canada, specifically
18   British Columbia, that encompasses the Tsilhqot'in Nation, the
19   country of Chilcotin?
20   A.   Well, actually, it's not in Canada.  Canada surrounds it.
21   It has been there for a thousand years.  It's recognized by
22   Canada.
23   Q.   We'll go into that, but my question is:  Is there a
24   designated --
25   A.   Yes.

Parsons - Direct                                                    636

1    Q.   -- area of land --

2    A.   There's a Chilcotin territory recognized by British

3    Columbia.

4    Q.   Very good.  And where is that located, generally speaking,

5    for the jury, and what is the approximate size of that land?

6    A.   Okay.  The Chilcotin territory.  If you're familiar with

7    British Columbia or just north of Washington state and Idaho,

8    in the western tip of Montana, about 50 miles north of the

9    border on the southeast corner, is a town called Kamloors.

10   That would be the southeasternmost quadrant of the Tsilhqot'in

11   Nation.  And then if you go over towards Vancouver Island,

12   50 miles just short of Vancouver Island would be the

13   southwestern quadrant of the Tsilhqot'in Nation.

14        Proceeding northward up past Bella Coola Inlet to the

15   Tweedsmuir mountain range would be the northwestern quadrant.

16   And then over to just south of Prince George, about 150 miles

17   north of Williams Lake and a hundred miles east of the Fraser

18   River, is the northeastern quadrant.  And it is effectively the

19   size of Nebraska.

20   Q.   And it has been established as that territory for how

21   long, approximately?

22   A.   Well, through royal proclamation the King of England

23   recognized the Tsilhqot'in Nation in 1763 before --

24        MR. SHARP:  Your Honor, I'm going to object to

25   Mr. Parsons getting into legal matters.

Parsons - Direct                                                       637

1               THE COURT:  Okay.  Sustained.

2               MR. SCHENSE:  All right.

3    A.   It's public record.

4    BY MR. SCHENSE:

5    Q.   No, no, no.

6    A.   It's not a legal matter.

7               THE COURT:  The objection is sustained, sir.

8         You may proceed.

9    BY MR. SCHENSE:

10   Q.   Mr. Parsons, it has been so designated since you became

11   affiliated with the Tsilhqot'in Nation and the country of

12   Chilcotin when you were adopted in; correct?

13   A.   They've been known as the Tsilhqot'in Nation for virtually

14   a thousand years and recognized by Canada since the Hudson

15   Compact.

16              MR. SHARP:  I'm going to object again.  Involuntary

17   and engaging in a narrative.

18              THE COURT:  Sustained.

19              MR. SCHENSE:  Very good.

20   BY MR. SCHENSE:

21   Q.   Were you in Nebraska in January of 2017?

22   A.   I was.

23   Q.   Did you just indicate to me a couple of minutes ago that

24   you were on official business?

25   A.   I was, that's true.

Parsons - Direct                                                          638

1   Q.   And can you tell the jury what that official business was?

2   A.   Yes.  I was traveling en route on official business for

3   the Tsilhqot'in Nation, specifically to finalize the timber

4   deal with the Tennessee buyer -- or the Tennessee logging

5   company that's going to manage the logging operation for the

6   Tsilhqot'in Nation and the buyer for the Chinese company.

7        We had a meeting scheduled where there was going to be a

8   ceremonial process through Native American customs of -- it's

9   called making of relations, and a sacred giveaway would be

10  performed.  As a Native American minister, I would be

11  officiating that, and then the documents would be signed.  We

12  had ceremonial pens, and everything was ready to go forward so

13  that the Chilcotin can start establishing development of their

14  own natural resources.

15  Q.   There was earlier testimony by a government's witness that

16  you were on your way to Montana to visit an elderly couple.

17  Tell us about that, please.

18  A.   Well, excuse me.  The trip included stopping at a location

19  where -- there is a port of entry coming in and out of Canada.

20  You have ports of entry where you stop and you check in, and as

21  a tribal Native American, I have a status card, and via the Jay

22  Treaty, Canada and the United States recognizes these.  I have

23  no other credentials, ID, at all; and, therefore, they have to

24  verify who I am.

25            MR. SHARP:  I'm going to object again on him

1  testifying to what the law is.

2           THE WITNESS:  Oh.

3           THE COURT:  Sustained.  You --

4  A.   And we were going to stop --

5           MR. SCHENSE:  No, no, no.  Wait.

6           THE COURT:  Sustained.  There will be question and

7  answer.

8      You may proceed.

9           MR. SCHENSE:  Thank you.

10 BY MR. SCHENSE:

11 Q.   You were on your way to Montana to visit an elderly

12 couple?  Yes or no.

13 A.   That was part of the plan, yes.

14 Q.   Okay.  And your intention after the -- were you going to

15 Montana from -- were you specifically in Nebraska at the

16 Arapahoe Airport when you were in Nebraska January 2017?

17 A.   Was I at the Arapahoe Airport?

18 Q.   Yes.

19 A.   Is that the question?  Yes.

20 Q.   And that's part of the -- you were en route.  That was

21 part of the en route, was it not?

22 A.   That's correct.

23 Q.   And you were then going directly to Montana; is that

24 correct?

25 A.   There would have possibly been one other stop depending on

1    the weather at that time of year.  The weather is ever

2    changing, and the necessities of anyone that flies knows that

3    you're apt to have to stop and wait for weather to pass

4    through.

5    Q.   And then your ultimate destination was --

6    A.   That's it.  That's as far as I knew to go.  I didn't have

7    any other instructions beyond that to go anywhere because I did

8    not have the actual final meeting place.  For purposes of the

9    security of the nation given the fact -- the history of Canada

10   intervening in the internal affairs of the Tsilhqot'in Nation

11   for so long --

12            MR. SHARP:  I'm going to object to this as being an

13   irrelevant narrative.

14            THE COURT:  Sustained as to both.

15   A.   I didn't know the final destination until I got there.

16            THE COURT:  You may proceed with the question.

17   BY MR. SCHENSE:

18   Q.   All right.  You didn't know the final destination.  Yes,

19   sir?

20   A.   No, I did not.

21   Q.   All right.  You also -- and I'm not going to put it on the

22   screen, but there was also testimony by a government's witness

23   about certain materials or things that were found on the plane.

24   There were a couple of bags from -- I believe it was Walmart.

25   Do you recall that testimony?

Parsons - Direct                                                          641

1    A.    I do.

2    Q.    And was that -- were those materials on the plane?

3    A.    Those were ceremonial gifts.

4    Q.    Yes?

5    A.    Yes.

6    Q.    So was that on the plane?

7    A.    Yes.

8    Q.    And they were ceremonial gifts for what reason, and to

9    whom were they going to be given?

10   A.    Those were to be given to the queen clan mothers.  It's a

11   simple --

12            MR. SHARP:  Objection, he's answered the question.

13            THE COURT:  Sustained.

14   BY MR. SCHENSE:

15   Q.    And why would they be going -- why were they going to be

16   given -- were they going to be given by you?

17   A.    By me.

18   Q.    And why were you going to give the clan mothers these

19   gifts?

20   A.    In Native American culture the sacred giveaway is a

21   tradition in showing respect for elders, and as a token of that

22   respect, a customary gift to women are blankets.  The customary

23   gift to men would be a weapon.  That would be the knives that

24   were also on the plane that mysteriously apparently

25   disappeared.

Parsons - Direct                                                      642

1    Q.   Well, so the gifts would have been the blankets for the

2    clan mothers?

3    A.   Correct.

4    Q.   Are the clan mothers typically -- what is the -- are they

5    older women?

6    A.   They are, they are.

7    Q.   Are they the seniors of the community?

8    A.   They are.

9    Q.   And I'm also assuming that as a hereditary grand chief,

10   one would be more -- obviously more senior to obtain such a

11   position; is that a fair statement?

12   A.   Not always.  The clan mother doesn't have to be the eldest

13   one of the community, nor does the hereditary grand chief.

14   It's based on blood lineage.  The hereditary grand chiefs'

15   wives typically become the clan mothers through -- it's a

16   matriarch system.  The bloodlines run through the female side

17   of the family.

18   Q.   Okay.  And in terms of the grand chiefs, same thing?

19             MR. SHARP:  I'm going to object to this on relevance

20   grounds.

21             THE COURT:  Sustained.  I presume -- I mean, we've

22   determined that gifts were being given to each.  Okay.

23   BY MR. SCHENSE:

24   Q.   The knives, though, what were they in?  Were those on the

25   plane also?  And then we're going to move on.

Parsons - Direct                                                    643

1    A.   Yes.  They were brand-new in shrinkwrapped packaging.  I

2    think I paid 10 or $20 apiece at Tractor Supply.  They were

3    camouflage yellow with locked blades, and they had a pin on it

4    so you could break out a window.  They were basically tools you

5    could put in your car in case you were stranded, like, if you

6    run off the road into a ditch and you need to cut yourself out

7    of a seatbelt and break out the glass.

8         These were just a token of the sacred giveaway in the --

9    you know, the cultural identifying with the traditions of the

10   Cherokee Nation and -- which I'm from, it's very similar to the

11   Tsilhqot'in Nation, and many nations practice this same

12   philosophy as the -- as a Native American medicine man ordained

13   through the Native American Church in Nemenhah, the traditional

14   customs follow --

15             MR. SHARP:  Your Honor, I would object again to him

16   engaging in a narrative.

17             THE COURT:  Sustained as to narrative.

18        You may proceed.

19   BY MR. SCHENSE:

20   Q.   Mr. Parsons, you've heard all of the testimony during the

21   course of this trial; correct?

22   A.   Well, I have 50 percent hearing.  I've heard most of it.

23   I think the only exception would be some of the things the

24   judge has spoken of while the jury has been out, but other than

25   that I've heard pretty much everything, yes.

Parsons - Direct                                                     644

1   Q.   And there's been testimony about certain things that were

2   found in the plane?

3   A.   I've heard what they alleged.

4   Q.   I'm going to ask you this directly.  Did you put Exhibit 1

5   in the plane?

6   A.   You're referring to the gun?

7   Q.   Yes.

8   A.   No.

9   Q.   Did you know the gun was in the plane?

10  A.   No.

11  Q.   There was a lot of material -- luggage, boxes, et

12  cetera -- in the rear of the plane; is that true?

13  A.   In the back seat of the plane.

14  Q.   In the back seat of the plane.  Is that true?

15  A.   That's true.

16  Q.   And you're telling the jury here this morning that you did

17  not put nor did you have any knowledge of that gun in the

18  plane?

19  A.   No.  And anybody that walked by the plane and looked in

20  the back window that shows right into that rear compartment

21  would have been able to see that, because the only thing back

22  there were the three blankets or the gifts; the cover for the

23  airplane tail section, which was in the back compartment, which

24  is very light.  And given the fact that the plane is situated

25  in such a configuration that you literally can't put anything

Parsons - Cross (Sharp)                                          645

1     back there, that was off the center of gravity.

2          No one in their right mind would put something as heavy as

3     that rifle back there and think they're going to fly a plane

4     safely, because that changes the center of gravity to the rear

5     too extreme that it would be unstable to fly the plane.  As a

6     matter of fact, in the owner's manual it limits your weight

7     back there at, I believe, less than 5 pounds.

8                 MR. SCHENSE:  Judge, may I have a moment, please?

9                 THE COURT:  You may.

10                MR. SCHENSE:  I believe that's all I have at this

11    point.  Thank you.

12                THE COURT:  All right, very well.  Cross-examination.

13                MR. SHARP:  Yes, Your Honor.

14                           CROSS-EXAMINATION

15    BY MR. SHARP:

16    Q.   Mr. Parsons, we've heard a lot about your background.

17    Where were you born?

18    A.   Well, I believe it was John Gaston Hospital.

19    Q.   Well, what city and state?

20    A.   Well, I don't reference your references to city and state.

21    In the United States, which is a corporation, they use those

22    terms.  This is referred to in the Native culture as Turtle

23    Island, but effectively you would be looking at what you

24    consider as Tennessee and --

25    Q.   And so you were born --

Parsons - Cross (Sharp)                                              646

```
 1    A.    -- and --
 2    Q.    -- within the exterior borders of the United States of
 3    America; is that correct?
 4    A.    No, sir.  I was not born in the United States.  The United
 5    States is a corporation listed, and we've discussed that off
 6    the record.  They don't want the jury to know that, but it's a
 7    corporation.  It's not a place.  I know that sounds odd, but
 8    it's --
 9    Q.    Well, the place that you were born --
10    A.    Memphis, Tennessee, for purposes of --
11    Q.    Memphis, Tennessee.  Is that correct, sir?
12    A.    That's where you're wanting to come is Memphis, Tennessee,
13    yes, but we were --
14    Q.    And you did not become a member of the -- is it Chilcotin
15    or Tsilhqot'in?  How are you pronouncing it?
16    A.    Well, the white man refers to it as Chilcotin.
17    Q.    How do you pronounce it?
18    A.    Chilcotin.
19    Q.    Okay.  So you were --
20    A.    I pronounce --
21    Q.    -- adopted into the Tsilhqot'in Nation in 2015; is that
22    right?
23    A.    And I refer to it as Chilcotin for --
24    Q.    This is a yes or no question, sir.  Were you adopted in,
25    in 2015?
```

Parsons - Cross (Sharp)                                              647

1    A.   May I answer the question?

2              THE COURT:  You can answer the question that's posed.

3    If there are other questions, your counsel will have to ask it.

4              THE WITNESS:  Well, I would like to finish the first

5    question, if I may.

6              THE COURT:  You've finished the first.

7        You may rephrase your question.  This is

8    cross-examination.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Listen to the question --

11             THE WITNESS:  I am.

12             THE COURT:  -- and answer the question.

13       All right.  You may proceed.

14   BY MR. SHARP:

15   Q.   Were you adopted into the Nation in 2015?

16   A.   Yes.

17   Q.   So prior to that time you were not a member of the

18   Tsilhqot'in Nation; is that correct?

19   A.   That's correct.

20   Q.   Now, as we've talked about your background, a couple other

21   things, I guess, I want to ask about your background.  Have you

22   ever been convicted of any criminal offenses punishable by

23   imprisonment for more than one year?

24   A.   That was expunged by the international court of the

25   Universal Supreme Court in 2015, and it's been -- that has not

Parsons - Cross (Sharp)                                               648

1    been rebutted by any court in this land.  So anything

2    unrebutted stands as fact, so effectively those charges no

3    longer exist, those convictions.

4              MR. SHARP:  I object to this witness testifying to

5    what he believes the law to be and ask that his answer be

6    stricken.

7              THE COURT:  The objection is sustained.

8    BY MR. SHARP:

9    Q.   Before we get to what may or may not have happened to the

10   charges after the fact, you've been convicted of a couple of

11   felony offenses, haven't you?

12   A.   That's not true.

13   Q.   Well, have you been convicted of aggravated assault?

14   A.   No, sir.

15   Q.   You were convicted but you believe later exonerated; is

16   that right?

17   A.   It's not a belief.  It's a fact under international law of

18   this state.

19   Q.   Sir, were you --

20   A.   Can I finish?

21             MR. SHARP:  Your Honor, I would ask the witness to be

22   instructed to listen to my question.

23             THE COURT:  You need to just --

24             THE WITNESS:  I need to finish the question [sic].

25             THE COURT:  No, sir.  You can -- if there's redirect

Parsons - Cross (Sharp)                                              649

1    examination, you can answer at that time.  This is

2    cross-examination.  Counsel will ask you questions.  You just

3    answer the question.

4         All right.  You may proceed, counsel.

5    BY MR. SHARP:

6    Q.   Before the exoneration you had been convicted of the

7    offense of aggravated assault; correct?

8    A.   Falsely.

9    Q.   But you were convicted; correct?

10   A.   Actually, no.  That was a --

11   Q.   Did you go to trial?

12   A.   Are you familiar with a judicial --

13   Q.   I'm asking you if you went to trial on it.

14   A.   There was a trial, yes.

15   Q.   Did the jury return a verdict of guilty?

16   A.   They did.

17   Q.   Have you also been convicted of another felony offense

18   that also is punishable by imprisonment for more than one year?

19             MR. SCHENSE:  Objection, relevance.

20             THE COURT:  Overruled.

21   A.   But they didn't convict me.

22   BY MR. SHARP:

23   Q.   I've asked whether or not you, the person sitting in that

24   witness box, has been convicted of any other felony offenses,

25   anything punishable by imprisonment for more than one year.  Do

Parsons - Cross (Sharp)                                    650

1    you have another felony conviction?

2    A.   No, sir.

3    Q.   Were you convicted of failing to appear for trial in

4    Tipton County, Tennessee?

5    A.   No, sir.

6              MR. SCHENSE:  Objection, relevance.

7              THE COURT:  Overruled.

8    BY MR. SHARP:

9    Q.   Did you have a trial within the last 18 months in Tipton

10   County, Tennessee?

11   A.   No, sir.  That was for a juristic person.  That was not

12   for me.

13   Q.   Well, was there a trial for a juristic person named

14   Michael Wayne Parsons that was held in Tipton County,

15   Tennessee?

16   A.   Yes, there was.

17   Q.   And was the juristic person Michael Wayne Parsons found

18   guilty by a jury?

19             MR. SCHENSE:  Judge, I'm going to object as to the

20   form of the question, and it exceeds the -- I'm sorry.  I

21   don't -- you don't -- form of the question.

22             THE COURT:  All right.  The objection is overruled.

23   A.   That occurred after this false charge here.

24   BY MR. SHARP:

25   Q.   Sir, I'm asking you whether or not there was a trial for a

Parsons - Cross (Sharp)                                        651

1    Michael Wayne Parsons on failure to appear in Tipton County,

2    Tennessee.

3    A.    After this charge.

4    Q.    Was there a trial for that, sir?

5    A.    After this charge.

6    Q.    So there was a trial after this charge was brought; is

7    that correct?

8    A.    Yes, correct.

9    Q.    And were you in attendance at that trial?

10   A.    I was.

11   Q.    Was there any other person at that trial named Michael

12   Wayne Parsons?

13   A.    No.   That's a corporate fiction that they go after -- that

14   all-capital-letter name according to the U.S. printing style

15   manual is a juristic person that -- under Title 28, Section

16   3002 by definition the United States is a federal corporation,

17   and they can -- a corporation can only sue another corporation

18   unless there's a contract.   Without a contract it's a crime

19   and --

20   Q.    So basically you're saying that you are not subject to the

21   jurisdiction of the court in Tennessee; is that correct?

22   A.    I'm a live man.   The answer to that is no.

23   Q.    No.   No, you're not subject to the jurisdiction of the

24   court; correct?

25   A.    Well, back -- back in 2009, by virtue of being a live man,

Parsons - Cross (Sharp)                                              652

1    I was deceived.  Last year --

2    Q.    I want to explore this failure to appear proceeding that

3    we've talked about.  Somebody was convicted by a jury of

4    failing to appear; is that accurate?

5    A.    That's correct.

6    Q.    And that somebody had the name Michael Wayne Parsons; is

7    that correct?

8    A.    That's the juristic person I'm referring to, correct.

9    Q.    And you were in the court proceeding -- in the court

10   proceedings when that happened; is that right?

11              MR. SCHENSE:  Judge, I'm going to object to the form

12   of the question.  Could I be heard on it?

13              THE COURT:  Approach.

14        (At sidebar)

15              THE COURT:  It is -- objection is as to form?

16              MR. SCHENSE:  Yes, Judge.  I believe this exceeds the

17   proper scope of even cross-examination.  I think Mr. Sharp is

18   allowed to ask:  Have you been convicted of a felony, or even

19   to the extent of how many times, but to go into the facts and

20   the jury trial and all of this I think just exceeds all of

21   that.  And for the record, on behalf of Mr. Parsons, I would

22   object to such questioning by Mr. Sharp.

23              THE COURT:  I think if your client will answer the

24   question, I think Mr. Sharp is prepared to go on.

25              MR. SCHENSE:  I understand.

Parsons - Cross (Sharp)                                            653

1           MR. SHARP:  Since we're up here, can I raise another

2      matter that I intend to go into?  Mr. Parsons was -- has

3      already testified that his purpose in being in Nebraska was

4      that he was traveling on official business to Canada or

5      Chilcotin to do this timber deal.  He had a trial date in

6      Tipton County, Tennessee, of January 10th of 2017.  I'm told he

7      cut off his ankle bracelet and failed to appear and was then

8      arrested in Nebraska.  I don't want to go into the fact that

9      that was a charge of being a felon in possession of a firearm,

10     but I do intend to go into, unless the Court tells me I can't,

11     that he skipped out on a trial date.

12          MR. SCHENSE:  Judge, given that, then, for the record

13     I'd like to make an oral motion in limine to preclude the

14     government from asking those questions.  It's highly

15     prejudicial, 403, and I don't know that it's got any relevance

16     to these proceedings.  And, again, I think it exceeds the

17     proper scope of cross-examination.  For all of those reasons,

18     I'd make the motion in limine.

19          THE COURT:  Very well.  And that motion in limine is

20     overruled.  I'm not going to let you go into trying the case or

21     anything, but I am going to -- he has testified that he was on

22     official business traveling from the state of Tennessee to

23     either Montana or the Chilcotin country, and if there is

24     evidence that he may be asked about that it was for some other

25     purpose, then I will allow that, then cross-examination no

Parsons - Cross (Sharp)                                    654

1   further.  Thank you.

2        (In open court)

3            THE COURT:  The objection is overruled.  You may

4   proceed.

5   BY MR. SHARP:

6   Q.   Now, Mr. Parsons, you've told this jury that you were on

7   your way to the country of Chilcotin to engage in some official

8   business during January of 2017 when you stopped in Nebraska;

9   is that correct?

10  A.   I was on my way to Montana for a meeting as the ambassador

11  of the Tsilhqot'in Nation in my official capacity to,

12  specifically, Cut Bank, Montana.

13  Q.   And I understood your testimony to be you were going to

14  await further directions, though, because you had to go

15  somewhere to meet with some Chinese representatives.  Did I

16  have that right?

17  A.   The meeting included the buyer for the Chinese company and

18  the owners of the logging company from Tennessee as well as the

19  hereditary grand chiefs, but until I got to that point, I had

20  no way of knowing exactly if the meeting was going to be there

21  or someplace else.

22  Q.   Were you anticipating entering -- crossing the

23  international border between the United States and Canada at

24  that time?

25  A.   I wasn't anticipating anything.

Parsons - Cross (Sharp)                                                    655

1    Q.   Well, was that a possibility?

2    A.   I don't know.

3              MR. SCHENSE:  Objection, asked and answered.

4              THE COURT:  Overruled.  But he's answered.  He said,

5    "I don't know."

6    A.   It's a port city so when you stop there they tell you what

7    you can do or not do so it's up to --

8    BY MR. SHARP:

9    Q.   Now, in terms of whether or not you were traveling on

10   official business, you landed in Arapahoe, Nebraska, on or

11   about January 11th of 2017; is that accurate?

12   A.   We did.

13   Q.   And didn't you have some official business somewhere else

14   on or about January 11th of 2017?

15   A.   No, sir.

16   Q.   Well, didn't you have a --

17             MR. SCHENSE:  Judge, I'd ask --

18   BY MR. SHARP:

19   Q.   -- court --

20             MR. SCHENSE:  I'm sorry, Mr. Sharp.  I'll let you ask

21   the question first.  Well --

22   BY MR. SHARP:

23   Q.   Didn't you have a court appearance scheduled in Tipton

24   County, Tennessee, on January 10th of 2017?

25             MR. SCHENSE:  Judge, I'd object, and I'd like to

Parsons - Cross (Sharp)                                           656

1   renew my motion in limine.

2              THE COURT:  The objection grounds is what?

3              MR. SCHENSE:  Relevance and foundation.

4              THE COURT:  Overruled.  You may proceed.

5   A.   The answer is no.  There was no court order for me to

6   appear at any time in Tipton County Court.

7   BY MR. SHARP:

8   Q.   Did you have charges pending in Tipton County, Tennessee?

9   A.    No, sir.  Those charges have been dismissed six times now.

10  Q.   Did the -- was there some juristic person named Michael

11  Parsons that had charges pending --

12  A.    No, sir.

13  Q.   -- in Tennessee -- let me finish the question -- in

14  January of 2017?

15  A.    No, sir.

16  Q.   Had you been released awaiting trial by any court?

17  A.    No, sir.

18  Q.   Were you ever asked to wear an ankle bracelet or anything

19  of that nature?

20  A.    I was.

21  Q.   Did you cut that bracelet off before you got in your plane

22  and headed north?

23              MR. SCHENSE:  Objection, Judge, objection.

24  A.    No, sir, I did not.

25              THE COURT:  Just a moment.

Parsons - Cross (Sharp)                                          657

1          MR. SCHENSE:  Objection, motion in limine and

2    relevance and foundation.

3          THE COURT:  All right.  Overruled as to each.  You

4    may answer.

5    A.   No, sir.  None of that's true.

6    BY MR. SHARP:

7    Q.   So you removed the bracelet?

8    A.   No, sir.  That's not true either.

9    Q.   What happened to the bracelet?

10   A.   The lady that put it on removed it.

11   Q.   Who's the lady that put it on?

12   A.   Miss Penny is all I know.

13   Q.   Ms. Penny Gregg that testified earlier in this trial?

14   A.   No.  I don't know this lady's last name.  It's a different

15   Miss Penny.

16   Q.   Where is she employed?

17   A.   In Tipton County, Tennessee.  I'm not sure the name of the

18   company.

19   Q.   Did you have a trial date?  Had you been told to show up

20   for a jury trial on January 10th of 2017?

21   A.   No, sir; no, sir.

22   Q.   I understand you believe certain charges have been

23   overturned by the Universal Supreme Court of the Chilcotin; is

24   that correct?

25   A.   The International Court of the Universal Supreme Court of

Parsons - Cross (Sharp)                                             658

1    the Chilcotin notified Tennessee.  When they didn't respond,

2    they proceeded to issue their orders, which were to exonerate

3    me, after they reviewed the entire file.  This is before they

4    ever adopted me, but because of my tenacity and integrity,

5    that's what they saw in me, qualities that they wanted working

6    with them for my efforts --

7    Q.   The charges that you were exonerated on --

8    A.   -- because I was --

9    Q.   -- did any of those charges relate to charges that were

10   pending in Tipton County, Tennessee, in January of 2017?

11   A.   I had no pending charges in January of 2017 in Tipton

12   County.  There was no warrant for my arrest that the FBI had

13   when I was arrested.  I asked.  They've provided none here

14   today or at any time.  That's the issue.  This is a false

15   prosecution.  It's a crime.

16   Q.   Now, you don't actually believe you're subject even to the

17   jurisdiction of this court, do you?

18   A.   This is not the Article III --

19   Q.   I asked you a question.  Do you believe you're subject to

20   the jurisdiction of this court?

21   A.   Ambassadors are only subject to the supreme court.  This

22   is not that court.  No, sir.

23          MR. SHARP:  I'm going to object to him expounding on

24   what the law is, Your Honor, and ask him to be directed to

25   answer the question.

Parsons - Cross (Sharp)                                      659

1          THE WITNESS:  The jury needs to know.

2          THE COURT:  The answer will stand.  Answer the

3    question as it's posed.

4          THE WITNESS:  Thank you, Your Honor.

5    BY MR. SHARP:

6    Q.   Do you believe you're subject to the jurisdiction of this

7    court?

8    A.   Pertaining to testimony, yes, I do.  At this moment most

9    certainly.

10   Q.   Now, you've testified that whatever felony convictions

11   that might be out there for somebody -- the jurastic (phonetic)

12   person Michael Wayne Parsons have been dismissed or -- and

13   you've been exonerated; is that accurate?

14   A.   It's a juristic person, not Jurassic.  Jurassic would be

15   having to do with dinosaurs.

16   Q.   Thank you for the explanation, sir.  Is it your

17   understanding that all the felony offenses for Michael Wayne

18   Parsons have been dismissed?

19   A.   From 2009, yes.

20   Q.   Do you have any other felony convictions besides that?

21   A.   I do not.

22   Q.   As such is there any reason that you're aware of that you

23   would not be allowed to possess a firearm and ammunition?

24   A.   No, sir.  I have no restrictions whatsoever.  I'm the

25   ambassador of the Tsilhqot'in Nation, and under the Vienna

Parsons - Cross (Sharp)                                    660

1    Convention on Diplomatic Relations, I am immune from

2    prosecution, detention or arrest in this country.

3    Q.   So there's no reason for you why you should not be able to

4    have a firearm; is that correct?

5    A.   No, not at all, if I chose to.

6    Q.   Do you know who Michael -- or Matthew Lovan is?

7    A.   I've met him one time.

8    Q.   You bought a gun from him, didn't you?

9    A.   I did.

10   Q.   You bought an LAR-15 gun from him, didn't you?

11   A.   I did.

12   Q.   In fact, you bought the gun that's in this courtroom,

13   Exhibit No. 1; is that right?

14   A.   I don't know that to be true.  I've never examined that

15   gun.

16   Q.   Well, you've seen it as it's been passed around in the

17   courtroom.  Does it appear to be the same gun?

18   A.   I can't answer that truthfully because I haven't examined

19   it.  If you'd like to give it to me, I'll examine it.

20          MR. SHARP:  May I approach the witness, Your Honor?

21   I'll hold it myself.

22          THE COURT:  You may, and I would ask you to hold it

23   yourself.

24   BY MR. SHARP:

25   Q.   Mr. Parsons, I'm holding in front of you what's been

Parsons - Cross (Sharp)                                         661

1    marked as and received into evidence as Government's Exhibit 1.

2    It's been rendered safe with a lock through the chamber.  I'm

3    going to turn it around so you can look at it.

4    A.   I can't read the serial number.  Thank you.  Yeah.  Can

5    you tilt it down just a little?  Your thumb's in the way.

6    Thank you.

7    Q.   Let me ask it this way.

8    A.   Other than the attachments that are on it.  That wasn't on

9    there the last time I saw it, which was in 2008.  Those are

10   all -- I guess somebody put those on there.

11   Q.   Does that otherwise appear to be the same firearm that you

12   purchased from Matthew Lovan?

13   A.   It does.

14   Q.   And did you have any accessories with that that you bought

15   at the time or added later?

16   A.   No, sir.

17   Q.   What happened to that gun?  Do you still have it?

18   A.   Well, like Mr. Lovan said, he was in a financial bind.  He

19   was needing to make some money, and his friend Mr. Bravo, who

20   had acquired a wolf hybrid from us for his child, who's

21   learning disabled, autistic, he approached me about buying this

22   back in 2007, actually, is when it was, and I had done some

23   consulting work for Mr. Bravo.

24        MR. SHARP:  Your Honor, I'm going to object to this

25   as not being responsive and volunteering.

Parsons - Cross (Sharp)                                              662

1            THE COURT:  The objection is sustained.  I believe

2    the question -- well, you can repose the question.

3    BY MR. SHARP:

4    Q.   What happened to the gun that you bought from Mr. Lovan?

5    A.   I traded it off within about six months to a friend of

6    mine.  I've got a farm, and I needed a hay baler.

7    Q.   Who's the friend?

8    A.   Jerry Thomas.

9    Q.   And where does he live?

10   A.   Jerry passed away.

11   Q.   How long ago did Mr. Thomas pass away?

12   A.   In July of last year.

13   Q.   All right.  Where does he live?

14   A.   Jerry lived in Mississippi.

15   Q.   All right.

16   A.   I don't remember his address.

17   Q.   How long did he live in Mississippi?

18   A.   Oh, he's been there all of his adult life that I've known.

19   I've known him for -- since 1991.  He's always lived in

20   Mississippi.

21   Q.   You said he passed away.  Had he been in poor health for

22   some time?

23   A.   No, not at all.  He had a -- what I was told was that he

24   had an aneurysm and died.

25   Q.   Did he live for all the time that you knew him in

Parsons - Cross (Sharp)                                              663

1    Mississippi?

2    A.    Yes.

3    Q.    All right.  Did he live in Tennessee at any point in time?

4    A.    I believe he was born and raised in Memphis until he

5    graduated high school and his parents moved to Mississippi, and

6    that's where they lived from then on.

7    Q.    In December to January of 2017, where was this gentleman

8    living?

9    A.    At his farm.

10   Q.    In Mississippi?

11   A.    Yes.

12   Q.    All right.  Did you ever see the gun after you sold or --

13   gave it to him or sold it to him?

14   A.    We traded for work, and, no, I hadn't seen it since then.

15   Q.    So you never saw him, for instance, bring the gun to

16   Tennessee in January of 2017?

17   A.    No.  I believe he --

18   Q.    Has he ever been on a plane of yours?

19   A.    No.

20   Q.    Now, you're a pilot; is that correct?

21   A.    I am.

22   Q.    You paused.  Are you or are you not a pilot?

23   A.    I'm trying to think of -- I'm not a licensed pilot through

24   the United States for purposes of piloting a plane in the

25   United States.  I was -- at one time, as I mentioned, I was a

Parsons - Cross (Sharp)                                          664

1    First Lieutenant with the United States Air Force, flew Special

2    Ops missions for them for four years and flew constantly.  I

3    was working on being a pilot for FedEx at one time.  But as the

4    ambassador of the Tsilhqot'in Nation and as a tribal member

5    from the Tsilhqot'in Nation, I'm no longer obligated to have a

6    pilot's license.  Actually, I can't have one.  But I can still

7    operate -- it's just like when Vladimir Putin comes to this

8    country or other --

9            MR. SHARP:  Okay.  I'm going to object to this as --

10   A.   They don't have --

11           MR. SHARP:  -- volunteered.

12           THE COURT:  Yeah.

13   A.   There's no pilot's license for --

14           MR. SHARP:  Objection, ask that the witness be

15   instructed to --

16           THE COURT:  Sustained.  Answer the questions that are

17   posed.

18       You may proceed.

19   BY MR. SHARP:

20   Q.   You own a plane or at least owned a plane in January of

21   2017; is that right?

22   A.   That's the property of the Tsilhqot'in Nation.

23   Q.   Well, there was a piece of paper that was with you when

24   you were arrested that said you were the owner of the plane;

25   isn't that correct?

Parsons - Cross (Sharp)                                          665

1   A.   No, sir.

2            MR. SHARP:  May I approach, Your Honor?

3            THE COURT:  You may.

4            MR. SHARP:  May I have Exhibit 9, I believe it is?  I

5   can put it on the screen, actually.  Let me do this that way.

6            THE COURT:  Exhibit 9?

7            MR. SHARP:  It's either 9 or 15.

8            THE COURT:  Exhibit 9.

9            MR. SHARP:  Yeah.  Okay.  I'm going to ask that

10  Exhibit No. 9, Your Honor, be published on the screen.

11           THE COURT:  You may.  It should be in front of you in

12  a moment.

13           MR. SHARP:  Oh, we don't have it on there?

14  BY MR. SHARP:

15  Q.   Now, Mr. Parsons, I'm going to place Exhibit No. 9 on the

16  overhead here.  This document was actually with you when you

17  were arrested in Nebraska; isn't that correct?

18  A.   I believe this was in the plane in the red bag.

19  Q.   Right.  It arrived to Nebraska with you; correct?

20  A.   It would, that's correct.

21  Q.   And is it also correct that that document indicates about

22  halfway down that the registered owner is Michael Parsons?

23  A.   Well, no.  Actually, if you notice, it has --

24  Q.   Does it say registered owner Michael Parsons?

25  A.   No, it does not.  It has a cross that says loss payee to

Parsons - Cross (Sharp)                                          666

1    the side.  It's a dual purpose form.  You could be the

2    registered owner or the loss payee.  I was not the registered

3    owner.  There is no registered owner.  It's the property of the

4    Tsilhqot'in Nation.  I acquired --

5    Q.    So there's no registered owner of this plane?

6    A.    No, sir.

7    Q.    Is that your testimony, sir?

8    A.    The Tsilhqot'in Nation does not register its airplanes.

9    Neither does the United States Air Force.  Air Force One, it's

10   not registered anywhere.

11        MR. SHARP:  I'm going to object to that last

12   volunteered statement.

13        THE COURT:  The objection is sustained.  It is --

14   just a minute.  The testimony is stricken, and the jury is

15   ordered to disregard the ownership of Air Force One.

16        You may proceed.

17   BY MR. SHARP:

18   Q.    You also had paid to hangar that airplane, hadn't you?

19   A.    In Arapahoe?

20   Q.    No.  Down in Tennessee.

21   A.    Oh, yes.

22   Q.    Where did you keep it hangared at?

23   A.    Oh, one month at -- it was there in Tennessee, yeah.

24   Q.    So who had effective control over that airplane back in,

25   say, December and January of 2017?

Parsons - Cross (Sharp)                                                667

1    A.   That would have been me or the person who has a loan

2    outstanding for a portion of the plane, which would have been

3    the owner of the timber harvesting company, Steve Sweat.

4    Q.   How about the individual that lived in Mississippi that

5    you sold the gun to?  Did he have control of the plane in

6    December and January of 2017?

7    A.   I never sold him a gun.  We traded work.  And, no, he's

8    never been in the plane, never had access to the plane.

9    Q.   Now, on -- you were arrested in Arapahoe, Nebraska, on

10   January 11th of 2017.  When in relation to that had you taken

11   off from Tennessee heading north?

12   A.   Can you repeat that date again?

13   Q.   Well, you were -- we've heard during this trial that you

14   were arrested on January 11th of -- actually January 12th of

15   2017.  When in relation to that had you taken off from

16   Tennessee?

17   A.   I believe it was the 9th.

18   Q.   And where did you take off from?

19   A.   The airport.

20   Q.   Where?

21   A.   In Tennessee.

22   Q.   What city?

23   A.   Jackson.

24   Q.   Did you come directly to Nebraska, or did you fly

25   someplace else first?

Parsons - Cross (Sharp)                                            668

1    A.   Well, I had to stop along the way for fuel.  It's a long

2    trip.

3    Q.   Did you do any overnight stays anywhere?

4    A.   I did.

5    Q.   Where did you do an overnight stay at?

6    A.   I can't remember the name of the airport.  It was in --

7    just on the other side of the line of Spring- -- where

8    Springfield, Missouri, is, just on the other side of the line

9    in Kansas, a small airport.  I can't remember the name of it.

10   Q.   Now, you saw the picture of everything that had been taken

11   out of the airplane that Agent Czaplewski went through a day or

12   so ago in trial.  Do you remember that, when everything was sat

13   on the floor of the hangar?

14   A.   That wasn't everything that was in the plane.  There were

15   things missing.

16   Q.   Did you see the exhibit?

17          MR. SHARP:  I believe it's Exhibit 26, Your Honor.

18   May I display this?

19          THE COURT:  You may.

20   BY MR. SHARP:

21   Q.   I put Exhibit 26 on the screen for you to see there, sir.

22   You were present yesterday when we went through this with Agent

23   Czaplewski; is that correct?

24   A.   I've seen this photo, yes.

25   Q.   Would it be correct, sir, that everything except the gun

1    and the ammunition and the accessories for the gun is yours?

2    A.   Yes.

3    Q.   So everything else in that plane was put there by you;

4    correct?

5    A.   Excluding the property of the Tsilhqot'in Nation which was

6    in one of the bags which is not shown here which the FBI says

7    they never found but was in the plane at the time when I

8    arrived.

9    Q.   I'm asking if these things were put on the plane by you,

10   other than the gun and the ammunition and the accessories.

11   A.   Correct.

12   Q.   Now, you spent some time in custody in -- first in Furnas

13   County, Nebraska, and then in Phelps County, Nebraska; is that

14   correct?

15   A.   Correct.

16   Q.   During the time that you were at certainly Phelps County,

17   you were aware that inmates who made telephone calls were

18   subject to having their conversations recorded; is that

19   accurate?

20   A.   I didn't consent to any of those conditions.

21   Q.   I didn't ask whether you consented, sir.  I asked you

22   whether you knew that they were recorded.  Did you know that?

23   A.   I don't know that to be a fact.

24   Q.   Well, you've been heard on a number of conversations where

25   you're telling people that you're being recorded.  Did you say

Parsons - Cross (Sharp)                                              670

1    that on those tapes?

2    A.   Right.  I believe that was my statement, but I didn't know

3    for a fact that they were being recorded because there was

4    questions about that, because when I arrived I didn't sign

5    anything, and I asked them to not record my conversations

6    specifically because I am the ambassador of the Tsilhqot'in

7    Nation and all of my correspondence and communication are

8    privileged and protected by the Vienna Convention on Diplomatic

9    Relations, and I have not waived those privileges at all.

10   Q.   I'm not asking whether or not you thought you should have

11   been recorded.  I'm asking whether you knew you were being

12   recorded.  And your testimony is -- yes or no.

13   A.   I advised them it's a crime to record my conversations

14   under United States Code as well as treaties that the United

15   States is in agreement with.

16   Q.   You were in court yesterday when certain conversations

17   were played for the jury; isn't that right?

18   A.   I was.

19   Q.   And you heard the recording say that the conversation was

20   subject to monitoring or recording; is that right?

21   A.   I believe I heard that on the recording.  It was --

22   Q.   And is it also correct, sir, that in a conversation with

23   Sue Holland, you started off with, hey, let me make a statement

24   because this is all being recorded?  Do you recall saying that?

25   A.   I did, yes.

Parsons - Cross (Sharp)                                        671

1    Q.   But your testimony today is you're not sure you were being

2    recorded.  Is that what you're saying?

3    A.   Right, because I made conversation to the lieutenant there

4    that as the ambassador I needed to have a secure line, and they

5    had told me they were working on facilitating that, and they

6    assured me that they would do that for me.

7    Q.   Well, actually, in one of your -- the last conversation we

8    played that you had with Susannah Holland, you actually talked

9    about the fact that you did submit a request for a confidential

10   non-recorded call; correct?

11   A.   That's correct.

12   Q.   But then in this conversation you were saying listen to me

13   before you speak, and you told her, number one, don't say

14   anything about the Nation's item?

15   A.   That's correct.

16   Q.   Now, we've heard reference to the nation's item, certain

17   gifts.

18   A.   Uh-huh.

19   Q.   Is it your testimony that these Walmart blankets for the

20   elders were the gifts that you were talking about?

21   A.   They were ceremonial gifts.  They were tokens to be given

22   at this ceremony of -- the signing ceremony.

23   Q.   Was there anything special about these blankets that would

24   make them embarrassing for someone to hear about?

25   A.   No.  That's why I --

Parsons - Cross (Sharp)                                          672

1    Q.    Is there anything about those blankets that you thought

2    made them illegal to possess?

3    A.    They're not illegal.  They're not the item.

4    Q.    What is "the Nation's item"?

5    A.    That's the contracts and the computer that I had in the

6    luggage that are missing that is pertinent to the Nation's

7    business because of the --

8    Q.    Are you saying, sir, that it was the computer that you

9    were talking about that you didn't want to mention?

10   A.    That's a separate computer that I mentioned.  My personal

11   computer was the one that was in police custody.  I'm talking

12   about a brand-new tablet PC that was loaded with all the

13   software for operating the Nation's business, including all the

14   logistical wherewithals for running and exporting of timber

15   with another country and receiving the payments.  This was

16   going to manage all that for them.

17   Q.    When you said to Sue Holland, "Don't mention the native's

18   *[sic]* item," by "item" what were you talking about?

19   A.    The contracts for the timber deal that I had prepared for

20   this meeting and the computer.

21   Q.    The contracts were in digital form; is that accurate?

22   A.    No.  They were paper and on the computer.  They were both.

23   Q.    Why would you care whether or not somebody mentioned that

24   on a recorded telephone call in a jail facility?

25   A.    Because the Canadian government for the last 150 years has

Parsons - Cross (Sharp)                                      673

1   been meddling in the internal affairs to the Tsilhqot'in

2   Nation; to wit, interfering with their ability to harvest their

3   raw materials and provide for their own needs.

4   Q.   So you thought if you mentioned in a recorded jail call at

5   the Phelps County Jail that there were contracts in your plane

6   that somehow the Canadian government would get that and use

7   that to oppress the Chilcotin?

8   A.   No doubt.  That's been going on for 150 years.

9   Q.   Is there anything that you would worry about Phelps County

10  law enforcement or the FBI or Furnas County law enforcement

11  finding out that was on that plane?

12  A.   No.  Them personally, no.  But would they turn it over to

13  the Canadian officials if requested?  Yes.  The Canadian

14  officials and the United States officials in this case are

15  working against both of us.  That's why I'm here to --

16  Q.   So I understand you thought that somebody -- if they heard

17  about these contracts that somebody would reach out to the

18  Canadians and turn those over to them; is that right?

19  A.   With your current state of affairs, with your child

20  trafficking system called a foster program in this country as

21  there, the natives getting their children back by being able to

22  make enough money to afford to keep their kids and not be

23  claimed that they are dependent and neglected takes away

24  $750 million a year from the Canadian government.

25            MR. SHARP:  Your Honor, I'm going to ask this witness

Parsons - Cross (Sharp)                                            674

1    be -- that that answer be stricken as --

2    A.   That's the motivation.

3              MR. SHARP:  -- volunteered and not responsive.

4              THE COURT:  The objection is sustained, and I'm not

5    going to strike that.  I don't even know what it was.

6    A.   It's the motivation for why Canada would not want this

7    contract to not go through.  $750 million a year.

8              THE COURT:  Just a minute, sir.  The objection is

9    sustained.

10        It's about 12:03.  How are we doing with

11   cross-examination?

12             MR. SHARP:  I can wind this up in a couple of

13   minutes.

14             THE COURT:  Okay.  Thank you.

15             MR. SHARP:  Well, I shouldn't say that.  I don't

16   know.  Maybe we should take a break now.  Is that what you're

17   asking me?

18             THE COURT:  Well, at some point we need to.

19             MR. SHARP:  No.  I can probably wind this up.  I just

20   don't want to make that representation.

21             THE COURT:  Okay.  Let's go ahead and wind it up.

22             MR. SHARP:  Okay.

23             THE COURT:  I'll stop if it's not winding.

24             MR. SHARP:  Okay.

25   BY MR. SHARP:

1    Q.   So when you were talking about the Nation's item and the

2    gifts, why did you feel the need to warn other people about

3    mentioning it when you talked to them on the phone?

4    A.   I'm not sure what other people you're referring to.

5    Q.   People you were talking to on the phone.

6    A.   I'm not sure who you're talking to.

7    Q.   Well --

8    A.   I'm not sure --

9    Q.   -- Pat Parsons, your wife?

10   A.   I'm not sure you -- pardon?

11   Q.   Did you talk to Pat Parsons?

12   A.   Daily.

13   Q.   And did you talk to Suzanne Holland?

14   A.   Daily.

15   Q.   And did you tell them not to mention the Nation's item?

16   A.   That's right.  That would be the only two, because no one

17   else knows about them.

18           MR. SHARP:  May I have just a moment, Your Honor?

19           THE COURT:  You may.

20           MR. SHARP:  I have no other questions at this time,

21   Your Honor.

22           THE COURT:  All right, very well.

23           MR. SCHENSE:  It'll be very brief.

24           THE COURT:  Okay.

25           MR. SCHENSE:  Is that okay with the Court?  And I --

Parsons - Redirect                                                        676

1                      THE COURT:  I would like to wind up the testimony, if

2      we can.  So we'll go about four or five minutes.

3                      MR. SCHENSE:  I'll be done.

4                      THE COURT:  Okay.  Thank you.

5                      THE WITNESS:  I'm sorry.  I've got one question to

6      pass to my counsel, if possible.

7                      THE COURT:  You may approach.

8                      THE WITNESS:  I think this might help answer a

9      question or two if you can read my writing.

10                     THE COURT:  Redirect.

11                     MR. SCHENSE:  Thank you.

12                              REDIRECT EXAMINATION

13     BY MR. SCHENSE:

14     Q.    You were asked a lot of questions about -- or some

15     questions about Sue Holland and the exoneration.  Do you recall

16     that line of questioning?

17     A.    Yes, sir.

18     Q.    Who is Sue Holland?  What is her position?

19     A.    She's the Chief Justice of the Universal Supreme Court of

20     the Chilcotin, the international court that handles aboriginal

21     cases worldwide.

22     Q.    Is she therefore a government official for the Tsilhqot'in

23     Nation, the country of Chilcotin?

24     A.    She is.

25     Q.    As such did you rely upon that exoneration, that it was

1    true and correct?  That's just a yes or no.  Did you rely upon

2    it?

3    A.    Not completely.  I did research to verify that the --

4               MR. SHARP:  Your Honor, I object to this.

5    A.    -- exoneration was actually --

6               THE COURT:  The objection is sustained.

7    BY MR. SCHENSE:

8    Q.    I asked a yes or no.  Did you rely upon it?

9    A.    I did.

10   Q.    And did you do further investigation?

11   A.    I did.

12   Q.    And did you rely upon it more at that point?

13   A.    Yes, I did.

14   Q.    To see that it was authentic, applicable and legal?

15   A.    I did.  Yes, it was.

16   Q.    And you were asked about whether or not, if you had any

17   weapons, did you think you were authorized to do so.  Do you

18   remember that general line of questioning on cross-exam?

19   A.    If it was legal for me to have or possess weapons?

20   Q.    After the exoneration by Sue Holland in --

21   A.    Yes.

22   Q.    Now, let me finish.  If it was -- did you think it was

23   legal for you to have possession of a gun after the exoneration

24   by Sue Holland, a government official from the Supreme Court of

25   the Tsilhqot'in Nation, the country of Chilcotin?  Yes or no.

Parsons - Redirect                                          678

1   Did you believe it was legal?

2   A.   It's the Universal Supreme Court of the Tsilhqot'in.

3           THE COURT:  That calls for a yes or no, sir.

4   A.   Yes.

5   BY MR. SCHENSE:

6   Q.   Universal Supreme Court of the Tsilhqot'in?

7   A.   Yes, sir.

8   Q.   And you relied upon that?

9   A.   Sir?

10  Q.   You relied upon that?

11  A.   I didn't have a gun, but I knew that if I needed to, I

12  could possess a gun.  There was no restriction anymore.

13          MR. SCHENSE:  Judge, I cannot read Mr. Parsons'

14  writing.  May I approach for a moment?

15          THE COURT:  Briefly.

16      (An off-the-record discussion was had between the

17  defendant and counsel.)

18  BY MR. SCHENSE:

19  Q.   This is my last question.  What is the connection with

20  wolves in terms of the blankets that were in the Walmart bags

21  that you were shown in Government's Exhibit No. 26?

22  A.   Being Native American Cherokee Wolf Clan, it is -- my

23  family lineage is I'm a peacekeeper, traditional medicine man,

24  a shaman.  I am a religious leader.  With the symbolization of

25  the wolves on the blankets, they recognize that as a token gift

```
 1    from me, someone they hold in high regard.  As the gentleman

 2    testified the other day, he has a friend that had one of our

 3    wolves.  We've been known to provide wolves to children with

 4    special needs --

 5             MR. SHARP:  I'm going to object to this as being a

 6    volunteered narrative.

 7    A.   -- as well as St. Jude's.

 8    BY MR. SCHENSE:

 9    Q.   There is great significance --

10    A.   My ministry --

11    Q.   -- in connection with wolves; yes?

12    A.   My ministry with Make-A-Wish is known all over this

13    country.

14             MR. SCHENSE:  Thank you.  That's all I have.

15             THE COURT:  Very good.  This witness may step down.

16        Are there any other witnesses?

17             MR. SCHENSE:  No, Your Honor.  Mr. Parsons would

18    rest.

19             THE COURT:  All right, very well.  And does the

20    government have --

21             MR. SHARP:  I would like to have the lunch hour to

22    see if I might have some documentary evidence I could offer.

23             MR. SCHENSE:  Judge, I think -- could I just renew my

24    Rule 29 at this point?

25             THE COURT:  Yeah.  We'll do that outside -- in just a
```

1    moment here, then.  Okay?  All right.

2        Ladies and gentlemen of the jury, the government has

3    rested.  No.  The government has rested initially, and the

4    defense has now rested.  We're going to take about an

5    hour-and-10-minute noon hour break.

6        As I have advised you before that until this case is

7    completely submitted, all the evidence is in, and you've been

8    instructed, do not discuss the evidence or anything about this

9    case with anyone, including each other.  We will take a

10   one-hour-and-10-minute lunch, and we will be back at 1:10 or

11   1:20 p.m.  Thank you.

12       (Jury out at 12:12 p.m.)

13           THE COURT:  We're outside of the presence of the

14   jury.

15       And, counsel, you wanted to renew a motion?

16           MR. SCHENSE:  Yes, Judge.  After the defense has

17   presented their evidence and after Mr. Parsons has testified on

18   behalf of Mr. Parsons, I would like to renew my Rule 29 motion

19   for a judgment of acquittal.  I would just ask the Court to

20   consider all of the evidence that has been adduced and the

21   insufficiency of the evidence as it exists for the government

22   to present to the jury, and I would make such a motion.

23           THE COURT:  All right.  And is there any response by

24   the government?

25           MR. SHARP:  I'll submit it, Your Honor.

 1            THE COURT:  All right, very well.  For the reasons

 2    stated earlier -- and I have considered all of the evidence

 3    thus far.  There is evidence sufficient, if believed by the

 4    jury, to sustain a conviction in this particular case.  That

 5    will be up to the jury once the facts and evidence are argued

 6    to them, but the Rule 29 motion is overruled at this point in

 7    time.

 8            MR. SCHENSE:  Yes, Judge.

 9            THE COURT:  All right, very well.  Is there anything

10    that we need to take up?  We will either have rebuttal or we

11    won't.  I would like to -- let's plan on meeting about ten

12    after one just to see where we're at with our schedule.  We're

13    still going to move ahead so --

14            MR. SHARP:  The only thing I might have is I'm going

15    to see if there's anything in the pleadings.  There's some

16    documents I need to go over.

17            THE COURT:  Very well.  Then I'm going to excuse the

18    jury at that point in time for approximately an hour and

19    20 minutes or so, so we can do our business as far as both an

20    informal and formal jury instruction conference.  All right?

21        So we'll see where we're at with the schedule, but I will

22    let them know, but I'm going to have them come back so we can

23    argue this case before the end of the day.  Thank you, counsel.

24        All right.  So we'll be back at 1:10 p.m.

25        (Recess taken at 12:14 p.m.)

1          (At 1:12 p.m. on August 30, 2018, with counsel for the

2     parties and the defendant present; WITHOUT the jury:)

3               MR. SHARP:  We're going to rest, Your Honor.

4               THE COURT:  Okay, very well.  You know what?  Kathy,

5     let's go see if the jury is ready, because we will -- I'm going

6     to be sending them back.

7               COURTROOM DEPUTY:  Okay.

8               THE COURT:  And I understand that the government had

9     to do what it had to do.  Here we are.  I am going to -- I'll

10    bring them back -- go ahead.  I'm going to have them come back

11    and be ready for argument at 2:45.  That will give us an hour

12    and a half to do informal and formal.  At 2:45 -- I will have

13    the jury come back at 2:45 for closing arguments.  We'll have

14    an instruction conference in between, if I can talk.

15              MR. SHARP:  I hear you.

16         (Jury in at 1:14 p.m.)

17              THE COURT:  You may be seated.  Welcome back, ladies

18    and gentlemen of the jury.  The government had rested.  The

19    defense has rested.

20         Is there any rebuttal evidence?

21              MR. SHARP:  There is not, Your Honor.

22              THE COURT:  All right.  The government rests in

23    total?

24              MR. SHARP:  Total, yes, Your Honor.

25              THE COURT:  All right, very well.  Ladies and

1    gentlemen of the jury, I apologize once again and ask you for

2    your patience.  I need to spend some time with the lawyers,

3    hopefully as quickly as possible.  We're going to complete the

4    instructions for you.  I'm going to ask you to be in recess

5    probably until about 2:40 or 2:45, and then we're going to have

6    closing arguments and submit this case to you yet this

7    afternoon.

8         So I will instruct you once again and remind you, just as

9    I have before, that until this case is completely submitted to

10   you -- the evidence is now in, but the closing arguments will

11   be made.  I will instruct you, and then this case will be

12   submitted to you, and until all of that is in, you're not to

13   discuss the evidence or anything about this case with each

14   other or with anybody else until all matters have been

15   submitted to you.

16        So I'm going to release you, and I apologize and thank

17   you -- for the inconvenience, and we will have you back here,

18   and we hope to be having closing arguments at 2:45 p.m.  Okay?

19   Thank you.

20        (Jury out at 1:15 p.m.)

21            THE COURT:  You may be seated.  We are outside the

22   presence of the jury.

23        Counsel, at this time we're going to have our informal

24   instruction conference.  We'll have that in chambers.

25        Marshal, I'll have you -- if you could bring Mr. Parsons

1     back, we will have our formal instruction conference on the

2     record in the courtroom in open court.

3           Just a moment.

4           And I anticipate that to be within about 30 or 35 minutes.

5     So we will let you know, but I anticipate at about 10 minutes

6     till two, we'll have our formal jury instruction conference.

7           Mr. Parsons, you need something from your counsel?

8           THE DEFENDANT:  Your Honor had submitted an order on

9     a motion for dismissal that I received a copy of last Friday.

10    I had prepared an appeal to the Eighth Circuit Court and

11    mailed -- put that in the mail at the jail.  I haven't heard

12    anything that they've responded as yet.  I didn't know if Your

13    Honor was aware of that or if they responded to it.

14          THE COURT:  A, I'm not aware of it, and B, they have

15    not responded and until I -- that's called an interlocutory

16    appeal.

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  And the Eighth Circuit in general will

19    not entertain an interlocutory appeal on a motion to dismiss.

20    That will be taken up at the time after this trial is completed

21    so -- but we continue on until I hear from the Eighth Circuit

22    and they put a stay on these proceedings, which they haven't

23    and they won't.  We move on.

24          THE DEFENDANT:  And one other thing, Your Honor.  I

25    have not rested.  I didn't know that Mr. Schense had said we

1    rested, because I was going to call Mr. Bill Bittings [sic],

2    because this gentleman over here is not Mark Anderson.  That's

3    not his name.  I believe he's committed perjury before the

4    court.

5              THE COURT:  Well, this case has been submitted, all

6    right, and we will stand -- this case has been submitted by the

7    government and by the defense.  There will be no further

8    argument, and there will be no further evidence.  I shouldn't

9    say there won't be further argument.  There will be closing

10   arguments at the time that I instruct the jury.

11        All right.  We will stand in recess.  At about 10 minutes

12   till two, we will have a formal jury instruction conference.

13        (Recess taken at 1:18 p.m.)

14        (At 2:10 p.m. on August 30, 2018, with counsel for the

15   parties and the defendant present; WITHOUT the jury:)

16             THE COURT:  You may be seated.  Good afternoon,

17   everyone.  We are back on the record in the United States of

18   America versus Michael Wayne Parsons.  We are outside of the

19   presence of the jury.  Counsel and the Court has had an

20   informal instruction conference this afternoon.  Instructions

21   were mailed out last night, proposed instructions, to counsel

22   from both parties.  After consulting with counsel for both

23   parties, receiving suggestions, the Court is now ready to enter

24   into the formal instruction conference.

25        Counsel, are you both ready?

1          MR. SHARP:  Yes, Your Honor.

2          MR. SCHENSE:  Yes, Your Honor.

3          THE COURT:  All right, very well.  We will go through

4    the instructions one by one.  I will let counsel know and

5    Mr. Parsons know that the Court will be instructing the jury

6    based on the law and the evidence that's been presented, and

7    that will be the law as set forth by the Eighth Circuit and the

8    United States Supreme Court and not the law as maybe we wish it

9    were, so that's what the instructions will be based on.

10        Counsel, Mr. Parsons has a question for you.

11         THE DEFENDANT:  I would like to notify the judge of

12    the assault on me by the U.S. Marshal sitting over there and

13    ask for a copy of the video surveillance for preservation of

14    the record for potential prosecution for the U.S. Attorney.  I

15    was assaulted by the --

16         THE COURT:  Hold on a minute.

17         MR. SCHENSE:  Judge, well, I guess the Court could

18    hear Mr. Parsons.  Could the Court hear Mr. Parsons' comments?

19         THE COURT:  I heard him claiming something that he

20    was assaulted by a marshal.

21         MR. SCHENSE:  I wasn't even in the courtroom so I

22    don't know, but Mr. Parsons has indicated that to the Court and

23    made a request for a video and so --

24         THE COURT:  All right.  We'll take that up after the

25    instruction conference.  We're going to get this case to the

1    jury, and then we'll take up other complaints that may be had.

2        All right.  We're ready for a final instruction

3    conference.  Counsel, you have the instructions in front of

4    you.  First of all, instruction number 1, the introduction.  Is

5    there any -- I will ask the government first and then the

6    defense.

7        Any objection?

8            MR. SHARP:  No, Your Honor.

9            THE COURT:  Any objection to instruction 1?

10           MR. SCHENSE:  No, Your Honor.

11           THE COURT:  All right.  Instruction 2, duty of jury.

12           MR. SHARP:  No objection.

13           MR. SCHENSE:  Judge, I don't have any objection.

14   Mr. Parsons, however, would like it to be on the record that he

15   objects to this instruction that the people judge the law and

16   determine the law and the facts.  The Court should not give the

17   law.  The jury should determine the law.

18           THE COURT:  Okay.  Well, that is not the law, and

19   this instruction is from the Eighth Circuit pattern 1.01 and

20   3.02.  So if that is an objection, it is overruled.

21           MR. SCHENSE:  Yes.  Did I frame it in the form of an

22   objection?

23           THE COURT:  I'm not sure.  Mr. Parsons had one, so

24   I'll take it as an objection.  I'll take it as an objection,

25   and it's overruled.  All right?  And I'm not assessing any

```
1    blame to counsel.

2         All right.  Instruction number 3, evidence.

3              MR. SHARP:  No objection.

4              MR. SCHENSE:  No objection.

5              THE COURT:  All right.  Instruction number 4,

6    exhibits.

7              MR. SHARP:  No objection.

8              MR. SCHENSE:  No objection.

9              THE COURT:  Very well.  Instruction number 5,

10   credibility of witnesses.

11             MR. SHARP:  No objection.

12             MR. SCHENSE:  No objection.

13             THE COURT:  Instruction number 6, statements by

14   defendant.

15             MR. SHARP:  No objection.

16             MR. SCHENSE:  No objection.

17        What?

18        Judge, could I have a moment, please?

19             THE COURT:  Yeah, you can.

20        (An off-the-record discussion was had between the

21   defendant and counsel.)

22             MR. SCHENSE:  Did I say no objection to 6, Judge?

23             THE COURT:  Yes.

24             MR. SCHENSE:  No objection to 6 -- 5 or 6.

25             THE COURT:  All right, very well.  We are now on
```

```
1    instruction number 7.
2              MR. SHARP:  No objection.
3              MR. SCHENSE:  Judge, for the record and on behalf of
4    Mr. Parsons, Mr. Parsons would ask that after the first
5    sentence in the first paragraph ends with "ammunition," period,
6    that the --
7              THE DEFENDANT:  Well, inclusion with interference
8    with interstate commerce.
9              MR. SCHENSE:  Yes.  That Mr. -- possession of a
10   firearm or ammunition in interference with commerce.
11             THE DEFENDANT:  Interstate commerce.
12             THE COURT:  That's going to be instructed in
13   instruction number 8 on the elements instruction.  So I will
14   not be adding any further language to sentence number one in
15   paragraph number 1 of instruction 7.  So if that is made as an
16   offer, it's overruled.
17         All right.  Any other objection to instruction number 7?
18             MR. SCHENSE:  No, Your Honor.
19             THE COURT:  All right, very well.  Instruction
20   number 8.
21             MR. SHARP:  No objection.
22             MR. SCHENSE:  For the record, Mr. Parsons would note
23   that the word -- on paragraph 2 the word "assault" was taken
24   out before the word "rifle" and also --
25             THE COURT:  And it has been taken out.
```

1        MR. SCHENSE:  And "multiple" was also taken out.  I

2    just wanted to make that on the record, please.

3        THE COURT:  I should also note that the final

4    instructions under element number 2 where I say "specifically,"

5    that should be Rock River Arms.  That's the name of the

6    manufacturer; so it will specifically become a Rock River Arms

7    5.56 LAR-15.  That's what Exhibit No. 1 is.

8        MR. SCHENSE:  Yes, Your Honor.

9        THE COURT:  So that correction will be made.

10       All right.  Is there any other objection as to instruction

11   number 8.

12       MR. SHARP:  No objection.

13       MR. SCHENSE:  Judge, if I may be heard?  And this was

14   brought up during -- if I may be heard?

15       THE COURT:  You may, certainly.

16       MR. SCHENSE:  This was brought up during the informal

17   conference with the Court and counsel, and I'm going to -- as I

18   indicated in chambers, pursuant to *United States vs. Benning*,

19   348 *[sic]* F.3d 772, Eighth Circuit (2001), I would submit to

20   the Court there has been evidence adduced through the testimony

21   of Mr. Parsons, particularly on redirect examination, that

22   he -- I'm sorry, Mr. Parsons reasonably relied upon statements.

23       And I would add also documents made by the Chief Justice

24   of the Universal Supreme Court of the Chilcotin, Sue Holland,

25   who is a government official, and that because of those

1    reasonably relied upon statements and documents made by this

2    government official, Sue Holland, and even if they were

3    misleading to him, he reasonably believed and relied upon them.

4         Therefore, any conduct of his was legal because of this,

5    what we've been referring to as his exoneration; and,

6    therefore, even though Mr. Parsons denies having a weapon or

7    knowing it was there, even if it was, he was legally bound and

8    legally could have the possession of the gun.  And so I would

9    make that request for the Court's consideration again under

10   *United States vs. Benning*.  Thank you.

11             THE COURT:  All right, very well.  Is there any

12   response by the government?

13             MR. SHARP:  No, Your Honor.

14             THE COURT:  All right, very well.  The *United States*

15   *vs. Benning* isn't exactly applicable to this case.  I assume

16   you're relying upon a entrapment by estoppel; in other words, a

17   government official is making some representation that

18   Mr. Parsons can reasonably rely upon.  Is that right?

19             MR. SCHENSE:  That's correct.

20             THE COURT:  Okay, very well.  There's a case by the

21   name of *United States vs. Afr*- -- and there are other cases,

22   but the *Africa* case, and that's found at 52 F.3d 753, sets

23   forth the principle that if you're relying upon entrapment by

24   estoppel when an official assures a defendant or some

25   individual that certain conduct is legal, that official must be

1    from that particular governmental unit.  So in other words, if

2    an official in Tennessee said you are able to have this gun or

3    whatever, there might be -- I'm not saying there would be, but

4    there might be estoppel by entrapment.

5         But I've already determined that any official from the

6    Tsilhqot'in Nation or country is not recognized by the United

7    States.  Even if it were, an official from another governmental

8    agency cannot give the type of assurances that the defendant

9    could reasonably rely upon.  And so for those reasons that's

10   not an accurate statement of the law, and I will not be giving

11   a different instruction than that that's contained in

12   instruction number 8.  So the proposed instruction is rejected,

13   and any objection to exhibit -- or to instruction number 8 is

14   overruled.

15        All right.  Is there any further -- anything further with

16   instruction number 8?

17             MR. SHARP:  No, Your Honor.

18             MR. SCHENSE:  No, Your Honor.

19             THE COURT:  All right, very well.  Instruction

20   number 9, proof of intent or knowledge.

21             MR. SHARP:  No objection.

22             MR. SCHENSE:  No objection.

23             THE COURT:  All right, very well.  Instruction

24   number 10, possession.

25             MR. SHARP:  No objection.

```
 1              MR. SCHENSE:  No objection.

 2              THE COURT:  Very well.  Instruction number 11,

 3    reasonable doubt.

 4              MR. SHARP:  No objection.

 5              MR. SCHENSE:  No objection.

 6              THE COURT:  Instruction number 12, venue.

 7              MR. SHARP:  No objection.

 8              MR. SCHENSE:  Judge, on behalf of Mr. Parsons, if I

 9    could be heard, please.

10              THE COURT:  You may.

11              MR. SCHENSE:  On behalf of Mr. Parsons, as it relates

12    to instruction number 12, Mr. Parsons would take exception with

13    the words "greater weight of the evidence" and would insert,

14    rather, "proof beyond a reasonable doubt" to be consistent with

15    all other essential elements of the crime charged even

16    though -- well, that would be his objection to instruction 12

17    under venue, and that's it.  Thank you.

18              THE COURT:  I would be happy to insert that if that

19    were the law, but it's not the law.  The greater weight of the

20    evidence is the burden of proof for venue, and so instruction

21    number 12 comes from the Eighth Circuit Model Instructions

22    3.13.  It is a correct statement of the law, and it'll remain.

23    So that's instruction number 12.

24         Is there any other objection to 12?

25              MR. SCHENSE:  No, Your Honor.
```

```
 1              THE COURT:  All right, very well.  Instruction
 2     number 13, theory of defense.
 3              MR. SHARP:  No objection.
 4              MR. SCHENSE:  Judge, I would object on behalf of
 5     Mr. Parsons as it relates to instruction 13 and specifically
 6     the finding of the Court that the -- it says the defendant,
 7     Mr. Parsons, is not an ambassador and does not have diplomatic
 8     immunity and actually that whole -- that whole sentence and the
 9     fact that he hasn't -- he has not been recognized or accepted
10     by the State Department of the United States.
11              THE COURT:  I've taken that out.
12              MR. SCHENSE:  Oh.  This all out, Judge?
13              THE COURT:  Is it not out?  It's supposed to be.
14              MR. SCHENSE:  I think I was looking at the old one.
15              THE COURT:  Okay.
16              MR. SCHENSE:  I'm sorry.
17              THE COURT:  I'm on page --
18              MR. SCHENSE:  I'm on 14.
19              THE COURT:  I'm on page 14.  It says specifically
20     on -- the second sentence reads specifically, "I have found
21     that the defendant is not an ambassador and does not have
22     diplomatic immunity," period.
23              MR. SCHENSE:  I'm sorry.  I was referencing the
24     draft.  Could I start over?
25              THE COURT:  Yes, you may.
```

1          MR. SCHENSE:  Page 14 of the final instructions,

2     instruction 13.

3          THE COURT:  Yes.

4          MR. SCHENSE:  I would ask the Court to consider

5     removing that instruction and specifically the -- well, where

6     it starts with the word "specifically" and then the rest of

7     that paragraph.  And also in terms of jurisdiction, based upon

8     the offers of proof made on behalf of Mr. Parsons, I would ask

9     the Court to remove the second paragraph of instruction

10    number 13, and I really -- I guess, given the nature of all of

11    the offers of proof, I should also, to be consistent, object,

12    then, to the full paragraph, paragraph 3 contained in

13    Instruction 13.  So I guess when you get down to the bones of

14    it, Judge --

15         THE COURT:  You've objected to everything.

16         MR. SCHENSE:  -- I've objected to everything.  I

17    could have just said that.

18         THE COURT:  Fair enough.

19         THE DEFENDANT:  I would object to counsel, and I'm

20    fine with it just like it is.

21         THE COURT:  I'm going to give it like it is; so I'm

22    glad you're happy with it.

23         THE DEFENDANT:  Saves time.

24         THE COURT:  All right, very well.  Counsel?  It's

25    your case, counsel, so if you want to maintain the objection,

1    I'll rule upon it.

2         MR. SCHENSE:  Well, it's on the record now that

3    Mr. Parsons says he does not object to it.  I've made my

4    record, and the Court's going to make its ruling, but I guess

5    the record is clear that Mr. Parsons doesn't object.

6         THE COURT:  Okay, all right.  Well, for the record --

7    I mean, there is an objection that's pending on the record.  I

8    will overrule the objection.  I have found that he's not an

9    ambassador and does not have diplomatic immunity.  I'm

10   referring to Filing No. 146 and my various other statements

11   during the course of the trial.  I have determined that this

12   Court has proper jurisdiction.  That was raised in the

13   testimony so I think the jury needs to be instructed on that.

14        And, finally, I have ruled in Filing No. 146 and in other

15   rulings that there is no international court or universal

16   supreme court with authority to vacate the judgment of the --

17   of a court of the state of Tennessee or to exonerate the

18   defendant in any way, and so that instruction will be given.

19   If there is a pending objection, it is overruled.

20        All right.  Instruction number 14.

21        MR. SHARP:  No objection.

22        MR. SCHENSE:  No objection.

23        THE COURT:  All right, very well.  Then we'll go to

24   the verdict form.

25        MR. SHARP:  No objection.

1          THE DEFENDANT:  I would object.

2          MR. SCHENSE:  Wait.

3          THE COURT:  Wait just a minute.

4          MR. SCHENSE:  Judge, on -- I think on the verdict

5    form, Judge, I would ask the Court to consider and Mr. Parsons

6    has requested that on the last line of A, "fire or ammunition,"

7    comma, that the words "interfere with interstate commerce" be

8    inserted, and I think to be consistent we would have to also

9    insert that into B also after the word "ammunition," comma,

10   "interfering with interstate commerce."

11       I know the Court refers the jury back to Instruction 8,

12   which I think covers it, but nonetheless, on behalf of

13   Mr. Parsons, I would ask the Court's consideration.

14          THE COURT:  All right, very well.  Anything from the

15   government?

16          MR. SHARP:  No, Your Honor.

17          THE COURT:  All right.  I will overrule that request.

18   I do refer the jury to instruction number 8, and juries have

19   been consistent in going -- if they don't read any other

20   instructions, they go back to the element instructions, and the

21   element instructions clearly provide all three of the elements

22   that the jury must find beyond a reasonable doubt, and they

23   must find beyond a reasonable doubt all three of the elements,

24   and that is clearly instructed upon.

25       All right.  Are there any other objections or motions that

1    need to be heard?

2              THE DEFENDANT:  It's confusing not to tell the jury

3    to do it that way.  I've been on a jury.  I know that would be

4    confusing to me.

5              MR. SCHENSE:  I don't think I need to add any

6    comment.

7              THE COURT:  All right, very well.  All right.

8    Counsel, will you be ready if we bring the jury in at 2:35?

9              MR. SHARP:  Yes, Your Honor.  I would like to use the

10   podium.

11             THE COURT:  We will get that arranged.  So 2:35.

12             MR. SCHENSE:  Yes, sir.  I'm ready.

13             THE COURT:  Ms. Miller, if you can let the jury know

14   that we'll be prepared.  Twenty minutes per side is what

15   counsel has requested and the Court will grant.  The government

16   may use no more than 40 percent in rebuttal.  I doubt that you

17   will, but you may reserve two to three minutes for rebuttal if

18   you wish to do so.

19        I will read all instructions except the final closing

20   instructions.  I will read the instructions to the jury,

21   counsel will argue, and then I'll read instruction number 14 to

22   close the proceedings.

23        All right.  We will stand in recess for about eight or

24   nine minutes.  Thank you.

25             (Recess taken at 2:27 p.m.)

1              (At 2:41 p.m. on August 30, 2018, with counsel for the

2       parties and the defendant present; WITHOUT the jury:)

3              THE COURT:  We're outside of the presence of the

4       jury.

5          Counsel, are you ready for closing arguments?

6              MR. SCHENSE:  Yes, Your Honor.

7              MR. SHARP:  Yes, Your Honor.

8              THE COURT:  Very well.  Let's bring the jury.  Good

9       luck to both of you.

10             MR. SCHENSE:  Thank you.

11         (Jury in at 2:42 p.m.)

12             THE COURT:  You may be seated.  Welcome back.

13         (The Court read final Jury Instructions 1 through 13.)

14             THE COURT:  Instruction 14 we'll come back to after

15      counsel have made their closing arguments.

16         Counsel, are you ready to proceed?

17             MR. SHARP:  We are, Your Honor.

18             THE COURT:  Mr. Sharp, you may proceed.

19             MR. SHARP:  Ladies and gentlemen, good afternoon.  I

20      haven't had a chance to directly address you yet.  Again, as

21      you heard me introduced at the beginning, my name is Jan Sharp.

22      I'm an Assistant United States Attorney for the District of

23      Nebraska.  This has been a short trial.  Probably a little

24      unusual, some of you may think.

25         But what you've heard over the course of the last two and

1   a half to three days is that an individual who happens to think

2   that he is above the law took off with charges pending against

3   him in another jurisdiction and traveled cross-country with a

4   sleeping bag, blankets, survival gear, and, most importantly,

5   an LAR-15 .556 or .223 -- they're the same thing -- .556 rifle

6   and literally hundreds of rounds of ammunition.

7        We've played telephone calls for you where you have heard

8   his own words where he is freaking out about the fact that that

9   plane is up here in Nebraska, and he's wanting somebody to come

10  get it, and he's talking cryptically about something that is on

11  that plane.

12       And, lastly, you've heard that we are able to trace that

13  gun from the manufacturer to a man who bought it in Alabama to

14  Michael Parsons.  And, in fact, when Michael Parsons took the

15  stand today, he admitted that he had possessed that gun at some

16  point in the past.

17       So let's turn to what the issues are that you're going to

18  be charged with deciding.  There's three instructions that

19  you've -- or three elements that you've just been instructed

20  on, and we're going to talk most of -- most of the time we're

21  going to be talking about one particular element, but I want to

22  at least brush over all three elements.

23       And if you can put up the second slide -- or first slide

24  is fine.

25       As the judge instructed you, there are three elements the

1    United States has to prove beyond a reasonable doubt.  Like

2    almost every case, there are some elements that are not that

3    seriously in dispute, and there are others that are really the

4    crux of the case.  I would submit that on the evidence that's

5    before you that, really, the first and third elements are not

6    really that seriously in dispute, although the defendant, of

7    course, is free to disagree with me.  But I want to talk just

8    briefly about one and three before I come back to element

9    number two.

10        Ms. Bailey, could you go to the second slide?

11        The United States has to prove that the defendant was

12    previously convicted of a crime punishable by imprisonment for

13    more than one year, a felony, and he had to have had that

14    felony conviction before he was found in possession of a

15    firearm here in the District of Nebraska.  I would submit to

16    you that there's really not any question but what the defendant

17    was convicted of a felony offense.

18        Ms. Bailey, if you could put Exhibit No. 31 on the screen.

19        Exhibit 31 is the judgment.  It has the raised seal of the

20    Tipton County Court, and it's a judgment of conviction, and

21    you'll see that it indicates that someone by the name of

22    Michael Parsons was convicted of a -- the crime of aggravated

23    assault and received a three-year sentence.  If you look at

24    that document, you'll see that there's a date of birth on

25    there.

1        And Ms. Bailey, can you blow that up?

2        And you'll see that the date of birth is May 5th of 1961.

3    We presented another exhibit during the trial that also has the

4    defendant's date of birth on it.  It's Exhibit No. 15.

5        Ms. Bailey, if you could put that up.

6        And what that is, is an application for a Tennessee

7    driver's license that Kurt Kapperman told you had been found

8    when the defendant was arrested in Nebraska, and on that

9    Tennessee driver's license -- application for Tennessee

10   driver's license --

11       Ms. Bailey, if you can blow that up.

12       -- it's got the same date of birth of May 5th, 1961.

13   We've got more evidence than that that it was the defendant

14   himself who was convicted.  It's a Tennessee case, and we

15   produced somebody who was in that courtroom when this case went

16   to trial and that it is Michael Parsons who was the subject of

17   the conviction.  That element has been established beyond any

18   doubt at all.

19       The third element --

20       I want to jump to slide -- I think it's 4, Linda.

21       -- is we have to establish beyond a reasonable doubt that

22   either before or during the defendant's possession of the

23   firearm, it was transported across a state line.  Well, you've

24   heard that that firearm was manufactured in Illinois.  You

25   heard that from Special Agent Cory Shelton.  You're going to

1    see the gun.  It's stamped manufactured in Illinois.

2         You've heard from Debbie Davenport that it was sold in

3    Alabama, that Mr. Lovan took it to Tennessee, according to

4    Mr. Parsons that he even made a stop in Mississippi, and it was

5    found in the State of Nebraska.  That gun is more well traveled

6    than I am.  That gun was transported across a state line.  So

7    that element is, frankly, not in dispute.

8         If you could put up the element two slide, Linda.

9         Which brings us to element number two, which is really

10   what we're going to be talking about and have been talking

11   about over the course of the last two and a half days, and that

12   is the United States has to prove that the defendant knowingly

13   possessed a firearm.  And by the way, one of the instructions

14   the judge just gave you is that a firearm doesn't have to be

15   operable for it to be considered a firearm under the law.

16        If it was designed to expel a projectile through the use

17   of an explosion -- I forget the magic words, but Special Agent

18   Shelton told you that's a firearm, and Matthew Lovan told you

19   he had actually fired that gun, so it is a firearm.

20        But we have to prove not just that there was a firearm

21   that was present in the plane, we have to prove that the

22   defendant knew it was there, because if it was there -- if you

23   look at the definitions of "possession," it doesn't have to be

24   physically on his person to be in his possession.  Constructive

25   possession is enough.  If he knew it was there, he was clearly

1    in possession of the firearm.

2         So what evidence do we have that Mr. Parsons knew that

3    that gun was on that plane?  Well, I would submit at the outset

4    you've got the obvious problem that it is on the plane.  It's a

5    very small space.  We're not talking about a derringer,

6    something that's 2 or 3 inches long that somebody tossed into a

7    corner.  This is a gun that is 3 to 3 and a half feet long.

8    It's in a black bag.  It's got all kinds of accessories.  It's

9    got an upper for an interchangeable barrel.  There's an ammo

10   box with hundreds of rounds of ammunition in it, and all of

11   Mr. Parsons' belongings are packed into that space with that

12   gun.  He flew the plane to Nebraska, and only he flew the plane

13   to Nebraska.

14        That's our starting point.  It's inconceivable that he

15   would not know that that gun was in there, but we have more

16   than that.  You have heard three telephone calls that the

17   defendant was on -- two with Suzanne Holland, one with his

18   wife -- where the defendant is greatly concerned about the fact

19   that his plane is in Arapahoe, Nebraska.  I'd encourage you to

20   listen to Exhibits 35, 36 and 37 and ask yourself whether he's

21   talking about some Walmart blankets.

22        On Exhibit 35, his call with his wife, this is, like, I

23   think a day, maybe two, after he's been arrested.  Before the

24   plane has been searched, he knows all they have is just the

25   personal belongings that were in the administrative office, and

1    he is freaking out.  Three times in that call he says that

2    plane has to be moved.  I think the last time he really puts

3    emphasis on it immediately.

4        If you listen to Exhibits 36, 37, calls with Suzanne

5    Holland, he starts off by saying we're being recorded, don't

6    say anything, and then says don't mention the Nation's item or

7    don't mention the Nation's gifts.

8        We put up Exhibit 26 during this trial.  Exhibit 26 was

9    the picture of all of the items that had been taken off that

10   plane, and the plane was stripped down to the metal.  We went

11   through every item on there.  There was not one earthly thing

12   found in that plane that anyone would have to be afraid to

13   mention on a telephone call or would be illegal to possess

14   except an LAR-15 and several hundred rounds of ammunition if

15   you're a convicted felon.

16       It gets better than that in terms of proving the

17   defendant's knowledge of the possession of that weapon.  The

18   gun is traceable.  We can trace it to a gun dealer in Alabama,

19   to a man from at the time Alabama who bought it, who then took

20   it to Tennessee and sold it to Michael Wayne Parsons.  Matthew

21   Lovan is not some drug dealer that's trying to work off a

22   sentence.  He's just a guy.  He met him once, maybe twice, and

23   I sold -- yeah, I sold the gun to Michael Parsons.  And

24   Mr. Parsons takes the witness stand today and says, yeah, I had

25   that gun, but I don't have it anymore.  I traded it to some guy

1    that's now dead.  And the elephant in the room is how does this

2    gun get from Mississippi to Nebraska in the defendant's plane?

3          We've had some issues of credibility that we've talked

4    about at various times during this case.  A lot of that was

5    focused on Anthony Wayne -- Anthony Todd Weverka.

6    Mr. Weverka's frankly got some credibility issues.  You've

7    heard that he lied to law enforcement officers about some

8    unrelated matters and got himself into trouble, but what does

9    he give you in this case?

10         Mr. Weverka says Mr. Parsons flew the plane to Arapahoe

11   and he was by himself.  The defendant says he flew the plane to

12   Arapahoe and was by himself.  Mr. Weverka says he looked in the

13   plane with all of the stuff piled in the back and he didn't see

14   a gun.  I assume Mr. Parsons thinks he's telling the truth with

15   regard to that.  He says he got in and out of the plane several

16   times trying to get to the battery, and he did see a gun box,

17   but he never even opened it.

18         So Mr. Weverka really does not even give you anything that

19   demonstrates knowledge on the part of the defendant other than

20   information that is corroborated in several other respects.

21   The defendant's admitted he flew the plane.  His belongings are

22   on the plane.  There's Tsilhqot'in Nation paperwork both in the

23   office where Mr. Parsons was arrested also found on the plane.

24         Aha.  But what if, what if, Mr. Weverka planted the gun,

25   or what if somebody else did?  Well, setting aside the fact of

1  why somebody would do that, why somebody would spend the money

2  on a gun and accessories just to frame Mr. Parsons, we still

3  have the fact that this is not some random Saturday night

4  special that was thrown onto the ground.  It is an identifiable

5  weapon.  The gun that was found in Mr. Parsons' plane had a

6  serial number.

7       We know the defendant possessed not a gun that was similar

8  to the one that's on the plane.  He had previously possessed at

9  a minimum that exact gun.  We can trace it directly to him.

10 And if somebody's going to frame him, how does a gun get from

11 the southern United States to Arapahoe, Nebraska, and find

12 itself in the defendant's plane?

13      We talked a little bit about DNA and the fact that there

14 was not DNA evidence collected in this case.  It's true there

15 was not.  I would say that this is not television.  This is not

16 *CSI* or *NCIS*.  You've heard from Agent Czaplewski they don't do

17 DNA analysis in every single case.  But why do you prove -- or

18 why do you go through DNA analysis?  You do it to try to put an

19 item in the possession of somebody.  And in this case you know

20 from Matthew Lovan -- I think I'm pronouncing that wrong, I

21 think it's Lovan -- that that gun was hand-delivered to the

22 defendant.  And so, yes, they did not pursue a court order to

23 get a DNA sample from Mr. Parsons.

24      Well, you heard this morning what happens when you try to

25 get a biological sample from Mr. Parsons.  They had to get a TB

DEFENDANT'S CLOSING ARGUMENT                                      708

1    test.  They got a court order for a blood test, and they had a

2    knock-down, drag-out fight with him getting strapped into a

3    restraint chair.  And so, yes, investigators, once they trace

4    that gun through Matthew Lovan into the defendant's hands, did

5    not pursue DNA testing.

6         One last matter.  This is a case where the gun -- the

7    plane was left unattended for two and a half months while some

8    other matters unrelated to this were being investigated.  The

9    argument's going to be anybody could have got into that plane

10   and planted that gun, and that would be true if this was the

11   Saturday night special I talked about earlier with a

12   scratched-off serial number, but it's not.  It's an

13   identifiable gun that we can trace and put in Michael Parsons'

14   hands.  This is not a conspiracy to frame Mr. Parsons.  He got

15   caught as a convicted felon in possession of a firearm.

16        We met our burden, and we are going to be asking you at

17   the conclusion of the arguments to return a verdict of guilty.

18        Thank you.

19             THE COURT:  Thank you, counsel.

20        Mr. Schense, are you ready to proceed?

21             MR. SCHENSE:  I am.

22             THE COURT:  You may do so.

23             MR. SCHENSE:  Thank you.  May it please the Court,

24   counsel.

25        This trial may have only lasted three days, but it has

1    great significance.  Some trials can last for two or

2    three weeks or a month or two months, but it doesn't take away

3    the significance of the trial itself.  Every trial that we

4    engage in in this profession has significance, and the trial

5    that we are presently engaged in for the participants is the

6    most important trial we've ever been a part of.

7         And the reason I say that is because of the consequences

8    that it has.  It has consequences for both the government --

9    they are an interested party -- but of course it has

10   consequences for my client, Michael Parsons, who is also a

11   participant and a party to this litigation.  So there's a lot

12   of significance involved in this case.  And then you, the 12 of

13   you who will stay to deliberate this matter, are brought in as

14   the jury.

15        And as I told you two or three -- two days ago, I guess,

16   on Tuesday, I have been a part of this process, I'm glad to

17   say, for 35 years, and I've handled these matters in military

18   courts, state courts, federal courts, and there's never been

19   one case that doesn't have consequences, and this one does too.

20   And so to help us to resolve these issues that are presented to

21   you and that we have to solve, we bring you in to decide the

22   verdict.

23        Is Michael Parsons guilty beyond a reasonable doubt, or is

24   he not?  That is your charge at this point.  To help you

25   accomplish that, you will go back to the jury room, and you

1    will discuss this, I trust, fully, fairly, openly, and unafraid

2    to share your opinions with how you feel about witnesses and

3    testimony.  And when you do that and you think to yourself

4    individually and out loud and collectively as a jury, you will

5    then have to make the decision about the guilt or the innocence

6    of Michael Parsons.

7        I will tell you Mr. Parsons has a strong will, he has

8    strong beliefs, and he has strong convictions.  You may have

9    noticed that during the last three days while you've observed

10   the players here walk around the courtroom, interact with one

11   another, and through his testimony today, and I will make no

12   apologies, but I will tell you that some of you -- I just feel

13   it -- may reject his notion that somehow he can be a part of

14   something different, that he can be a part of the Nation of

15   Tsilhqot'in, the country of Chilcotin, and for some reason

16   that's wrong and he should be punished for it, that his beliefs

17   don't carry any weight, they're of no consequence, and they

18   should be completely disregarded.

19       I just simply ask you to judge his testimony as you will,

20   and you must, every other witness who was here.  There is

21   evidence.  I understand the Court has instructed you as to the

22   findings of the law as to diplomatic immunity and

23   ambassadorship and all of that, and I respect the rulings of

24   the Court.  You must follow the law, but it can be no different

25   for Mr. Parsons, and you must follow the law.

1    But I'm simply asking you to consider where Mr. Parsons

2    was, his state of mind, and his position in a community that is

3    unknown to most of us, if not all of us.  It's a small area of

4    land in Canada.  It's got a history that's rich with custom and

5    nature and that sort of thing and the earth, and for that we

6    should -- we should give some due respect for that notion of

7    people who want to govern themselves.  I am not asking you to

8    accept that.  I am not asking you to reject it.  You will make

9    up your own minds how you feel about that and possibly discuss

10   it among yourself, but Mr. Parsons was considered -- in that

11   culture and in that nation and in that country, he was

12   recognized in that society to be an ambassador, an associate

13   justice, and a diplomat.

14   Of course, if you want to, you can scoff at that and say

15   that's a bunch of nonsense, but it goes to his state of mind,

16   and because of his strong convictions and his belief in what he

17   does and who he does it with, he should not be short shrifted

18   on that.  I indicated when I was -- we were talking the other

19   day that in 35 years I really feel like I've never had a jury

20   be anything other than fair and impartial, ever, no matter in

21   what forum I was practicing, what the type of case was, whether

22   it be criminal or civil, and I feel no differently about all of

23   you.

24   All I ask was that -- for you all to give Mr. Parsons a

25   fair shake, and I trust and I know that you will.  That's all

1   any of us can ask for.  Any of us who are engaged in this

2   process on a day-to-day basis live and die by that creed of

3   fair and impartial.  The law demands of you a just verdict

4   unencumbered by any sympathies, prejudices or biases for or

5   against either party, so that's what you must do.

6       And so this proof beyond a reasonable doubt standard is

7   the highest standard that exists.  This proof beyond a

8   reasonable doubt must be applied and must be met and overcome

9   by the government during their case in chief.  All three of the

10  elements of the crime charged must be proved to you beyond a

11  reasonable doubt, all of them.  And if they're not, you must

12  find Mr. Parsons not guilty.

13      And there are some flaws in the case for the United

14  States.  Some of the -- if I ever want to be known as anything,

15  I want to make sure that I always keep my credibility intact

16  with a jury.  There's nothing more important, at least to me.

17  So there are some of the elements in this case that you might

18  find to be readily provable.  You might, and I'd be less than

19  honest if I said anything different.

20      But you know this concept of knowingly possessed a weapon

21  on a certain day in a certain area is what we must talk about,

22  and you must find beyond a reasonable doubt, as alleged in the

23  indictment, that on January 11, that specific date,

24  January 11th of 2017, Michael Parsons, who considered himself

25  and held himself out as an ambassador of the Tsilhqot'in

 1    Nation, the country of Chilcotin, was in possession of this

 2    gun.

 3         Now, you've heard argument by Mr. Sharp that Mr. -- is it

 4    Weverka?  -- offered testimony to you and that Weverka -- well,

 5    you're going to have to determine his credibility for yourself.

 6    You'll remember that we talked about this laundry list of

 7    factors you can look at.  You now can use that laundry list of

 8    factors to judge Weverka's credibility.

 9         You had the sheriff of the county and you had an FBI agent

10    both call into question his credibility and told you that

11    sometimes he lies.  So when he told you that Parsons told him

12    that I flew the plane in and he was by himself, there's no

13    testimony that Weverka saw Mr. Parsons fly that plane into

14    Arapahoe.  There's no evidence that he was by himself.  In

15    fact, I want -- if you will, please, if you will recall the

16    testimony of Mr. Parsons today, he said we flew in.  I don't

17    know if you caught that.  Maybe some of you did.

18         I'm submitting and suggesting to you that any evidence --

19    I don't care how minute it was -- offered from Weverka should

20    be called into question by you.  Even the local sheriff,

21    Sheriff Kapperman, who I have respect for, and the FBI agent,

22    who I have respect for, they even called into question his

23    credibility.  These are issues that you must decide.

24         But in order to be completely honest, you too have to call

25    into -- you have to also look at the credibility of my client,

DEFENDANT'S CLOSING ARGUMENT                                    714

1     Michael Parsons.  I'd be less -- you know, that wouldn't be

2     fair for me to say you don't get to look at all the witnesses.

3          But as all of you know, because you've been instructed on

4     it, there is what we call a presumption of innocence.  That

5     presumption never changes.  It never shifts.  The burden of

6     proof never goes to a defendant.  It never has shifted to

7     Michael Parsons.  That burden of proof is always on the

8     government, and the presumption of innocence is enough to find

9     Mr. Parsons not guilty only until -- up and until the

10    government has proved to you beyond a reasonable doubt each and

11    every essential element of the crime.

12         Now, I'm not naive.  I've been in front of juries too many

13    times in 35 years.  If you think Mr. Parsons is guilty, you'll

14    find him guilty.  That's a fact.  But if you believe that there

15    is reasonable doubt as to any of these elements of the crime,

16    if you believe there is any reasonable doubt of these elements

17    of the crime, you must find Mr. Parsons not guilty.  You must.

18    You may not want to.  You may not like it.  You may not like

19    Mr. Parsons.  It doesn't matter.  No bias, sympathies,

20    prejudices for or against either party.

21         These phone calls, you can make of them what you will.

22    You heard Mr. Parsons' explanation today that anything he was

23    referring to were gifts for the clan mothers.  Maybe some of us

24    would giggle at that, and maybe these gifts for the hereditary

25    chiefs, we might giggle at that, and the signing pens, but this

1     was important to Mr. Parsons, where he was going, the people

2     who he was interacting with, and the long, rich tradition and

3     history that they enjoy and that they're so proud of.

4          Reasonable doubt is, as the Court has instructed you,

5     doubt so sufficient that a reasonable person was -- would

6     hesitate to act upon it or rely upon it in his or her most --

7     most important aspects of life.  If you're convinced beyond a

8     reasonable doubt that Mr. Parsons is guilty, you'll be able to

9     get through that burden or find the burden has been met by the

10    government.  I'm asking on behalf of Mr. Parsons that you judge

11    this case, you give it the due consideration that it is owed,

12    understanding that every case has significance.

13         You're the jury.  I mean, maybe you won't remember this

14    case a year from now, two years from now.  Maybe you will.  I

15    remember the first case I ever handled 35 years ago and cases

16    that I handled decades ago.  Some of you forget it the next

17    day, let's be honest, but some of them stick with you forever.

18    Maybe this will be one.  I please ask you to give it the

19    attention it deserves, and please give it your full

20    consideration, which I know you will.

21         I'm asking that after you conclude your deliberations and

22    after you individually and collectively discuss this matter

23    among yourselves that you enter a verdict of not guilty on

24    behalf of Michael Parsons.

25         Thank you.

1          THE COURT:  Thank you, counsel.

2      Rebuttal from the government, Mr. Sharp.

3          MR. SHARP:  Thank you, Your Honor.

4      I have only about three minutes left, you'll be happy to

5  know.

6      I just want to respond to a couple of points that were

7  raised by Mr. Schense.  There's been a lot of noise during this

8  trial about ambassadorships and whether or not somebody had

9  been exonerated.  The judge addressed that.  If you look at

10  exhibit -- or not exhibit, instruction number 13, theory of the

11  defense, the judge has told you that that's a matter of law for

12  the Court.  The Court has determined he's not an ambassador,

13  and there's no court, universal or otherwise, that can overturn

14  a Tennessee conviction.

15      There's also the issue of whether or not the defendant --

16  what his belief set is.  If you look at instruction number 8,

17  there is a statement in there that really addresses that.  What

18  we have to prove is that the defendant knew he had a gun.  We

19  don't have to prove that he knew it was illegal for him to

20  possess a gun, so whatever paperwork might have been floating

21  around or might have been told to him by some woman up in

22  Canada is not relevant.  We have to prove he knew he had a gun.

23      Mr. Schense talked about or represented that we have to

24  prove that on the exact date of January -- I think he said

25  11th, Mr. Parsons possessed the firearm.  The indictment

 1    actually says on or about January 11th, but in any event,

 2    that's the date that he arrived.

 3         I'm going to refer you back to instruction number 8.

 4    That's got the three elements.  That's your guidepost in

 5    deciding whether or not we've proven our case.

 6         With regard to the telephone calls, play those.  Listen to

 7    them.  There's just no plausible way you can interpret those to

 8    think that he's talking about some blankets in a Walmart bag

 9    that he's warning people not to mention or a computer.  He

10    actually mentions a computer in the telephone calls.  That's

11    clearly not what he was talking about.  And I note that there

12    still has been no explanation at all for how a gun that we can

13    trace directly into the defendant's hands that he says wound up

14    in the state of Mississippi ended up in Arapahoe, Nebraska, in

15    the defendant's plane, and that's because there is no

16    explanation for that other than the defendant brought it to

17    Nebraska.

18         The United States has met its burden, and I thank you for

19    your time and attention.  I'm going to thank Mr. Schense and

20    Mr. Parsons for their time and attention, but we have met our

21    burden, and we are asking you to return a verdict of guilty.

22         Thank you.

23             THE COURT:  Thank you, counsel.

24         (The Court read Final Jury Instruction 14.)

25             THE COURT:  Good luck to you.

 1          Ms. Miller, I will give you the jury instructions as well

 2     as the verdict form.

 3          And you may commence your deliberations.  Thank you.

 4          (Jury out at 3:33 p.m.)

 5              THE COURT:  All right.  You may be seated.

 6          All right.  Counsel, Mr. Parsons, congratulations.  This

 7     was professionally and a well-tried case, and the Court wants

 8     to express its gratitude to all parties present.  It's now in

 9     the hands of the jury.

10          I will ask counsel a couple of things before we recess.  I

11     would like you to, or at least a representative from each of

12     you, to be sure and get together with Ms. Miller to make sure

13     that those items that have been introduced into evidence and

14     going back to the jury -- not those items that have just been

15     marked for the record, but the items that have been marked and

16     received into evidence will go back to the jury, I want to be

17     sure you agree upon those, and those will be sent back.

18          I will also ask you to give Ms. Miller a cell phone.  I

19     would probably prefer that you remain -- I think one of the

20     jurors may have to leave at 4:30 or 4:40 today if they haven't

21     reached a verdict, but if you could remain in or around the

22     building, that would be helpful in the event that the jury has

23     any questions.

24          If not, I would like you to give a cell phone to

25     Ms. Miller.  If the jury does have any questions, I will call

1    counsel, have you come into the courtroom, receive your input,

2    and I will answer whatever the jury's questions are.

3         All right.  Are there any questions?

4              MR. SHARP:  No, Your Honor.

5              MR. SCHENSE:  No, Your Honor.

6              THE COURT:  All right.  If not, very well.

7         Mr. Parsons, you have something through counsel?

8              THE DEFENDANT:  Yes, sir.  I would like to again

9    emphasize that I would request a copy of any surveillance video

10   that might be available to show that I was assaulted by this

11   gentleman over here.  I'm not sure what his real name is, but I

12   was assaulted by him, and I would like to obtain the evidence

13   to --

14             THE COURT:  You talk with your counsel about that.

15   That's a matter that's not for the Court.  I'm not sure where

16   any alleged assault occurred or if there's any video equipment,

17   but you talk with your counsel about that.

18        All right.  Is there anything else that we need to take

19   up?

20             MR. SHARP:  No, Your Honor.

21             MR. SCHENSE:  No, Your Honor.

22             THE COURT:  All right, very well.  If you would meet

23   with Ms. Miller.  Congratulations.  Thank you.  I appreciate

24   it, counsel.  We stand in recess until further order.

25             (Recess taken at 3:36 p.m.)

1              (At 3:47 p.m., with counsel for the parties present, the

2      following record was made:)

3              COURTROOM DEPUTY:  This is in the case of United

4      States of America versus Michael Wayne Parsons.  The following

5      are exhibits that were offered and received by the plaintiff:

6              Exhibits 1 through 12, Exhibits 14 through 33.

7              And 32 and 33 will not go back to the jury.

8              35, 36, 37.

9              35A, 36A and 37A were offered but not received.

10             And 40.

11             And the following exhibits were offered by the defendant:

12             101, 102, 104.

13             105, which will not go back to the jury.

14             106 and 107 through 121, which were received but will not

15     go back to the jury.  They were offer of proof only.

16             Is that correct?

17             MR. SCHENSE:  Yes, I agree.

18             MR. MULLIS:  Yeah.

19             (Recess taken at 3:48 p.m.)

20             (At 4:49 p.m. on August 30, 2018, with counsel for the

21     parties and the defendant present; WITHOUT the jury:)

22             THE COURT:  You may be seated.  Good afternoon.

23     We're back on the record outside the presence of the jury in

24     the United States of America versus Michael Wayne Parsons.  I

25     understand the jury has reached a verdict.

PLAINTIFF'S REBUTTAL ARGUMENT                                    721

1          Counsel, are you ready to bring the jury in?

2                MR. SHARP:  Yes.

3                MR. SCHENSE:  Yes.

4                THE COURT:  Let's please do so.  Counsel, I will

5     advise you that it is not this Court's practice to poll the

6     jury unless specifically requested by counsel.

7                MR. SCHENSE:  It is not the practice.

8                THE DEFENDANT:  Will I be able to make a motion for

9     the poll?

10               THE COURT:  Your counsel can.

11               MR. SCHENSE:  Are you asking me to?

12               THE DEFENDANT:  If it's a guilty verdict, yes.  If

13    it's a not guilty, then no.

14          (Jury in at 4:50 p.m.)

15               THE COURT:  All right.  You may be seated.  Looks

16    like juror number 2 has the envelopes.  I will ask you, sir,

17    has the jury reached a unanimous verdict?

18               FOREPERSON:  Yes, we have.

19               THE COURT:  All right.  Please hand the envelope to

20    my courtroom deputy.  I'll examine it as to form.

21          Thank you.  Briefly hand it to counsel and examine for

22    form.  Then I'll read the verdict.

23          As to form, thank you.

24          The Court will now read the verdict.

25          This is in the United States District Court for the

1    District of Nebraska, United States of America versus Michael

2    Wayne Parsons.

3         On the charge of possession of a firearm or ammunition by

4    a felon, we, the jury, find that the defendant, Michael Wayne

5    Parsons, is guilty beyond a reasonable doubt of being a felon

6    in possession of a firearm or ammunition under instruction

7    number 8.  The foreperson signed and dated the verdict form on

8    this 30th day of August, 2018.

9         All right.  Counsel, are there any motions to be made at

10   this time?

11             MR. SHARP:  Not from the government, Your Honor.

12             MR. SCHENSE:  Mr. Parsons has requested that the jury

13   be polled.  I would make such a request on his behalf.

14             THE COURT:  All right, very well.  I will ask each

15   one of you, then, and I'll start with juror number 1.  I will

16   ask if -- and I will ask each one of the jurors if,

17   individually, whether the verdict as read by me constitutes

18   your individual judgment in all respects.

19        Juror number 1.

20             JUROR NO. 1:  Yes, sir.

21             THE COURT:  Juror number 2, does the verdict as read

22   by me constitute your individual judgment in all respects?

23             JUROR NO. 2:  Yes, Judge.

24             THE COURT:  Thank you.

25        Juror number 3, was -- the verdict read by me, does it --

1    did it constitute your judgment in all respects?

2            JUROR NO. 3:  Yes, Your Honor.

3            THE COURT:  Very well.  Juror number 4, I'll ask you

4    the same question.  Does the verdict as read by me constitute

5    your individual judgment in all respects?

6            JUROR NO. 4:  Yes, sir.

7            THE COURT:  Thank you.

8        Juror number 5, I'll ask you the same question.  Does the

9    verdict that I have read constitute your individual judgment in

10   all respects?

11           JUROR NO. 5:  Yes, sir.

12           THE COURT:  Thank you.

13       Juror number 6, does the verdict read by me constitute

14   your individual judgment in all respects?

15           JUROR NO. 6:  Yes, sir.

16           THE COURT:  Thank you, ma'am.

17       Juror number 7, does the verdict read by me constitute

18   your individual judgment in all respects?

19           JUROR NO. 7:  Yes, sir.

20           THE COURT:  Thank you.  Juror number -- let's see.

21   I'm at number 8.

22       Juror number 8, does the verdict read by me constitute

23   your individual judgment in all respects?

24           JUROR NO. 8:  Yes, sir.

25           THE COURT:  Juror number 9, does the verdict that has

PLAINTIFF'S REBUTTAL ARGUMENT                                724

1    been read by me constitute your individual judgment in all

2    respects?

3                 JUROR NO. 9:  Yes, sir.

4                 THE COURT:  Thank you.

5         Juror number 10, does the verdict read by me constitute

6    your individual judgment in all respects?

7                 JUROR NO. 10:  Yes, sir.

8                 THE COURT:  Thank you.

9         Juror number 11, does the verdict read by me constitute

10   your individual judgment in all respects?

11                JUROR NO. 11:  Yes, sir.

12                THE COURT:  Thank you.

13        Juror number 12, does the verdict read by me constitute

14   your individual judgment in all respects?

15                JUROR NO. 12:  Yes, sir.

16                THE COURT:  Thank you, ma'am.

17        All right.  At this time unanimity has been verified.  The

18   Court accepts the verdict, and I'll direct my courtroom deputy

19   to file and record the verdict.

20        Ladies and gentlemen of the jury, I want to thank you for

21   your service.  You've been most diligent and patient in your

22   service as jurors, and I want to thank you on behalf of the

23   United States District Court and everybody in this courtroom.

24   You will now be excused.

25        For those of you that have a few moments, I would be happy

 1   to visit with you briefly and answer any questions that you may

 2   have.  There may be one or two jurors that have to leave, and I

 3   understand that so -- but if you would wait for a few moments,

 4   I would be happy to visit with you in my chambers.  But in the

 5   meantime I want to thank you for your service, for your

 6   dedication as citizens, and you are excused.

 7        (Jury out at 4:55 p.m.)

 8             THE COURT:  All right.  You may be seated, counsel.

 9        And at this time for the record, the Court has and will

10   accept the verdict of the jury, and I will adjudge the

11   defendant, Michael Wayne Parsons, guilty of possession of a

12   firearm or ammunition by a felon.

13        And is there anything to be heard as far as detention?

14             MR. SHARP:  No, Your Honor.  He's already in custody.

15             THE COURT:  He is in custody.  Very well.  The

16   defendant will be remanded to the custody of the United States

17   Marshal.  The sentencing date in this matter will be December 7

18   of 2018 at 10 a.m.

19        Counsel, are you available at 10 a.m. on December 7, 2018?

20             MR. SHARP:  Yes.

21             MR. SCHENSE:  Yes, Your Honor.

22             THE COURT:  All right.  I will enter an order.  It

23   will probably be entered yet on this date, order on -- and I'll

24   set the sentence scheduling as far as the presentence

25   investigation and everything else that goes along with that.

1      All right.  Are there any other matters that need to be

2   taken up?

3            MR. SHARP:  No, Your Honor.

4            MR. SCHENSE:  No, Your Honor.

5            THE COURT:  All right.  If not, again, counsel, thank

6   you for your service.

7      Mr. Parsons, I want you to cooperate with the probation

8   department.  That will be in your best interest in conducting

9   the presentence investigation.  And I'll see you on December 7

10  of 2018.

11     We will stand in adjournment.  Thank you, counsel.

12     (4:57 p.m.-- Adjourned.)

13

14

15

16                  * * * * * * * *

17

18     I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.

20

21

22        */s/Lisa G. Grimminger*              January 3, 2019

23        Lisa G. Grimminger, RDR, CRR, CRC    Date

24

25

PLAINTIFF'S REBUTTAL ARGUMENT                                    727

```
 1                              I-N-D-E-X

 2

 3                        Direct   Cross   Redirect   Recross

 4

 5    WITNESSES:

 6    FOR THE PLAINTIFF:

 7    Cory Shelton            ---      ---      561        566

 8    FOR THE DEFENDANT:

 9    Mark S. Anderson        620      625      626        ---

10    Michael W. Parsons      628      645      676        ---

11

12

13                                              Made       Ruled
      MOTIONS                                              On
14
      Defendant's Rule 29 motion                571        573
15
      Defendant's motion in limine re:
16    Tennessee court appearance                653        653

17    Defendant's renewed motion in limine re:
      Tennessee court appearance                656        656
18
      Defendant's renewed motion in limine re:
19    Tennessee court appearance                657        657

20    Defendant's Rule 29 motion renewed        680        681

21
                                                           Ruled
22    EXHIBITS                            Offered          On

23    32. Tennessee Statute 39-13-102        552           552

24    33. Tennessee Statute 40-35-11         552           552

25    108. Notification of reservation of rights  575      576
```

PLAINTIFF'S REBUTTAL ARGUMENT                                     728

| | | Offered | Ruled On |
|---|---|---|---|
| 1 | EXHIBITS (cont'd) | | |
| 2 | 109. Affidavit of Clete Webster | 577 | 577 |
| 3 | 110. Affidavit of Patricia Parsons dated 1-24-17 | 577 | 579 |
| 4 | 111. Affidavit of Patricia Parsons dated 2-8-18 | 578 | 579 |
| 5 | 112. Affidavit of Clete Webster dated 8-31-17 | 579 | 580 |
| 6 | 113. Reasons for Judgment dated 3-8-94 | 581 | 582 |
| 7 | 114. Letter dated 3-15-15 | 585 | 585 |
| 8 | 115. Application dated 3-26-18 | 587 | 587 |
| 9 | 116. Submission of Points and Authorities | 592 | 593 |
| 10 | 117. Reasons for Judgment | 595 | 596 |
| 11 | 118. Amended Order | 602 | 602 |
| 12 | 119. Letter dated 1-30-17 | 603 | 603 |
| 13 | 120. Letter of Appointment | 604 | 604 |
| 14 | 121. Notice to the Court | 604 | 605 |